**EXHIBIT A**

**SUM-100**

# SUMMONS
## (CITACIÓN JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Cisco Systems, Inc., a Delaware corporation

and DOES 1 through 20, inclusive
**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Mosaic Systems, Inc., a California corporation

---

   **You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.    A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.   There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.   If you cannot pay the filing fee, ask the court clerk for a fee waiver form.   If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**
   **There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
Santa Clara County
191 North First Street
San Jose, CA  95113

CASE NUMBER:
*(Número del Caso):*
**104** CV016867

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jack Russo (State Bar No. 96068)   (650) 327-9800  (650) 327-3737
Russo & Hale LLP
401 Florence Street
Palo Alto, CA  94301

Kiri Torre
Chief Executive Officer/Clerk

DATE:                                            Clerk, by _____ Jose Rojas , Deputy
*(Fecha)* **MAR 2 9 2004**          *(Secretario)*                                          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)

          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):* _____

Page 1 of 1



(ENDORSED)

2007 MAR 23  P 3: 23

Rose Rojas

1  Jack Russo (State Bar No. 96068)
   Michael Risch (State Bar No. 197600)
2  RUSSO & HALE LLP
   401 Florence Street
3  Palo Alto, CA 94301
   650-327-9800
4
   Attorneys for Plaintiff
5  MOSAIC SYSTEMS, INC.

6

7

8                  IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA

9                          IN AND FOR THE COUNTY OF SANTA CLARA

10

11                                                    **104**    C V 0 1 6 8 6 7
                                               NO. _____

12  MOSAIC SYSTEMS, INC., a                    **COMPLAINT FOR DAMAGES AND**
    California corporation,                    **FOR DECLARATORY RELIEF FOR**
13                                             **BREACH OF WRITTEN AGREEMENT,**
                 Plaintiff,                    **TRADE SECRET MISAPPROPRIATION,**
14                                             **BREACH OF FIDUCIARY DUTY,**
                 v.                            **BREACH OF COVENANT OF GOOD**
15                                             **FAITH AND FAIR DEALING, BREACH**
    CISCO SYSTEMS, INC., a Delaware            **OF ORAL CONTRACT, PROMISSORY**
16  corporation, and DOES 1 through 20,        **ESTOPPEL, QUANTUM MERUIT,**
    inclusive,                                 **CONSTRUCTIVE FRAUD,**
17                                             **NEGLIGENT MISREPRESENTATION,**
                 Defendants.                   **AND UNFAIR COMPETITION**
18
                                               **[JURY TRIAL DEMANDED]**
19
                                               **(CCP § 1060 et seq.)**
20

21

22

23

24

25

26

27

28

                                        1

1    Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Cisco
2  Systems, Inc. (the "Defendant" or "Cisco") as follows:

3                                    **INTRODUCTION**

4    1.    This is an action for breach of written agreement, trade secret misappropriation,
5  breach of fiduciary duty, breach of the covenant of good faith and fair dealing, promissory estoppel,
6  constructive fraud, fraud and unfair competition (the "Action") arising from the continued receipt
7  and use of Plaintiff's trade secrets, proprietary materials, and Plaintiff's chip design documentation
8  (collectively the "Trade Secrets"), acquired by Defendants from Plaintiff under a written Non-
9  Disclosure Agreement. Defendants made multiple false promises in order to obtain the Trade
10  Secrets as well as to otherwise take advantage of the Plaintiff, and then disclosed and used the
11  information notwithstanding a written agreement barring such use.

12    2.    Plaintiff also seeks declaratory relief in this Action because a controversy exists and
13  Plaintiff is entitled to a declaration of its rights and of Defendant's duties under applicable California
14  law.

15                                      **PARTIES**

16    3.    Plaintiff Mosaic is a corporation duly organized and existing under California law and
17  with its principal office based in Los Altos, California, and was formerly based in Sunnyvale,
18  California.

19    4.    Defendant Cisco Systems, Inc. ("Cisco") is a Delaware corporation based in San
20  Jose, California.

21    5.    Defendants Does 1 through 20, inclusive, whether individuals, corporations,
22  associations or otherwise are fictitious names of defendants whose true names and capacities are at
23  this time unknown to Plaintiff. Each of said fictitiously named defendants, whether individuals,
24  corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately
25  thereby as hereinafter alleged. At such time as defendants' true names become known to Plaintiff,
26  Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and
27  capacities.

28

**Complaint for Trade Secret**
**Misappropriation; Breach of Contract, Breach of**
**Fiduciary Duty; and Breach of Contract, etc.**        2

6. Plaintiff is informed and believes and on that basis alleges that Cisco along with Defendant Does 1-20 did agree together and conspire together, with knowledge of their unlawful purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full course and scope of their illegal conspiracy, with the full knowledge and consent, either express or implied, of each of the other Defendants.

## JURISDICTION AND VENUE

7. This Court has general jurisdiction of all claims herein arising under California law. This Court also has jurisdiction of the declaratory relief claims pursuant to Section 1060 of the California Code of Civil Procedure as an actual case and controversy exists between the parties.

8. Venue is proper in this Court because the contractual, statutory and other obligations of Defendant arose and were to be performed in Santa Clara County, California.

## THE WRITTEN NON-DISCLOSURE AGREEMENT

9. Defendant Cisco is known throughout the industry as a Fortune 500 publicly traded corporation that has repeatedly acquired smaller, complementary private businesses in fields where Defendant expects to extend its business interests. In fact, during the period from 1990 through 2000, Cisco acquired over one hundred (100) other companies.

10. Beginning in 2000, Defendant communicated to Plaintiff its interest in developing a high-speed SRAM chip. Plaintiff knew how to make faster SRAM chips than had previously been developed, and Defendant knew this. With encouragement from Cisco's proclaimed interest, and a high-level Cisco executive serving as one of Mosaic's board members, Plaintiff pursued the development of SRAM that Defendant promised to purchase. If Cisco had not promised Plaintiff proprietary protection and remuneration for a high-speed SRAM chip and had Cisco not had a high ranking executive on Plaintiff's board of directors, Plaintiff would have not have pursued the many person-years of design, development, and engineering time with Defendant.

11. Mosaic and Cisco entered into a written Mutual Non-Disclosure Agreement ("NDA") on May 2, 2001. A true and correct copy of the NDA is attached hereto as Exhibit 1. Plaintiff trusted that Cisco would honor its agreements, and not use any confidential information disclosed by Plaintiff without an express agreement allowing such use.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.            3

## MOSAIC'S MULTIPLE DISCLOSURES TO CISCO

12.     In June 2002, Defendant notified Plaintiff that Cisco's architecture had significant technical problems that caused it to fail with standard SRAM specifications.

13.     Between June and July 2002, Defendant and Plaintiff worked together to create the CSRAM specification, ("CSRAM Spec") to solve these technical problems. During this time, Defendant's and Plaintiff's engineers communicated by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems. Many of these e-mails contained Plaintiff's trade secrets and proprietary information. At this point, Plaintiff reasonably relied on Cisco's representations that Plaintiff was developing the CSRAM chip hand-in-hand with Defendant Cisco, that it would abide by the NDA, and that Plaintiff was the only company that Defendant was working with on developing this type of SRAM technology. Defendant never disclosed to Plaintiff that it was evaluating Plaintiff's competitors, that it was using information disclosed under the NDA to develop competitive bids, or that the proprietary information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

14.     While working to develop the CSRAM chip, Plaintiff disclosed a wealth of trade secrets and proprietary information to Defendant, upon Defendant Cisco's request. These trade secrets and proprietary information include, but are not limited to, information about resolving packaging problems, projected costs, power numbers, yield data, and die sizes. Cisco's internal processor design and purchasing teams relied on this information to further develop their specification and to obtain bids from Plaintiff's competitors.

15.     Plaintiff first became aware of and concerned with competitors for Defendant Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Defendant a quote of one hundred dollars ($100) per chip. This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never given Defendant a one hundred dollar ($100) quote for the CSRAM chip.

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                4

1

## THE ACQUISITION OFFER AND DISCLOSURES

2

3

4

5

6

7

16. In September 2002, Defendant informed Plaintiff that Defendant was interested in acquiring the Plaintiff. Defendant began to conduct due diligence, and as part of the due diligence, Defendant asked Plaintiff to provide even further updated and highly detailed proprietary information about the CSRAM design, including, but not limited to, extremely sensitive information such as die size, power numbers, and design techniques. In reliance on Defendant's promises, Plaintiff provided this further information.

8

9

10

11

12

13

14

17. On October 1 and October 2, 2002, as part of Defendant's continued due diligence for its planned acquisition of Plaintiff, Defendant requested the resumés from five of Plaintiff's engineers. On October 2, 2002, Defendant arranged a meeting with the five engineers whose resumés Defendant had requested. During this meeting, Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in addition to the current CSRAM project, and their willingness to work for Cisco as opposed to Mosaic.

15

16

17

18

19

20

21

22

18. After the completion of the October 2, 2002 meeting between Plaintiff and Defendant Cisco, Plaintiff reasonably relied on the representation that it was being acquired by Cisco, and Plaintiff disclosed the requested confidential information to Cisco's processor design team. In fact, on October 16, 2002, Plaintiff provided Cisco with proprietary information that set out what it would take to produce the technology for the CSRAM chip and how the chip could be assembled.

23

## THE EXCLUSIVITY AGREEMENT

24

25

26

27

28

19. Plaintiff later discovered that Defendant was actively soliciting quotes on the CSRAM chip from Plaintiff's competitors. Plaintiff is informed and believes and on that basis alleges that Defendant distributed Plaintiff's proprietary and secret information to Plaintiff's competitors at a December 5, 2002 meeting with Cisco. Mr. Luca Cafiero, Vice President of Storage

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          5

1   Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all of

2   Defendant's business

3   in the CSRAM industry, and he provided Plaintiff with a per-unit quote. By the end of the

4   December 5, 2002 meeting, Plaintiff and Defendant agreed that Plaintiff would receive exclusivity

5   and $5-6 million in funding from Defendant to continue development of the CSRAM technology.

6   The $5-6 million offer was based on an estimate that Plaintiff had previously quoted as the level of

7

8   funding that would be necessary to bring the chip to production if Plaintiff was acquired by

9   Defendant.

10      20.     Plaintiff reasonably relied on Defendant's promise, and Plaintiff continued to dedicate

11  its time and energy toward the development of the CSRAM chip. Based on Cisco's verbal

12
    agreement (communicated by Mr. Cafiero), Plaintiff also continued to provide additional trade
13

14  secrets and proprietary information to Defendant pursuant to Defendant's requests.

15                              **CISCO BREACHES ITS PROMISES**

16      21.     Following the December 5, 2002 meeting, John McCool, Vice President of

17  Engineering for Cisco's Gigabit Systems, told Plaintiff that it would not receive exclusivity despite

18
    Cisco's promises, and that Defendant Cisco did not want to make any non-recurring engineering
19

20  commitment to Plaintiff even though Cisco had promised the same through Mr. Cafiero.

21      22.     Despite Cisco's failure to live up to its multiple promises, Plaintiff cooperated with

22  Mr. McCool in a failed attempt to salvage some business relationship. However, despite Mr.

23
    Cafiero's assurance that Cisco would pay the costs of designing a chip even if they exceeded $5
24

25  million, Mr. McCool insisted that Plaintiff's proposals had to be within the $5-6 million budget.

26  After hours of detailed analysis and planning, Plaintiff entered a proposal that took even these new

27  Cisco "concerns" (communicated by Mr. McCool) into consideration and even these new funding

28  limits.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.        6

23.     Defendant told Plaintiff that the pending project would be transferred to Richard Ellis from Defendant Cisco's Purchasing department. Plaintiff was also told by Cisco that a commercial agreement between Cisco and Mosaic would be completed by January 15, 2003.

24.     Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to Christmas of 2002. At this point, Plaintiff continued to reasonably believe that Cisco would live up to its promises. At the meeting, Mr. Ellis stated that the deal between Plaintiff and Defendant would be completed within two to three days, if it were not for the Christmas holidays. Plaintiff's staff went on vacation expecting to return in early January and conclude its agreement with Cisco; however, Plaintiff later discovered that within a few days of its initial meeting with Mr. Ellis, Cisco had reached an independent agreement with Sony as Cisco's supplier for CSRAM chips. Plaintiff contacted Mr. Ellis early in the first week of January 2003 to inquire about the status. Mr. Ellis told Plaintiff that Cisco was busy working out the details of the deal and that Plaintiff should not be concerned. Mr. Ellis did not disclose to Plaintiff that Cisco had already reached an agreement with Sony over the holiday season.

25.     Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Defendant and Plaintiff would be closed soon, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Based on both Mr. Cafiero's and Mr. Ellis' verbal assurances, Plaintiff also continued to disclose trade secrets and proprietary information to Defendant upon Defendant's requests.

26.     In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior promises, Cisco would not enter into an agreement with Mosaic, and that Cisco would expect that some mergers and acquisitions division from a semiconductor company would be the best way for Plaintiff to receive any money. Mr. Ellis referred Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc. ("Micron"). Mr. Ellis expressed interest in doing business

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                         7

with an American company, and he advocated for Micron and Cypress to work with Plaintiff to submit a business proposal to Defendant.

27.     Plaintiff traveled to Boise, Idaho to try to negotiate an acquisition deal with Micron. The initial meeting with Micron went well enough for the Micron team to fly out to San Jose, California to continue the negotiations. Mr. Ellis attended the meeting in San Jose between Micron and Plaintiff, and tried to convince Micron that acquiring Plaintiff would be a promising business move.

28.     In parallel with Micron discussions, Plaintiff also started discussions with Cypress. Plaintiff attended a three-way meeting with Cypress and Cisco where Mr. Ellis told Cypress that acquiring Plaintiff would be beneficial. Based on these representations, Plaintiff and Cypress submitted a proposal to Cisco soon thereafter, but Mr. Ellis told Cypress that it was too late, Cisco had already chosen all its suppliers.

29.     Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis told Plaintiff that Defendant had reached a second-source supplier deal with Samsung. Plaintiff contacted Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer. Mr. Ellis agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial details from the Samsung proposal. Plaintiff worked with Cypress, and at the end of three days of negotiations, Plaintiff was able to match Samsung's pricing. When Plaintiff contacted Defendant to deliver its proposal, Plaintiff was informed that the decision had been made to deal with Samsung, and Defendant would not entertain Plaintiff's proposal.

## FURTHER USE OF CONFIDENTIAL AND TRADE SECRET INFORMATION

30.     Since the discontinuation of negotiations between Plaintiff and Defendant, Plaintiff has reason to believe that the confidential CSRAM specification that Plaintiff designed has been used in at least one other Cisco project.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          8

31.     Throughout the entire relationship, Plaintiff had never received any indication that Defendant was dissatisfied or otherwise had any concerns regarding Plaintiff's work. Plaintiff's proprietary information and trade secrets were not returned upon failure to reach an agreement.

32.     Defendant has failed to acknowledge and has denied that it has a fiduciary duty or other obligations to Plaintiff, despite having been notified of such by Plaintiff, nor has it in any way attempted to rectify the substantial and irreparable harm that said failure has caused.

33.     Defendant has failed to acknowledge and has denied its express violation of the terms of its written and verbal agreements with Plaintiff, despite having been notified of such by Plaintiff, nor has it in any way attempted to rectify that breach.

34.     Plaintiff is entitled to a declaratory judgment of its rights and Defendant's responsibilities, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

35.     Under Section 1062.3 of the California Code of Civil Procedure, Plaintiff is entitled to have this Action set for trial "at the earliest possible date" in accordance with applicable law and Plaintiff requests that such trial date be set by the Court at the earliest possible time.

## FIRST CAUSE OF ACTION
(Breach of Written Agreement)

36.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 35 above, as if set forth at length here.

37.     On or about May 2, 2001, the parties entered into an NDA, attached hereto as Exhibit 1.

38.     Plaintiff performed all of the legally required terms and conditions of the NDA.

39.     Defendants breached said contract in multiple ways, namely:

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                9

a.  By using the trade secrets, confidential information, and know-how of

Plaintiff in development of technology with third-parties;

b.  By failing to disclose, or even discuss, with Plaintiff the use of said

confidential information, and know-how of Plaintiff in connection with third-

parties;

c.  By using the trade secrets, confidential information, and know-how of

Plaintiff for purposes outside the scope of the evaluation of a potential

business relationship between the parties; and,

d.  By failing to perform other terms and conditions of the NDA.

40.  Defendants' breaches are the proximate cause of damages to Plaintiff, and Plaintiff is

entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
(Declaratory Relief Regarding Ownership of Trade Secrets)

41.  Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

through 40 above, as if set forth at length here.

42.  A dispute has arisen between the parties as to the rights and responsibilities of each

party. Plaintiff is entitled to a declaratory judgment of Defendant's ownership of trade secrets and

other proprietary information, without prejudice to any other remedy, provisional or otherwise,

provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code

of Civil Procedure.

//

//

//

//

**Complaint for Trade Secret**
**Misappropriation; Breach of Contract, Breach of**
**Fiduciary Duty; and Breach of Contract, etc.**          10

### THIRD CAUSE OF ACTION
(Trade Secret Misappropriation)

43.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 42 above, as if set forth at length here.

44.     Defendant requested that Plaintiff share its trade secrets and proprietary information with Defendant. Defendant then used this information to create chip specifications that it distributed to other departments within Cisco and to Plaintiff's competitors.

45.     Defendant continued to falsely promise acquisition, non-recurring engineering agreements, and commercial agreements to Plaintiff in order to lure Plaintiff to continue to provide trade secrets, confidential information, and general know-how to Defendant.

46.     On information and belief, Defendant chose to work with Plaintiff based on Plaintiff's industry expertise. Defendant frequently praised Plaintiff for its expertise and acknowledged the substantial skill, experience, and head-start Plaintiff had compared to the rest of the industry.

47.     Defendant continues to work in the field of SRAM chips with Sony and Samsung and continues to use the trade secrets, confidential information, and know-how of Plaintiff.

48.     Plaintiff disclosed valuable trade secrets, confidential information, know-how, and other head-starts and negative information to Defendant. This information and advantage provided Defendant with a substantial edge in the development of SRAM technology and greatly expedited Defendant's progress in the industry. This head-start was gained through the wrongful conduct and misleading statements of Defendant to provide Plaintiff with additional investments, a non-recurring engineering agreement, a commercial agreement, and a possible acquisition. These misleading indications were maintained until Defendant reached a second-source supplier agreement with Plaintiff's direct competitor.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          11

49. Plaintiff provided trade secrets and proprietary information including detailed information and instructions to complete the development of the CSRAM chip and to change its system architecture, given that Defendant purposefully and with intent promised Plaintiff that Defendant would acquire and/or make investments in Plaintiff. These trade secrets and proprietary information, to which Defendant has no rights, were used by Defendant in the development of its CSRAM and system architecture specification. This and any other use by Defendant of illicitly acquired proprietary information has been without the expressed consent of Plaintiff.

50. Defendant's actions were the direct and proximate cause of damages to Plaintiff.

51. Plaintiff is entitled to damages for trade secret misappropriation, in an amount to be determined at trial.

52. Plaintiff is entitled to preliminary and permanent injunctive relief from the continued use and disclosure of its trade secrets.

## FOURTH CAUSE OF ACTION
(Declaratory Relief Regarding Fiduciary Duty)

53. Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 52 above, as if set forth at length here.

54. A dispute has arisen between the parties as to the rights and responsibilities of each party. Plaintiff is entitled to a declaratory judgment of Defendant's former and continued fiduciary duty to Plaintiff, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

//

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.            12

## FIFTH CAUSE OF ACTION
(Breach of Fiduciary Duty)

55.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 54 above, as if set forth at length here.

56.     By virtue of its special relationship of trust with Plaintiff, including an officer on Plaintiff's board, Defendant had a fiduciary duty to preserve, improve, and protect the long-term viability of Plaintiff, a duty upon which Plaintiff justifiably relied.

57.     Defendant knew or should have known that Plaintiff reasonably relied upon the assurances that a non-recurring engineering agreement, commercial agreement, investment, or acquisition would be forthcoming; Defendant knew or should have known this reliance by Plaintiff would cause great damage to Plaintiff's business if Defendant failed to reach an agreement with Plaintiff.

58.     The substantial expenditures made by Plaintiff based on Defendant's misrepresentations and breach of duty have cost Plaintiff irreparable harm and that expenditure is the proximate cause of damages to Plaintiff.

59.     Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

60.     Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
(Breach of Covenant of Good Faith and Fair Dealing)

61.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 60 above, as if set forth at length here.

62.     Given the relationship between Defendant and Plaintiff, Defendant had an implied obligation and duty, under California law, to act in good faith and deal fairly with Plaintiff.

**Complaint for Trade Secret Misappropriation; Breach of Contract, Breach of Fiduciary Duty; and Breach of Contract, etc.**          13

1   63.   By its dishonesty and negligent behavior alleged herein, Defendant has breached this

2   implied covenant of good faith and fair dealing.

3   64.   In committing the above actions, including but not limited to failing to disclose

4   competitive bidding with third-parties; distribution of Plaintiff's trade secrets, confidential

5   information, and know-how to third-parties; making multiple promises and false promises; and

6
7   otherwise failing to act fairly, Defendant has acted in bad faith and in a manner designed to cause

8   Plaintiff to rely to its detriment. These actions breached the covenant of good faith and fair dealing.

9   65.   As a direct and proximate result of Defendant's misconduct, Plaintiff has been

10  damaged in an amount to be determined at trial.

11
12
**SEVENTH CAUSE OF ACTION**
(Breach of Oral Contract)

13  66.   Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

14  through 65 above, as if set forth at length here.

15
16  67.   In or about June 2002 and thereafter, the parties entered into a series of oral

17  agreements.  The material terms were as follows:

18       a.   Plaintiff was to assist Cisco in designing a specification for the CSRAM chip.

19            Plaintiff was then to assist with designing and engineering the actual chip

20            according to Cisco's customized needs and requests.

21
22       b.   Defendant Cisco was to provide financial remuneration to Plaintiff.  This

23            would be achieved in one of several ways, such as acquisition by Cisco, a non-

24            recurring engineering fee paid by Cisco, and/or a commercial agreement

25            reached between Plaintiff and Cisco.

26  68.   On or about December 5, 2002, the parties entered into an additional oral agreement.

27  The material terms were as follows:

28

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.        14

1
2
a.    Plaintiff was to engineer a CSRAM chip that met all of the requirements set

forth in the CSRAM specification.

3
4
5
6
7
b.    In return for designing and engineering this chip, Cisco would pay Plaintiff a

negotiable sum of money originally set at \$5-6 million to complete the

development of the CSRAM chip, a royalty for every chip created, and

exclusivity for all of Cisco's business in the CSRAM field.

8       69.    Plaintiff performed on all of its obligations under both oral agreements.

9       70.    Cisco breached its agreements by not providing any financial remuneration, non-

10   recurring engineering agreements, and/or commercial agreements to Mosaic as promised.

11
12
71.    Defendant's breach of contract is the proximate cause of damage to Plaintiff.

13   Plaintiff is entitled to damages for breach of contract in an amount to be determined at trial.

14
## EIGHTH CAUSE OF ACTION
(Promissory Estoppel)

15
16
72.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

17   through 65 above, as if set forth at length here.

18       73.    Between June 2002 and January 2003, Defendant made numerous assurances,

19   indications, and pledges to Plaintiff, namely that: Defendant Cisco was to provide financial

20
21
remuneration to Plaintiff for continued development of the CSRAM chip. This would be achieved in

22   one of several ways, such as purchases by Cisco in the form of commercial agreements, non-

23   recurring engineering agreements with Cisco, investment by Cisco, or acquisition by Cisco.

24       74.    Plaintiff reasonably relied on these promises, and as a result expended a great deal of

25   time and monetary funds on Defendant's behalf. Such time and money included advising Cisco in

26
27
the design of the CSRAM specification, advising Cisco in the architecture and engineering of the

28

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          15

1  CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's inquiries

2  regarding the specific proprietary design details needed to bring the chip to production.

3  75.    Plaintiff's reasonable reliance on said promises was to its detriment, and it would be

4  unjust to allow Defendant to avoid the obligations of its promises after Plaintiff so relied.

5  76.    Plaintiff has been damaged by its reliance, and is entitled to compensatory damages in

6
7  an amount to be determined at trial.

8  ## NINTH CAUSE OF ACTION
   *(Quantum Meruit)*

9
10  77.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

11  through 65 above, as if set forth at length here.

12  78.    From July 2002 through January 2003, Mosaic provided services at the express

13  request of Cisco. These services included advising Cisco in the design of the CSRAM specification,

14
15  advising Cisco in the architecture and engineering of the CSRAM chip, developing and engineering

16  the CSRAM chip, and responding to Cisco's inquiries regarding the specific proprietary design

17  details needed to bring the chip to production.

18  79.    Cisco did not pay for those services, and it would be inequitable and unjust for such

19  services to be provided without any payment.

20  80.    The reasonable value of such services is a sum to be proven at trial.

21
22  ## TENTH CAUSE OF ACTION
   (Negligent Misrepresentation)

23
24  81.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

25  through 65 above, as if set forth at length here.

26  82.    Defendant made several representations to Plaintiff that Defendant Cisco was to

27  provide financial remuneration to Plaintiff. This would be achieved in one of several ways, such as

28  purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements

**Complaint for Trade Secret**
**Misappropriation; Breach of Contract, Breach of**
**Fiduciary Duty; and Breach of Contract, etc.**                16

between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco. For example, Luca Cafiero told officers of Mosaic on December 5, 2002 that Cisco would provide Mosaic with upwards of $5-6 million to complete the development of the CSRAM chip, and that Mosaic would receive exclusivity for the chip business at Cisco. Prior to Christmas 2002, Richard Ellis expressly told officers of Mosaic that "if it wasn't for Christmas break, Mosaic and Cisco would reach an agreement within a few days" or words to that effect.

83. Said representations were in fact false. Cisco did not provide financial remuneration to Plaintiff.

84. At the time said statements were made, Defendant knew or had reason to know that they were false. These statements were negligently false, for at the time said promises were made, Defendant did not intend to perform on such promises.

85. Defendant negligently intended that Plaintiff rely on its statements and promises, and Plaintiff did reasonably rely on such statements and promises to its detriment.

86. Defendant's negligent misrepresentations have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover damages in an amount to be determined at trial.

87. Defendant's negligent actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

88. Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also constitute constructive fraud.

//

//

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          17

## ELEVENTH CAUSE OF ACTION
(Constructive Fraud)

89.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

90.     By virtue of its special relationship of trust with Plaintiff, Defendant had a fiduciary duty to preserve, improve, and protect the long-term viability of Plaintiff, a duty upon which Plaintiff justifiably relied.

91.     Defendant made several representations to Plaintiff that Defendant Cisco was to provide financial remuneration to Plaintiff. This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco. For example, Luca Cafiero told officers of Mosaic in December 5, 2002 that Cisco would provide Plaintiff Mosaic with upwards of $5-6 million to complete the development of the CSRAM chip, and that Mosaic would receive exclusivity for the chip. Also, before Christmas 2002, Richard Ellis expressly told officers of Mosaic that "if it wasn't for Christmas break, Mosaic and Cisco would reach an agreement within a few days" or words to that effect.

92.     Said representations were in fact false. Cisco did not provide financial remuneration to Plaintiff.

93.     Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals from companies that would compete with Cisco. Defendant further failed to disclose that it had not made any plans to provide financial remuneration to Plaintiff.

94.     Plaintiff reasonably relied on the false representations by Defendant by advising Cisco in the design of the CSRAM specification, advising Cisco in the architecture and engineering

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          18

of the CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's

inquiries regarding the specific proprietary design details needed to bring the chip to production.

95. By virtue of the fiduciary relationship between the parties, said misrepresentations and failures to disclose constitute constructive fraud on Plaintiff by Defendant.

96. Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover such damages in an amount to be determined at trial.

97. Defendant's actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
(Statutory Unfair Competition)

98. Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

99. Defendant's acts described above, including but not limited to its continued receipt and use of trade secrets, its breach of fiduciary duties, its continued use and distribution of Plaintiff's work product as if it were its own, and its unfulfilled false promises, were designed to and constitute unfair competition by Defendant in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

100. Defendant's unfair and unlawful actions have caused extensive damage to Plaintiff. By its actions, Defendant has effectively kept Plaintiff from competing in the marketplace.

101. As a direct and proximate cause of Defendant's unfair practices, Defendant has been unjustly enriched and Plaintiff has provided value to Defendant, which must be repaid in restitution in an amount to be proven at trial.

102. Plaintiff has also suffered irreparable harm as a result of Defendant's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendant, and

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.        19

1   any of its officers, agents and employees, and all persons acting in concert with them, are enjoined

2   from engaging in any further such acts of unfair competition.

3                                   **PRAYER FOR RELIEF**

4           WHEREFORE, Plaintiff prays for a judgment against Defendant, jointly and severally,

5   as follows:

6
7       A.      On the First Cause of Action, for damages in an amount to be determined at trial;

8       B.      On the Second Cause of Action, for a declaration that Defendant owns Plaintiff's

9               trade secrets and other proprietary information;

10      C.      On the Third Cause of Action, for damages in an amount to be determined at trial;

11      D.      On the Second and Third Causes of action, for an injunction against the further use or
12
                disclosure of Plaintiff Mosaic's trade secrets, and an Order that Defendant return all
13
14              of Plaintiff's trade secrets;

15      E.      On the Fourth Cause of Action, for a declaration that Defendant has owed and owes
16
                a fiduciary duty to Plaintiff;
17
        F.      On the Fifth Cause of Action, for damages in an amount to be determined at trial;
18
19      G.      On the Sixth Cause of Action, for damages in an amount to be determined at trial;

20      H.      On the Seventh Cause of Action, for damages in an amount to be determined at trial;

21      I.      On the Eighth Cause of Action, for damages in an amount to be determined at trial;

22      J.      On the Ninth Cause of Action, for damages in an amount to be determined at trial;
23
        K.      On the Tenth Cause of Action, for damages in an amount to be determined at trial;
24
25      L.      On the Tenth Cause of Action, for punitive damages in an amount to be determined at

26              trial;

27      M.      On the Eleventh Cause of Action, for damages in an amount to be determined at trial;

28

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          20

N.  On the Eleventh Cause of Action, for punitive damages in an amount to be determined at trial;

O.  On the Twelfth Cause of Action, for restitution in an amount to be determined at trial;

P.  On the Twelfth Cause of Action, for an injunction against further unfair trade practices;

Q.  For an injunction barring the use of Trade Secrets and other confidential information of Plaintiff;

R.  For reasonable attorney's fees, as authorized by law; and,

S.  For such other and further relief as the Court deems just and proper.

Dated: March 29, 2004

Respectfully submitted,
RUSSO & HALE LLP

By: _Jack Russo_
Jack Russo
Michael Risch

Attorneys for Plaintiff
MOSAIC SYSTEMS, INC.

**Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.**                21

Mutual Non Disclosure Agreement                                          Page 1 of 3

☒

# EXHIBIT 1

## CISCO SYSTEMS, INC. MUTUAL NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement ("Agreement") is entered into on the day of     /2001 ("Effective Date") between Cisco Systems, Inc. a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134-1706 (and its direct and indirect w holly owned subsidiaries), ("Cisco") and Mosaic Systems, Inc, a California corporation having its principal place of business at 1133 Auburn Street, Fremont, CA, USA, 94538.

In consideration of the mutual promises and covenants contained in this Agreement and the disclosure of confidential information to each other, the parties to this Agreement agree as follows:

**1. DEFINITION.** "Confidential Information" means the terms and conditions of this Agreement, the existence of the discussions between the parties, the information described in Section 2 below, and any other information concerning the Purpose defined below, including but not limited to, information regarding each party's product plans, product designs, product costs, product prices, finances, marketing plans, business opportunities, personnel, research and development activities, know-how and pre-release products; provided that information disclosed by the disclosing party ("Disclosing Party") in written or other tangible form will be considered Confidential Information by the receiving party ("Receiving Party") only if such information is conspicuously designated as "Confidential," "Proprietary" or a similar legend. Information disclosed orally shall only be considered Confidential Information if: (i) identified as confidential, proprietary or the like at the time of disclosure, and (ii) confirmed in writing within thirty (30) days of disclosure. Confidential Information disclosed to the Receiving Party by any affiliate or agent of the Disclosing Party is subject to this Agreement.

**2. DESCRIPTION.** The Confidential Information to be disclosed under this Agreement is described as follows:

Cisco:                     Requirements for high-speed SRAMs

Mosaic Systems, Inc:       Product specifications, business plans, and product roadmap for high-speed SRAMs

**3. PURPOSE.** The Receiving Party may use the Confidential Information solely for the purpose of ("Purpose"):

Cisco:                     For evaluating potential business relationship

Mosaic Systems, Inc:       For evaluating potential business relationship

**4. DISCLOSURE.** The Receiving Party shall not disclose the Confidential Information to any third party other than employees and contractors of the Receiving Party who have a need to have access to and knowledge of the Confidential Information solely for the Purpose authorized above. The Receiving Party

Mutual Non Disclosure Agreement                                    Page 2 of 3

shall have entered into non-disclosure agreements with such employees and contractors having obligations of confidentiality as strict as those herein prior to disclosure to such employees and contractors to assure against unauthorized use or disclosure.

**5. EXCEPTIONS TO CONFIDENTIAL INFORMATION.** The Receiving Party shall have no obligation with respect to information which (i) was rightfully in possession of or known to the Receiving Party without any obligation of confidentiality prior to receiving it from the Disclosing Party; (ii) is, or subsequently becomes, legally and publicly available without breach of this Agreement; (iii) is rightfully obtained by the Receiving Party from a source other than the Disclosing Party without any obligation of confidentiality; (iv) is developed by or for the Receiving Party without use of the Confidential Information and such independent development can be shown by documentary evidence; and (v) is transmitted by a party after receiving written notification from the other party that it does not desire to receive any further Confidential Information. Further, the Receiving Party may disclose Confidential Information pursuant to a valid order issued by a court or government agency, provided that the Receiving Party provides the Disclosing Party: (a) prior written notice of such obligation; and (b) the opportunity to oppose such disclosure or obtain a protective order.

**6. RETURN OR DESTRUCTION OF CONFIDENTIAL INFORMATION.** Upon written request by the Disclosing Party, the Receiving Party shall: (i) cease using the Confidential Information, (ii) return the Confidential Information and all copies, notes or extracts thereof to the Disclosing Party within seven (7) business days of receipt of request; and (iii) upon request of the Disclosing Party, confirm in writing that the Receiving Party has complied with the obligations set forth in this paragraph.

**7. INDEPENDENT DEVELOPMENT** The Disclosing Party acknowledges that the Receiving Party may currently or in the future be developing information internally, or receiving information from other parties, that is similar to the Confidential Information. Nothing in this Agreement will prohibit the Receiving Party from developing or having developed for it products, concepts, systems or techniques that are similar to or compete with the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information provided that the Receiving Party does not violate any of its obligations under this Agreement in connection with such development. Neither party shall have any obligation to limit or restrict the assignment of its employees or consultants as a result of their having had access to Confidential Information. Further, subject to any copyrights, mask work rights or patent rights, the parties agree that as a result of exposure to Confidential Information of the Disclosing Party, employees of the Receiving Party may gain or enhance general knowledge, skills and experience (including ideas, concepts, know-how and techniques) related to Receiving Party's business ("General Knowledge"). The subsequent use by these employees of such General Knowledge as retained in their unaided memories, without reference to Confidential Information in written, electronic or other fixed form, shall not constitute a breach of this Agreement. Neither party shall have any obligation to limit or restrict the assignment of persons or to pay royalties for any work resulting from the use of such General Knowledge.

**8. NO LICENSES.** Each party shall retain all right, title and interest to such party's Confidential Information. No license under any trademark, patent or copyright, or application for same which are now or thereafter may be obtained by such party is either granted or implied by the disclosure of Confidential Information.

**9. DISCLAIMER.** CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITH ALL FAULTS. IN NO EVENT SHALL THE DISCLOSING PARTY BE LIABLE FOR THE ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION.

None of the Confidential Information disclosed by the parties constitutes any representation, warranty, assurance, guarantee or inducement by either party to the other with respect to the infringement of trademarks, patents, copyrights, any right of privacy, or any rights of third persons.

**10. EXPORT.** The parties acknowledge that the Confidential Information disclosed by each of them under this Agreement may be subject to export controls under the laws of the United States. Each party shall comply with such laws and agrees not to knowingly export, re-export or transfer Confidential Information of the other party without first obtaining all required United States authorizations or licenses.

**11. TERM.** This Agreement shall continue from the "Effective Date" written above until terminated by either party by giving thirty (30) days written notice to the other party of its intent to terminate this Agreement. Notwithstanding such termination, the obligations of the Receiving Party concerning confidentiality shall terminate five (5) years following receipt of the Confidential Information.

**12. GENERAL.** Each party acknowledges that monetary remedies may be inadequate to protect Confidential Information and that injunctive relief may be appropriate to protect such Confidential Information.

The Receiving Party shall not reverse-engineer, decompile, or disassemble any software disclosed to it under this Agreement and shall not remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from any originals or copies of Confidential Information it obtains from the Disclosing Party.

The parties hereto are independent contractors. Neither this Agreement nor any right granted hereunder shall be assignable or otherwise transferable.

If any term of this Agreement shall be held to be illegal or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect.

This Agreement may only be modified in writing and must be signed by both parties.

This Agreement shall be construed in accordance with the laws of the State of California.

This Agreement represents the entire agreement of the parties hereto pertaining to the subject matter of this Agreement, and supersedes any and all prior oral discussions and/or written correspondence or agreements between the parties with respect thereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date last written below.

CISCO SYSTEMS, INC.                          Mosaic Systems, Inc

By: _____                  By: _____

Name: Andy Bechtolsheim                       Name: Alex Alexanian

Title: VP/GM                                  Title: President and CEO

Date: 5/2/01                                  Date: 05/02/2001

**EXHIBIT B**

Jack Russo (State Bar No. 96068)
Michael Risch (State Bar No. 197600)
RUSSO & HALE LLP
401 Florence Street
Palo Alto, CA 94301
jrusso@computerlaw.com
mrisch@computerlaw.com
650-327-9800

Attorneys for Plaintiff
MOSAIC SYSTEMS, INC.

C3 OCT 13   AM 8:00

CLERK

D. Kontorovsky

IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

NO. 106CV 072920

MOSAIC SYSTEMS, INC., a
California corporation,

Plaintiff,

v.

ANDREAS BECHTOLSHEIM, an
individual, and DOES 1-20,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT FOR DAMAGES BASED
UPON BREACH OF FIDUCIARY DUTY,
NEGLIGENT MISREPRESENTATION,
CONSTRUCTIVE FRAUD,
CONCEALMENT, AND UNFAIR
COMPETITION**

**[JURY TRIAL DEMANDED]**

Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Andreas Bechtolsheim ("Defendant" or "Bechtolsheim" or "Defendant Bechtolsheim") as follows:

## INTRODUCTION

1.     This is an action for breach of fiduciary duty, negligent misrepresentation, constructive fraud, and unfair competition (the "Action") stemming from Defendant's multiple and continued misrepresentations, negligent misrepresentations, empty promises, false assurances, and negligent and bad faith directives made to Plaintiff, the reliance on which caused Plaintiff to divulge, and to continue to divulge, its valuable trade secrets, proprietary materials, chip design documentation, and other confidential information (collectively the "Trade Secrets and Other Information") to Defendant's employer, Cisco Systems, Inc ("Cisco"). Defendant's statements and actions also caused Plaintiff to waste thousands of person-hours working hand-in-hand with Cisco to design and test a Static Random Access Memory ("SRAM") semiconductor chip for which Plaintiff ultimately received no remuneration. Defendant, as both a member of Plaintiff Mosaic's Board of Directors and as the Vice President and General Manager of the very Cisco business unit with which Mosaic sought to do business, exerted a unique influence and control over Plaintiff with respect to its interaction with Cisco. Defendant Bechtolsheim's negligent and bad faith directives, misrepresentations, negligent misrepresentations, empty promises, false assurances, and other misleading statements caused Plaintiff to disclose its Trade Secrets and Other Information to Cisco, and caused Plaintiff to invest its time and engineering expertise in Cisco to the exclusion of other business partners and opportunities. Plaintiff seeks damages in amount to be determined at trial.

## PARTIES

2.     Plaintiff Mosaic is a corporation duly organized and existing under California law with its principal office based in Los Altos, California, and was formerly based in Sunnyvale, California.

3.     Defendant Bechtolsheim is an individual residing in Portola Valley, California.

4.     Defendants Does 1 through 20, inclusive, whether individuals, corporations, associations or otherwise are fictitious names of defendants whose true names and capacities are at this time unknown to Plaintiff. Each of said fictitiously named defendants, whether individuals,

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                     2

corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately thereby as hereinafter alleged. At such time as defendants' true names become known to Plaintiff, Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and capacities.

5. Plaintiff is informed and believes and on that basis alleges that Cisco along with Defendant Does 1-20 did agree together and conspire together, with knowledge of their unlawful purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full course and scope of their illegal conspiracy, with the full knowledge and consent, either express or implied, of each of the other Defendants.

## JURISDICTION AND VENUE

6. This Court has general jurisdiction of all claims herein arising under California law.

7. Venue is proper in this Court because the fiduciary and other obligations of Defendant arose and were to be performed in Santa Clara County, California.

## BACKGROUND FACTS

8. Defendant Bechtolsheim is the former Vice President and General Manager of the Gigabit Systems Business Unit at Cisco. Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim's responsibilities in Cisco's Gigabit Systems Business Unit included but were not limited to developing network switching technologies such as the Catalyst 4000 Gigabit Switch family.

9. Mosaic is a fabless semiconductor company specializing in the design, development and engineering of high performance SRAM for the networking and communications marketplace.

10. Beginning in mid-2000, Defendant Bechtolsheim communicated to Mosaic that Cisco was interested in developing a high-speed SRAM chip, and that Cisco was interested in working with Mosaic to do so. At the time, Mosaic knew how to make faster high performance SRAM chips

than had previously been developed. Where most SRAM suppliers were only able to project the ability to supply parts in the 300 - 400 MHz range for high performance SRAM, Mosaic was forecasting the ability to achieve 750 - 1000 MHz.

11. Defendant Bechtolsheim encouraged Mosaic to work with Cisco on the development of a custom SRAM chip, and assured Mosaic that no other competitor could match the speed and capabilities of the SRAM design offered by Mosaic. On this basis, Mosaic entered into serious business discussions with Cisco regarding working together to design and develop a high-speed SRAM chip which Cisco would purchase from Mosaic.

12. On July 28, 2000, Mosaic closed Series A funding. Mosaic was able to raise over $2.5 million, based largely on the strong indications from both Defendant Bechtolsheim and Cisco that Mosaic was going to be a chief supplier of Cisco's SRAM needs. In fact, Defendant Bechtolsheim himself was an investor in Mosaic. Defendant Bechtolsheim also joined Mosaic's Board of Directors at this time, assuming an active director's role over the company, and entering into a fiduciary relationship with Mosaic.

13. After receiving Series A funding, Mosaic endeavored to hire a team of engineers who could make the discussed SRAM a reality for Cisco. In January of 2001, engineering candidate Rich Roy met with then Mosaic CEO Suren Alexanian and Mr. Bectholsheim to discuss Cisco's need for high-speed SRAM chips and the role Mosaic could play to meet that need. Defendant Bechtolsheim convinced Mr. Roy that Cisco was serious about working with Mosaic to design SRAM chips, and Mr. Roy joined Mosaic as Vice President of Engineering at this time.

**BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN DDR3 SRAM FOR CISCO**

14. In 2001, IBM advertised that it could achieve 750 MHz high performance SRAM at a very high price per unit, and provided Cisco with an SRAM specification called "DDR3." In March 2001, at another meeting with Mr. Alexanian and Mr. Roy, Defendant Bechtolsheim

delivered the IBM specification to Mosaic and instructed Mosaic to try to design a chip that fit IBM's specification. Defendant Bechtolsheim told Mosaic that Cisco would be the primary customer for the designed chip, and that Cisco wanted Mosaic to serve as the second source to IBM on the project.

15.     Defendant Bechtolsheim's assurances and his status as both a director of Mosaic and as Vice President and General Manager of the very business unit at Cisco which sought SRAM, convinced Mosaic to begin work on the DDR3 test chip for Cisco with the understanding that Mosaic would be a supplier of the chip. Defendant Bechtolsheim assured Mosaic that its technology was far ahead of the competition and that Mosaic was going to be a source of SRAM for Cisco. If Defendant Bechtolsheim had not made such assurances, Mosaic would not have invested its time and resources in the DDR3 project.

16.     When Mosaic started working on DDR3, Mosaic initially tried to mold it to fit both Sun Microsystems' ("Sun") and Cisco's needs. However, Defendant Bechtolsheim convinced Mosaic that Cisco's interests in pursuing networking, and its specific priorities with respect to the chip specifications were significantly different than those of Sun. Mosaic made the decision to optimize for Cisco's needs because Defendant Bechtolsheim convinced Mosaic that Cisco's demand and potential pricing for the SRAM product was such that all Mosaic had to do to was deliver the chip, and Cisco would purchase the chips from Mosaic.

17.     To protect its Trade Secrets and Other Information, Mosaic requested that Cisco enter into a written Mutual Non-Disclosure Agreement ("NDA"). Such an agreement was entered into on or about May 2, 2001. Defendant Bechtolsheim signed the NDA on behalf of Cisco. The NDA stipulated that Mosaic's Confidential Information could be used only for the purposes of evaluating a potential business relationship. Plaintiff trusted Defendant Bechtolsheim and Cisco that Cisco would honor its agreements, and not use any Trade Secrets and Other Information disclosed by

Plaintiff without an express agreement allowing such use.

18.     Mosaic began work on the DDR3 design and, under the NDA, disclosed to Cisco the architecture and technology details describing how the DDR3 could meet Cisco's power, performance, and die size needs - all of which are important for pricing. Even with the NDA, Mosaic would not have disclosed its Trade Secrets and Other Information to Cisco regarding the DDR3 design had it not been for Defendant Bechtolsheim's direction that Mosaic do so. An initial test chip was taped out during May 2001, and in October, Mosaic was able to confirm for Cisco the capability of meeting an 800 MHz address rate in standard TSMC 0.18 micron process technology. Mosaic would not have done this work for Cisco had it not been for Defendant Bechtolsheim's assurances to Mosaic that it would be a supplier of Cisco SRAM.

19.     The success of the test chip and strong indications from both Defendant Bechtolsheim and Cisco that Mosaic would be a source of SRAM for Cisco enabled Mosaic to close a Series B round of funding in the end of 2001 and early 2002. Mosaic was able to raise over $4 million, and once again Defendant Bechtolsheim was an investor.

20.     Mosaic continued to work on the DDR3 with the understanding that it would be a supplier of SRAM for Cisco. After committing millions of dollars of Mosaic investment money and person hours to develop the DDR3 chip for Cisco, Mosaic was ready to do a "tape out" of the DDR3 chip to silicon in the summer of 2002. This would have cost the company a very major expense (over one million dollars) and would have put the company in a very unstable financial situation in the absence of any formal commercial agreement. Despite Cisco's failure to formally commit to the supplier agreement promised by Defendant, Defendant Bechtolsheim encouraged Mosaic to tape out.

21.     However, in May 2002, Mosaic learned that Cisco was having problems with the DDR3 architecture and its new processor, which problems Defendant Bechtolsheim had not disclosed when he directed Mosaic to "tape out." IBM claimed that its design could not achieve the required 750 Mhz operation. With the performance of IBM less certain, Cisco had growing concerns

over the DDR3 SRAM design.

22. On June 6, 2002, Defendant Bechtolsheim, Rich Roy, Tony Moroyan (the new CEO of Mosaic), Dipankar Bhattacharya (Cisco manager), and Jim Weaver (Cisco engineer) met to discuss the technical problems that had arisen with DDR3. At this meeting, Mosaic presented results from simulations showing the 750 Mhz SRAM was viable and within budget. Impressed with these results, Cisco proposed the idea of scrapping IBM's DDR3 specification and working directly with Mosaic to create a new, custom SRAM.

**BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN CSRAM FOR CISCO**

23. Between June and July 2002, Mosaic and Cisco worked together to create the CSRAM specification ("CSRAM Spec") in order to solve the technical problems of DDR3. During this time, Mosaic and Cisco engineers (including Defendant) communicated in person and by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems. Many of these e-mails contained Plaintiff's Trade Secrets and Other Information.

24. Because of Defendant's representations, Plaintiff reasonably relied that Cisco would abide by the NDA, and that Plaintiff was the only company that Cisco was working with on developing this type of SRAM technology. Defendant never disclosed to Plaintiff that Cisco was evaluating Plaintiff's competitors, that Cisco was using Trade Secrets and Other Information disclosed under the NDA to develop competitive bids, or that the Trade Secrets and Other Information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

25. Defendant had knowledge that Cisco was using and disclosing Plaintiff's Trade Secrets and Other Information in breach of the NDA. Defendant Bechtolsheim did not inform Plaintiff of this fact, and moreover, continued to direct Mosaic to work with Cisco in the development of the CSRAM chip, and continued to direct Mosaic to disclose its Trade Secrets and Other Information to Cisco.

26.     Plaintiff first became aware of and concerned with competitors for Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Cisco a quote of one hundred dollars ($100) per chip. This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never, in fact, provided Cisco a one hundred dollar ($100) quote for the CSRAM chip. Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim misrepresented the Micron "quote" in order to drive the cost of the CSRAM chip lower.

## THE ACQUISITION OFFER AND DISCLOSURES

27.     In September 2002, Defendant Bechtolsheim represented that he had instructed his unit at Cisco to either acquire Plaintiff or otherwise provide economic remuneration. Defendant did not disclose that Cisco was disregarding instructions from Defendant. In fact, Defendant Bechtolsheim purposely created the false impression that he could direct Cisco to acquire Plaintiff, or to otherwise ensure that Mosaic would be provided adequate compensation for Mosaic's work on SRAM to date. Cisco informed Plaintiff that Cisco was interested in acquiring Plaintiff, which directly followed Defendant Bechtolsheim's representation. Cisco began to conduct due diligence, and as part of the due diligence, Cisco asked Plaintiff to provide even further updated and highly detailed Trade Secrets and Other Information about the CSRAM design, including, but not limited to, extremely sensitive Trade Secrets and Other Information such as die size, power numbers, costs, and design techniques. In reliance on Defendant's promises and assurances, Plaintiff provided these further Trade Secrets and Other Information.

28.     On October 1 and October 2, 2002, as part of Cisco's continued due diligence for its planned acquisition of Plaintiff, Cisco requested the resumés from five of Plaintiff's engineers. On October 2, 2002, Cisco arranged a meeting with the five of Plaintiff's engineers whose resumés Cisco had requested. During this meeting, Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in addition to the current CSRAM

Complaint for Breach of Fiduciary Duty, Negligent Misrepresentation, etc.                    8

project, and their willingness to transition their work from Mosaic to Cisco.

29.    After the completion of the October 2, 2002 meeting between Plaintiff and Cisco, Plaintiff reasonably relied on Cisco and Defendant's representation that it was being acquired by Cisco, and Plaintiff disclosed the requested additional Trade Secrets and Other Information to Cisco's processor design team. In fact, in October 2002, Plaintiff provided Cisco with Trade Secrets and Other Information that set out what it would take to produce the CSRAM chip and how the chip would be assembled.

## THE EXCLUSIVITY AGREEMENT

30.    At a December 5, 2002 meeting with Cisco, Mr. Luca Cafiero, Vice President of Storage Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all of Cisco's CSRAM sales. By the end of the December 5, 2002 meeting, Plaintiff and Cisco agreed that Plaintiff would receive exclusivity, royalty payment, and actual costs for engineering and development from Cisco for the CSRAM technology. Plaintiff later discovered that Cisco was actively soliciting quotes on the CSRAM chip from Plaintiff's competitors, and that Defendant knew the details of this but never disclosed it to Plaintiff. Plaintiff is informed and believes and on that basis alleges that Cisco distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's competitors, and that Defendant knew this fact but did not disclose it to Plaintiff. Plaintiff is informed and believes and on that basis alleges that Defendant himself distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's competitors.

31.    During this December 5, 2002 meeting, Mosaic and Cisco discussed Cisco's decision not to acquire Mosaic but instead decided: (1) to grant exclusivity to Mosaic for all supply of CSRAM to Cisco; (2) to pay fifty percent (50%) royalty of the material cost of the final packaged product and tested CSRAM; and (3) to pay actual non-recurring engineering costs of at least five to six (5-6) million dollars (but not to exceed fifty (50) million dollars) to Mosaic, representing the

costs of the chip engineering and development.

32.     The $5-6 million non-recurring engineering fee was based on an estimate that Plaintiff had previously quoted as the level of funding that would be necessary to bring the chip to production if Plaintiff was acquired by Cisco. Mr. Cafiero agreed to this budget as long as the costs did not exceed fifty (50) million dollars.

33.     Plaintiff reasonably relied on Cisco's promise, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Defendant never disclosed to Plaintiff that Cisco would not perform on its promise.   Based on Cisco's verbal agreement (communicated by Mr. Cafiero), Plaintiff also continued to provide additional Trade Secrets and Other Information to Cisco pursuant to Cisco's requests.

## CISCO BREACHES THE EXCLUSIVITY AGREEMENT

34.     Following the December 5, 2002 meeting, John McCool, Vice President of Engineering for Cisco's Gigabit Systems Business Unit, told Plaintiff that it would not receive exclusivity despite Cisco's representations, and that Cisco would not make any non-recurring engineering commitment to Plaintiff even though Cisco had promised and agreed to the same through Mr. Cafiero. Mr. McCool worked directly for Defendant Bechtolsheim in the Gigabit Systems Business Unit. Mr. McCool was responsible for implementing Defendant Bechtolsheim's directives.

35.     Defendant never disclosed to Plaintiff that Cisco would not perform, nor did he instruct Mr. McCool to perform on behalf of Cisco. In fact, Defendant agreed with his Cisco co-workers that Cisco would not perform on its promises.

36.     Despite Cisco's failure to live up to its multiple promises, Plaintiff cooperated with Mr. McCool in a failed attempt to salvage some business relationship. However, despite Mr. Cafiero's assurance that Cisco would pay the costs of designing a chip even if they exceeded $5

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                    10

million (as long as those costs did not exceed $50 million), Mr. McCool insisted that Plaintiff's proposals had to be within a $5-6 million budget. After hours of detailed analysis and planning, Plaintiff entered a proposal that took even these new Cisco "concerns" (communicated by Mr. McCool) into consideration and setting these new funding limits.

37.    Cisco told Plaintiff that the pending project would be transferred to Richard Ellis from Cisco's Purchasing department. Plaintiff was also told by Cisco that another final agreement between Cisco and Mosaic would be completed by January 15, 2003. Defendant did not disclose to Plaintiff that Cisco did not intend to complete any agreement by January 15, 2003. In fact, Defendant continued to reassure Plaintiff in the face of Plaintiff's growing concerns.

38.    Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to Christmas of 2002. At this point, Plaintiff continued to reasonably believe that Cisco would live up to its promises, and Defendant did not disclose to Plaintiff that Cisco would do otherwise, despite knowledge that Cisco was actively seeking bids from Plaintiff's competitors. At the meeting, Mr. Ellis stated that the deal between Plaintiff and Cisco would be completed within two to three days, if it were not for the Christmas holidays. Plaintiff's staff went on vacation expecting to return in early January and conclude its agreement with Cisco; however, Plaintiff later discovered that within a few days of its initial meeting with Mr. Ellis, Cisco had reached an independent agreement with Sony as Cisco's supplier for CSRAM chips. Plaintiff contacted Mr. Ellis early in the first week of January 2003 to inquire about the status. Mr. Ellis told Plaintiff that Cisco was busy working out the details of the deal and that Plaintiff should not be concerned. Mr. Ellis did not disclose to Plaintiff that Cisco had already reached an agreement with Sony over the holiday season. At no time did Defendant disclose this information.

39.    Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Cisco and Plaintiff would be closed soon, and based on that and Defendant's failure to disclose any contrary

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                    11

facts, Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Based on both Mr. Cafiero's and Mr. Ellis' verbal assurances and Defendant's failure to disclose and contrary facts, Plaintiff also continued to disclose Trade Secrets and Other Information to Cisco upon Cisco and Defendant Bechtolsheim's requests.

40.     In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior promises, Cisco would not perform on its agreement with Mosaic or enter into any new agreement, and that Mosaic could expect that some alternative transaction sponsored by Cisco would be the best way for Plaintiff to receive compensation for all of its work for Cisco. Mr. Ellis referred Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc. ("Micron"). Mr. Ellis expressed interest in doing business with an American company, and he advocated for Micron and Cypress to work with Plaintiff to submit a business proposal to Cisco.

41.     At the direction of Cisco and Defendant, Plaintiff traveled to Boise, Idaho to try to negotiate an acquisition deal with Micron. The initial meeting with Micron went well enough for the Micron team to fly out to San Jose, California to continue the negotiations. Mr. Ellis attended the meeting in San Jose between Micron and Plaintiff, and tried to convince Micron that by acquiring Plaintiff, Micron would be obtaining a new business relationship with Cisco with respect to CSRAM technology.

42.     In parallel with Micron discussions and at the direction of Cisco and Defendant, Plaintiff also started discussions with Cypress. Plaintiff attended a three-way meeting with Cypress and Cisco where Mr. Ellis told Cypress that acquiring Plaintiff would be beneficial. Based on these representations, Plaintiff and Cypress submitted a proposal to Cisco soon thereafter, but Mr. Ellis told Cypress that it was too late  Cisco had already chosen all its suppliers for the CSRAM technology. Defendant never disclosed to Plaintiff any timelines or other deadlines that Plaintiff needed to meet, nor did Defendant apprise Plaintiff of the status of negotiations with Plaintiff's

competitors.

43.    Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis told Plaintiff that Cisco had reached a second-source supplier deal with Samsung. Plaintiff contacted Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer. Mr. Ellis agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial details from the Samsung proposal. Plaintiff worked with Cypress, and at the end of three days of negotiations, Plaintiff was able to match Samsung's pricing. Defendant never told Plaintiff that Cisco did not intend to follow through with its offer to accept a matched bid. When Plaintiff contacted Cisco to deliver its proposal, Plaintiff was informed that the decision had been made to deal with Samsung, and Cisco would not entertain Plaintiff's proposal.

## FURTHER USE OF PLAINTIFF'S TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION

44    Since the discontinuation of negotiations between Plaintiff and Cisco, Plaintiff has reason to believe that the confidential CSRAM specification that Plaintiff designed as well as Plaintiff's Trade Secrets and Other Information have been used by Cisco, and disclosed to third parties. Plaintiff has reason to believe that said Trade Secrets and Other Information have since been disclosed to third parties by Defendant.

45.    Throughout the entire relationship. Plaintiff never received any indication from Defendant that Cisco was dissatisfied or otherwise had any concerns regarding Plaintiff's work. Plaintiff never received any form of remuneration for all of its work on the DDR3 and CSRAM projects with Cisco. Plaintiff would not have worked on the DDR3 and CSRAM projects with Cisco but for Defendant's multiple assurances that Plaintiff would be adequately remunerated for its work.

## FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty)

46.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 45 above, as if set forth at length here.

47.    Defendant Bechtolsheim, an executive of Cisco, also served on Mosaic's Board of Directors. As a board member, Defendant Bechtolsheim as an individual owed a fiduciary duty to Mosaic. Such duty includes, but is not limited to, obligations to be truthful to Mosaic, to exercise good faith and due diligence in his directives to Mosaic and to reasonably look after Mosaic's best interests.

48.    Defendant Bechtolsheim was also Vice President and General Manager of the Gigabit Systems Business Unit (the "Gigabit SBU"), the very department of Cisco which dealt with Mosaic regarding technical developments and business discussions during the parties' interactions.

49.    Defendant Bechtolsheim's position at Cisco involved business activities with other companies on technological developments, such as SRAM chips. Defendant Bectholsheim was an executive, and through his management duties, an authorized agent of Cisco. Defendant Bechtolsheim had the apparent and/or actual authority to engage in business discussions with Mosaic, and Mosaic relied on such authority. Defendant Bechtolsheim made numerous representations to Plaintiff that he not only had such authority, but also that he had the authority within Cisco to drive a deal with Mosaic through Cisco. At no time prior to the time Plaintiff was harmed did Defendant disclose to Plaintiff that he did not have such authority. Mosaic reasonably relied on the representations of its fiduciary.

50.    As a Mosaic board member, Defendant Bechtolsheim made specific representations, as follows:

    A.  Cisco's obligations of confidentiality (by signing the NDA);

    B.  Cisco's business need for particular types of SRAM within the Gigabit SBU;

C. Cisco's technical requirements within the Gigabit SBU;

D. Cisco's projected needs for SRAM within the Gigabit SBU;

E. The fact that no other competitor could match the speed and performance offered

by Mosaic;

F. The specific steps (such as creation of a test chip) that would be required of

Mosaic for Cisco to work with Mosaic;

G. Promises to facilitate an acquisition of Mosaic by Cisco; and

H. Representations to potential and actual investors in Mosaic about Cisco's interest

in Mosaic and its technology.

51.     Defendant Bechtolsheim also omitted to disclose material facts, fact such as:

A. His own authority within Cisco;

B. Cisco's intentions relating to the use of Mosaic Trade Secrets and Other

Information;

C. Cisco's intentions relating to an acquisition;

D. Cisco's intentions relating to its discussions with Plaintiff's competitors; and

E. Cisco's unwillingness to abide by promises made by Cisco.

52.     Specifically, Defendant Bechtolsheim breached his duty to Mosaic in at least each of

the following ways:

A. Defendant Bechtolsheim breached his fiduciary duty to Mosaic by making

repeated misrepresentations to Mosaic in the form of assurances (i) that Mosaic was vital to Cisco's

interests, (ii) that Mosaic's technology was far ahead of any potential competitors, (iii) that Mosaic

did not have to worry about the lack of a formal, written commitment from Cisco, (iv) that such a

commitment would be completed, (v) that Mosaic would be a supplier of SRAM for Cisco, or would

otherwise receive remuneration for all of its work with Cisco, and (vi) that Mosaic could rely on

1  Defendant Bechtolsheim's representations with respect to Cisco. As Mosaic later discovered, such

2  representations and assurances were untrue, and furthermore, Defendant Bechtolsheim did not have

3  the authority within Cisco to make them. These misrepresentations strengthened Mosaic's reliance

4  on Cisco's similar claims, causing Plaintiff to entrust its most vital Trade Secrets and Other

5  Information with Cisco, as well as causing Plaintiff to waste thousands of person-hours working

6
7  hand-in-hand with Cisco to design and test a Static Random Access Memory ("SRAM")

8  semiconductor chip for which Plaintiff ultimately received no remuneration. All of these

9  misrepresentations were negligent and/or made in bad faith.

10      B. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directly

11  disclosing Mosaic Trade Secrets and Other Information to Mosaic competitors and to other third

12
13  parties. These disclosures not only breached Defendant Bechtolsheim's duty to Mosaic, but also

14  were in breach of Cisco's NDA, which Defendant Bechtolsheim signed on behalf of Cisco.

15      C. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by

16  directing Mosaic to pursue the development of SRAM only with Cisco, to the exclusion of other

17
18  potential business partners. During the initial stages of Mosaic's interaction with Cisco in 2000,

19  Mosaic had to make crucial business decisions concerning who it would partner with, and where to

20  apply its technical expertise in chip design. Defendant Bechtolsheim utilized his power over Mosaic

21  as a director of Mosaic, as a principal investor in Mosaic, and as the Vice President and General

22  Manager of the very Cisco business unit that sought SRAM suppliers, to convince Mosaic to focus

23
24  only on Cisco to exclusion of other potential business partners. Such representations and directives

25  were negligent and/or made in bad faith.

26      D. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directly

27  providing Cisco with confidential Mosaic Trade Secrets and Other Information with full knowledge

28  that Cisco was utilizing this information to aid in reaching supplier agreements with Mosaic's

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                    16

competitors, and in breach of the NDA.

E. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by providing Cisco with Mosaic Trade Secrets and Other Information for purposes other than those stipulated by the Non-Disclosure Agreement ("NDA"). Furthermore, Defendant Bechtolsheim signed the NDA on behalf of Cisco, and Cisco failed to follow it.

F. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by falsely promising an acquisition offer by Cisco to Mosaic.

G. Defendant Bechtolsheim further breached his fiduciary duty by misrepresenting to Mosaic that he had the requisite authority and influence within Cisco to drive a final deal through Cisco, and that Mosaic could rely on this fact and on Cisco's verbal promises and commitments even though Mosaic did not have a formal, written commercial agreement with Cisco. Such misrepresentations were negligent and/or made in bad faith.

H. Defendant Bechtolsheim further breached his duty by repeatedly failing to disclose information pertinent to Mosaic and its shareholders' best interests. Defendant Bechtolsheim neglected his obligations as a fiduciary by deliberately allowing Mosaic to operate under false assumptions for his own and for Cisco's gain.

I. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by failing to recognize his fundamental conflict of interest and disengage from any activities with respect to the two parties' interaction. Such failures were negligent and/or made in bad faith.

J. Defendant Bechtolsheim further breached his fiduciary duty generally, by putting his own and Cisco's interests ahead of Mosaic's.

53. Mosaic's time, money, and energy were devoted to the DDR3 and CSRAM projects, custom projects that could not be used with any other companies (Cisco's competitors) by nature of the custom design. Mosaic employees worked directly with Defendant Bechtolsheim to aid Cisco's

1
design. Several Cisco employees worked with Mosaic at the direction of Defendant Bechtolsheim.

2
Mosaic employees worked with Cisco at the direction of Defendant Bechtolsheim.

3      54.    Cisco's business negotiations granted Cisco access to Mosaic and its Trade Secrets

4
and Other Information, insight which other companies did not have. Cisco had access to Mosaic's

5
financial and funding information and thus was aware of Mosaic's negotiating leverage with other

6
7
parties. Plaintiff would not have provided access to said information but for Defendant

8
Bechtolsheim's multiple verbal and other assurances to Plaintiff.

9      55.    The actions by Defendant Bechtolsheim and the benefits conferred on Cisco put

10
Mosaic in an unequal and disadvantaged bargaining position with Cisco. Furthermore, Defendant

11
Bechtolsheim's role as head of the Gigabit SBU caused Mosaic to trust Cisco in its dealings at a

12
level that is higher than would be expected in an arm's length transaction. Because Defendant

13
Bechtolsheim was in a position to direct Mosaic, Cisco obtained undue leverage in the negotiation

14
15
process.

16      56.    Defendant knew that Plaintiff reasonably relied upon the relationship of trust that

17
existed between Defendant and Mosaic given Defendant's status as an active member of Plaintiff's

18
Board of Directors. Defendant knew that this reliance by Plaintiff would cause great damage to

19
20
Plaintiff's business if Cisco failed to remunerate Mosaic.

21      57.    Defendant breached his fiduciary duty and trust by negligently and/or in bad faith

22
failing to act in Plaintiff's best interests. Defendant breached his fiduciary duty by depriving Mosaic

23
of the compensation it rightly deserved.

24
25      58.    Plaintiff did not begin learning of Defendant's breaches of duty until 2003 and

26
commenced its investigation thereof in a reasonable fashion.

27      59.    The substantial expenditures made by Plaintiff based on Defendant's

28
misrepresentations and breach of duty have cost Plaintiff irreparable harm and that expenditure is the

proximate cause of damages to Plaintiff.

60.    Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

61.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
(Negligent Misrepresentation)

62.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 61 above, as if set forth at length here.

63.    Defendant made several representations to Plaintiff that Cisco would to provide financial remuneration to Plaintiff. This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco.

64.    Defendant made further representations during multiple board and other meetings about Cisco's interest in Plaintiff, and about how no competitor could match Plaintiff's products in Cisco's eyes.

65.    Defendant made further representations to Plaintiff with respect to the direction that Plaintiff should take, while omitting material facts that he had a duty to disclose, namely that Cisco was in fact pursuing other competitors and was not willing to provide remuneration to Plaintiff.

66.    Said representations were in fact false and/or misleading in light of the omitted facts. At the time said statements were made, Defendant knew or had reason to know that they were false or misleading in light of the omitted facts. Said statements were negligent, for at the time Defendant Bechtolsheim's multiple promises and assurances were made, Defendant Bechtolsheim did not exercise any of the diligence required of him in his role as a fiduciary of Plaintiff to, in good faith, confirm the veracity of said promises and assurances. Given Defendant's knowledge of the weight

his words carried with respect to Plaintiff's interaction with Cisco, said promises and assurances were grossly negligent.

67.     Defendant negligently intended that Plaintiff rely on his statements and promises, and Plaintiff did reasonably rely on such statements and promises to its detriment.

68.     Defendants's negligent misrepresentations have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(Constructive Fraud)

69.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 68 above, as if set forth at length here.

70.     Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also constitute constructive fraud.

71.     As discussed above, Defendant Bechtolsheim had a fiduciary duty to Mosaic to preserve, improve, and protect Mosaic's viability and interests, a duty upon which Mosaic justifiably relied.  Defendant Bechtolsheim breached his fiduciary duty to Mosaic in numerous ways.

72.     Defendant Bechtolsheim made several representations to Plaintiff that Cisco was to provide financial remuneration to Plaintiff.  Such representations and inducements were made all in effort to induce Mosaic to continue to trust Cisco, and to continue providing Cisco with Mosaic Trade Secrets and Other Information as well as its engineering expertise.  Defendant Bechtolsheim made assurances that Mosaic would receive purchases by Cisco in the form of a commercial agreement, a non-recurring engineering fee, investment by Cisco in Mosaic, or acquisition of Mosaic by Cisco.

73.     Said representations were in fact false.  Cisco did not provide financial remuneration to Plaintiff.

74.     Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals

1  from companies that would compete with Cisco.  Defendant further failed to disclose that Cisco had

2  not made any plans to provide financial remuneration to Plaintiff.

3      75.    Reasonably relying on the false representations made by Defendant Bechtolsheim,

4
5  Mosaic advised Cisco in the design of DDR3 chip, advised Cisco in the design of the CSRAM

6  specification, advised Cisco in the architecture and engineering of the CSRAM chip, aided in the

7  development and engineering in the CSRAM chip, and responded to Cisco's repeated inquiries

8  regarding the specific proprietary design details needed to bring the chip to production.

9      76.    Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is
10
    entitled to recover such damages in an amount to be determined at trial.
11

12      77.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

13  punitive damages in an amount to be determined at trial.

14                          **FOURTH CAUSE OF ACTION**

15
                                  (Concealment)
16

17      78.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

18  through 77 above, as if set forth at length here.

19      79.    As a director of Plaintiff, Defendant Bechtolsheim owed a fiduciary duty to Plaintiff,

20  including the duty to disclose important facts pertinent to Mosaic's interests.

21      80.    As discussed in detail above, over the course of the interaction between Mosaic and
22
23  Cisco from 2000 through 2003, Defendant Bechtolsheim intentionally failed to disclose many

24  important facts to Plaintiff.  Specifically, Defendant Bechtolsheim concealed the following important

25  facts from Plaintiff: (i) that Cisco was using Mosaic Trade Secrets and Other Information for

26  purposes other than those allowed by the NDA, including to develop competitive bids, (ii) that Cisco
27
28  was disclosing Mosaic Trade Secrets and Other Information to third parties, (iii) that Defendant

    Bechtolsheim himself was using Mosaic Trade Secrets and Other Information for purposes other

than those allowed by the NDA as well as disclosing Mosaic Trade Secrets and Other Information to third parties, (iv) that Cisco did not in fact intend to acquire Plaintiff or otherwise provide any remuneration for Plaintiff's work for Cisco, and (v) other important facts discussed in Paragraphs 1 through 79 above. Plaintiff is informed and believes, and on that basis alleges that Defendant Bechtolsheim intended to deceive Plaintiff by concealing the important facts.

81.    Plaintiff did not know of the important facts concealed by Defendant, and Plaintiff reasonably relied on Defendant Bechtolsheim's deception.

82.    Plaintiff was harmed and Defendant Bechtolsheim's concealment of important facts from Plaintiff was a substantial factor in causing Plaintiff's harm and in causing substantial damages to Plaintiff.

83.    Defendant's wrongful actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

(Statutory Unfair Competition)

84.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 83 above, as if set forth at length here.

85.    Defendant's acts as described above were designed to and constitute unfair competition by Cisco in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

86.    Defendant's unfair and unlawful actions have caused extensive damage to Plaintiff. By its actions, Defendant has effectively kept Plaintiff from competing in the marketplace.

87.    As a direct and proximate cause of Defendant's unfair practices, Cisco has been unjustly enriched and Plaintiff has provided value to Cisco, which must be repaid in restitution in an amount to be proven at trial.

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                    22

88.     Plaintiff has also suffered irreparable harm as a result of Defendant's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendant is enjoined from engaging in any further such acts of unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Cisco, jointly and severally, as follows:

A.    On the First Cause of Action, for damages and punitive damages in an amount to be determined at trial;

B.    On the First Cause of Action, for exemplary damages in an amount to be determined at trial;

C.    On the Second and Third Causes of Action for damages in an amount to be determined at trial;

D.    On the Third Causes of Action, for punitive damages in an amount to be determined at trial;

E.    On the Fourth Cause of Action for damages and punitive damages in an amount to be determined at trial

F.    On the Fifth Cause of Action, for restitution in an amount to be determined at trial;

G.    On the Fifth Cause of Action, for an injunction against further unfair trade practices;

H.    For reasonable attorney's fees, as authorized by law; and,

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                    23

1    I.    For such other and further relief as the Court deems just and proper.

2    Dated: October 13, 2006                        RUSSO & HALE LLP

3                                                   By: _Jack Russo_

4                                                       Jack Russo
                                                        Michael Risch
5

6                                                   Attorneys for Plaintiff
                                                    MOSAIC SYSTEMS, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.**                          24