# EXHIBIT 1

07/30/2007 15:06 FAX 4082956895                                    ☑001



1   HOWARD HOLDERNESS, State Bar No. 169814
2   LORELEI A. CRAIG, State Bar No. 244104
    STEPHANIE L. JOHNSON, State Bar No. 246072
3   MORGAN, LEWIS & BOCKIUS LLP
    One Market - Spear Street Tower
4   San Francisco, CA 94105-1126
    Tel:   415.442.1000
5   Fax:   415.442.1001

6   Attorneys for Defendants
    CISCO SYSTEMS, INC.
7   ANDREAS BECHTOLSHEIM

**(ENDORSED)**
**FILED**
JUL 30 2007
KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ DEPUTY
C. FUJIHARA

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF SANTA CLARA

11  MOSAIC SYSTEMS, INC.,

12              Plaintiff,                Case No. 1-04 CV 016867
                                          Consolidated for limited purposes with
13        vs.                             Case No. 1-06 CV 072920

14  CISCO SYSTEMS, INC., and DOES 1-      NOTICE OF FILING
15  20,                                   NOTICE OF REMOVAL

16              Defendant.                Judge:       Kevin E. McKenney

17  MOSAIC SYSTEMS, INC.,                 Action Filed:  March 29, 2004
                                          Trial Date:    Not yet set
18              Plaintiff,

19        vs.

20  ANDREAS BECHTOLSHEIM, and DOES
    1-20,
21
22              Defendant.

23

24  TO:   PLAINTIFF, ITS ATTORNEYS OF RECORD, AND THE CLERK OF THE SUPERIOR

25        COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF SANTA

26        CLARA:

27        PLEASE TAKE NOTICE that Defendants CISCO SYSTEMS, INC. and ANDREAS

28  BECHTOLSHEIM ("Defendants") have filed, concurrently herewith, a Notice of Removal, in the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
1-SF/7581907.1

NOTICE OF FILING NOTICE OF REMOVAL                        Case No. 1-04 CV 016867

HOWARD HOLDERNESS, State Bar No. 169814
LORELEI A. CRAIG, State Bar No. 244104
STEPHANIE L. JOHNSON, State Bar No. 246073
MORGAN, LEWIS & BOCKIUS LLP
One Market - Spear Street Tower
San Francisco, CA  94105-1126
Tel:    415.442.1000
Fax:    415.442.1001

Attorneys for Defendants
CISCO SYSTEMS, INC.
ANDREAS BECHTOLSHEIM

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

| | |
|---|---|
| MOSAIC SYSTEMS, INC.,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CISCO SYSTEMS, INC., and DOES 1-20,<br><br>                    Defendant.<br>―――――――――――――――――<br>MOSAIC SYSTEMS, INC.,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ANDREAS BECHTOLSHEIM, and DOES 1-20,<br><br>                    Defendant. | Case No. 1-04 CV 016867<br>Consolidated for limited purposes with<br>Case No. 1-06 CV 072920<br><br>**NOTICE OF FILING**<br>**NOTICE OF REMOVAL**<br><br>Judge:            Kevin E. McKenney<br><br>Action Filed:    March 29, 2004<br>Trial Date:      Not yet set |

TO:    PLAINTIFF, ITS ATTORNEYS OF RECORD, AND THE CLERK OF THE SUPERIOR

        COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF SANTA

        CLARA:

        PLEASE TAKE NOTICE that Defendants CISCO SYSTEMS, INC. and ANDREAS

BECHTOLSHEIM ("Defendants") have filed, concurrently herewith, a Notice of Removal, in the

1    Office of the Clerk of the United States District Court for the Northern District of California.  A

2    true and correct copy of the Notice of Removal is attached hereto and served herewith.

3

4    Date:  July 30, 2007                MORGAN, LEWIS & BOCKIUS LLP

5

6                                Lorelei A. Craig

7                                Attorneys for Defendants
CISCO SYSTEMS, INC. and
8                                ANDREAS BECHTOLSHEIM

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   HOWARD HOLDERNESS, State Bar No. 169814
    BRETT M. SCHUMAN, State Bar No. 189247
2   LORELEI A. CRAIG, State Bar No. 244104
    MORGAN, LEWIS & BOCKIUS LLP
3   One Market - Spear Street Tower
    San Francisco, CA  94105-1126
4   Tel:    415.442.1000
    Fax:    415.442.1001
5   Email: hholderness@morganlewis.com

6   Attorneys for Defendants
    ANDREAS BECHTOLSHEIM and
7   CISCO SYSTEMS, INC.

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  MOSAIC SYSTEMS, INC.,                        Case No. _____

12                      Plaintiff,               NOTICE OF REMOVAL OF
                                                 CONSOLIDATED ACTIONS
13              vs.
                                                 UNDER 28 U.S.C. §1441(b)
14  ANDREAS BECHTOLSHEIM, and                    (FEDERAL QUESTION)
    DOES 1-20,
15
16                      Defendants.

17  ───────────────────────────────

18  MOSAIC SYSTEMS, INC.,

                        Plaintiff,
19              vs.

20  CISCO SYSTEMS, INC., and
    DOES 1-20,
21
22                      Defendants.

23

24      TO THE CLERK OF THE ABOVE-ENTITLED COURT:

25      PLEASE TAKE NOTICE that defendants Andreas Bechtolsheim and Cisco Systems, Inc.

26  hereby remove to this Court the consolidated state court actions described below.

27      1.      On March 29, 2004, plaintiff commenced an action entitled *Mosaic Systems, Inc.,*

28  *vs. Cisco Systems, Inc.*, Case No. 1-04 CV 016867 (the "Cisco Action") in the Superior Court of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7580497.2                          1

1    the State of California in and for the County of Santa Clara.  A true and correct copy of the

2    original complaint in the Cisco Action is attached hereto as Exhibit A.

3        2.    On October 13, 2006, plaintiff commenced another action entitled *Mosaic Systems,*

4    *Inc., vs. Andreas Bechtolsheim*, Case No. 1-06 CV 072920 (the "Bechtolsheim Action") in the

5    Superior Court of the State of California in and for the County of Santa Clara.  A true and correct

6    copy of the original complaint in the Bechtolsheim Action is attached hereto as Exhibit B.

7        3.    On June 18, 2007, the Superior Court of the State of California in and for the

8    County of Santa Clara, ordered the Cisco Action and the Bechtolsheim Action consolidated for

9    pretrial purposes at least.  A true and correct copy of the Consolidation Order is attached hereto as

10   Exhibit C.

11       4.    **Jurisdiction** (Local Rule 3-5)

12       On July 18, 2007, plaintiff filed a First Amended Complaint ("FAC") in the Bechtolsheim

13   Action.  A true and correct copy of the FAC is attached hereto as Exhibit D.  In the FAC, plaintiff

14   contests the inventorship of a patent, and, therefore, the Bechtolsheim Action "arises under"

15   patent laws for purposes of federal subject matter jurisdiction.  *See MCV Inc. v. King-Steeley*

16   *Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989) (the resolution of inventorship disputes is provided

17   for by 35 U.S.C. §256).  The FAC alleges that Mosaic – not Cisco or any Cisco employees– is the

18   true inventor of U.S. Patent No. 7,047,385 B1 (the "'385 patent").  Exh. D., p.20:12-13

19   ("Defendant did not inform Mosaic that a patent was being filed *on its ideas* nor did he *give credit*

20   *to Plaintiff* Mosaic in the '385 patent" (emphasis added)).  In addition, plaintiff alleges that Cisco

21   employees wrongfully applied "for a patent stolen from, derived from, and based upon Plaintiff's

22   Trade Secrets and Confidential Information and other Mosaic knowledge." Exh. D., p.1:20-22.

23   Plaintiff alleges that "Mosaic's Trade Secrets and Confidential Information were being used to

24   apply for a patent by Cisco...." Exh. D., p.21:5-6.

25       5.    Plaintiff's allegations raise a "substantial federal question" concerning

26   inventorship of the '385 patent, giving rise to original and exclusive federal jurisdiction under 28

27   U.S.C. §1338(a).  *See, e.g., Rustevader Corp. v. Cowatch*, 842 F.Supp. 171, 174 ("Although the

28   plaintiff's claims asserted in their complaint are not created by federal law, their well-pleaded

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7580497.2                          2

1  complaint necessarily depends on the resolution of a substantial federal question under the *MCV*

2  decision.  This Court will not allow plaintiffs to deny the defendants 'a federal forum when the

3  plaintiffs' complaint contains a federal claim 'artfully pled' as a state law claim'").  The

4  Bechtolsheim Action therefore is removable pursuant to 28 U.S.C. §1441(b).  *See Christianson v.*

5  *Colt Industries Operating Corp.*, 486 U.S. 800, 809 (1988).

6          6.      The FAC in the Bechtolsheim Action was the first paper from which it could be

7  ascertained that the case was removable.  Defendants' counsel received a copy of the FAC on

8  July 18, 2007.

9          7.      The Bechtolsheim Action has been consolidated with the Cisco Action for pretrial

10  purposes at least and, therefore, the consolidated action is removable in its entirety.  Consolidated

11  cases are removed together.  *See, e.g., Parkhill v. Pecos Valley Southern Railway Co.*, 196

12  F.Supp. 404, 406 (S.D. Texas 1961) (a case not removable on its own was removed when

13  consolidated with others); *see also* 28 U.S.C. §1441(b) (whenever a separate and independent

14  claim arising under the laws of the United States is joined with a non-removable claim, the entire

15  case becomes removable).

16          8.      Alternatively, this Court can and should exercise supplemental jurisdiction over

17  the Cisco Action pursuant to 28 U.S.C. §1376, as the claims in the Cisco Action and the

18  removable Bechtolsheim Action "derive from a common nucleus of operative fact[s]."  *City of*

19  *Chicago v. International College of Surgeons*, 522 U.S. 156, 164-5 (1997).  Both actions are

20  based on the same basic allegations regarding the conduct of Mr. Bechtolsheim and Cisco during

21  a period when Mosaic and Cisco were contemplating certain transactions that were never

22  consummated and when Mr. Bechtolsheim was both a Mosaic director and a Cisco executive.

23  Some of the causes of action plaintiff asserts against Cisco in the Cisco Action are expressly

24  predicated on the alleged misconduct of Mr. Bechtolsheim, and some of the causes of action

25  plaintiff asserts against Mr. Bechtolsheim in the Bechtolsheim Action are predicated on Cisco's

26  conduct.  For example, Mosaic's sixth cause of action against Cisco in the Cisco Action is for

27  aiding and abetting Bechtolsheim's alleged breach of fiduciary duty to Mosaic.  And Mosaic's

28  fifth cause of action against Mr. Bechtolsheim in the Bechtolsheim Action is based on allegations

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7580497.2                                3

1    regarding the conduct of certain Cisco employees.  Therefore, supplemental jurisdiction over the

2    Cisco Action is appropriate based on the removal of the Bechtolsheim Action.  *See City of*

3    *Chicago*, 522 U.S. at 165 (the supplemental jurisdiction statute §1367, "applies with equal force

4    to cases removed to federal court as to cases initially filed there").

5          9.      Both defendants – Andreas Bechtolsheim and Cisco Systems, Inc. – join in this

6    Notice of Removal.

7          10.     This Notice of Removal is being filed concurrently with a Supplement, pursuant to

8    28 U.S.C. §1446(a), containing the process, pleadings and orders in the state court action, and

9    Certificates of Interested parties as to Cisco Systems, Inc., and as to Andreas Bechtolsheim.

10

11   Dated:  July 30, 2007                          MORGAN, LEWIS & BOCKIUS LLP

12

13                                                  By _____

14                                                       Howard Holderness
                                                         *Attorneys for Defendants*
15                                                       ANDREAS BECHTOLSHEIM and
                                                         CISCO SYSTEMS, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7580497.2                                    4

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(b) (FEDERAL QUESTION)

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Cisco Systems, Inc., a Delaware corporation

and DOES 1 through 20, inclusive
**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Mosaic Systems, Inc., a California corporation

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.   There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.   Una carta o una llamada telefónica no lo protegen.   Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.   Es posible que haya un formulario que usted pueda usar para su respuesta.   Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.   Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.   Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales.   Es recomendable que llame a un abogado inmediatamente.   Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.   Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.   Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of California<br>Santa Clara County<br>191 North First Street<br>San Jose, CA  95113 | CASE NUMBER:<br>*(Número del Caso):*<br>**104**   CV010867 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jack Russo (State Bar No. 96068)        (650) 327-9800  (650) 327-3737
Russo & Hale LLP
401 Florence Street
Palo Alto, CA  94301

DATE:                                      Kiri Torre
*(Fecha)*  **MAR 2 9 2004**     Chief Executive Officer/Clerk
                                   Clerk, by ___Rose Rojas_____, Deputy
                                   *(Secretario)*                      *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**



Code of Civil Procedure §§ 412.20, 465



1   Jack Russo (State Bar No. 96068)
    Michael Risch (State Bar No. 197600)
2   RUSSO & HALE LLP
    401 Florence Street
3   Palo Alto, CA 94301
    650-327-9800
4
    Attorneys for Plaintiff
5   MOSAIC SYSTEMS, INC.

6

7

8



(ENDORSED)

2004 MAR 23  PM 5: 28

Rose Rojas

9            IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA

10                      IN AND FOR THE COUNTY OF SANTA CLARA

11                                          NO. _____

                                            **104    CV016867**
12   MOSAIC SYSTEMS, INC., a                 )
     California corporation,                 )   **COMPLAINT FOR DAMAGES AND**
13                                           )   **FOR DECLARATORY RELIEF FOR**
                                             )   **BREACH OF WRITTEN AGREEMENT,**
14              Plaintiff,                    )   **TRADE SECRET MISAPPROPRIATION,**
                                             )   **BREACH OF FIDUCIARY DUTY,**
15              v.                           )   **BREACH OF COVENANT OF GOOD**
                                             )   **FAITH AND FAIR DEALING, BREACH**
16   CISCO SYSTEMS, INC., a Delaware         )   **OF ORAL CONTRACT, PROMISSORY**
     corporation, and DOES 1 through 20,     )   **ESTOPPEL, QUANTUM MERUIT,**
17   inclusive,                              )   **CONSTRUCTIVE FRAUD,**
                                             )   **NEGLIGENT MISREPRESENTATION,**
18              Defendants.                   )   **AND UNFAIR COMPETITION**
                                             )
19                                           )   **[JURY TRIAL DEMANDED]**
                                             )
20                                           )   **(CCP § 1060 et seq.)**

21

22

23

24

25

26

27

28

                                            1

1    Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Cisco

2  Systems, Inc. (the "Defendant" or "Cisco") as follows:

3                                    **INTRODUCTION**

4         1.    This is an action for breach of written agreement, trade secret misappropriation,

5  breach of fiduciary duty, breach of the covenant of good faith and fair dealing, promissory estoppel,

6  constructive fraud, fraud and unfair competition (the "Action") arising from the continued receipt

7  and use of Plaintiff's trade secrets, proprietary materials, and Plaintiff's chip design documentation

8  (collectively the "Trade Secrets"), acquired by Defendants from Plaintiff under a written Non-

9  Disclosure Agreement. Defendants made multiple false promises in order to obtain the Trade

10 Secrets as well as to otherwise take advantage of the Plaintiff, and then disclosed and used the

11 information notwithstanding a written agreement barring such use.

12        2.    Plaintiff also seeks declaratory relief in this Action because a controversy exists and

13 Plaintiff is entitled to a declaration of its rights and of Defendant's duties under applicable California

14 law.

15                                      **PARTIES**

16        3.    Plaintiff Mosaic is a corporation duly organized and existing under California law and

17 with its principal office based in Los Altos, California, and was formerly based in Sunnyvale,

18 California.

19        4.    Defendant Cisco Systems, Inc. ("Cisco") is a Delaware corporation based in San

20 Jose, California.

21        5.    Defendants Does 1 through 20, inclusive, whether individuals, corporations,

22 associations or otherwise are fictitious names of defendants whose true names and capacities are at

23 this time unknown to Plaintiff. Each of said fictitiously named defendants, whether individuals,

24 corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately

25 thereby as hereinafter alleged. At such time as defendants' true names become known to Plaintiff,

26 Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and

27 capacities.

28

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.        2

6. Plaintiff is informed and believes and on that basis alleges that Cisco along with Defendant Does 1-20 did agree together and conspire together, with knowledge of their unlawful purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full course and scope of their illegal conspiracy, with the full knowledge and consent, either express or implied, of each of the other Defendants.

## JURISDICTION AND VENUE

7.    This Court has general jurisdiction of all claims herein arising under California law. This Court also has jurisdiction of the declaratory relief claims pursuant to Section 1060 of the California Code of Civil Procedure as an actual case and controversy exists between the parties.

8.    Venue is proper in this Court because the contractual, statutory and other obligations of Defendant arose and were to be performed in Santa Clara County, California.

## THE WRITTEN NON-DISCLOSURE AGREEMENT

9.    Defendant Cisco is known throughout the industry as a Fortune 500 publicly traded corporation that has repeatedly acquired smaller, complementary private businesses in fields where Defendant expects to extend its business interests. In fact, during the period from 1990 through 2000, Cisco acquired over one hundred (100) other companies.

10.    Beginning in 2000, Defendant communicated to Plaintiff its interest in developing a high-speed SRAM chip. Plaintiff knew how to make faster SRAM chips than had previously been developed, and Defendant knew this. With encouragement from Cisco's proclaimed interest, and a high-level Cisco executive serving as one of Mosaic's board members, Plaintiff pursued the development of SRAM that Defendant promised to purchase. If Cisco had not promised Plaintiff proprietary protection and remuneration for a high-speed SRAM chip and had Cisco not had a high ranking executive on Plaintiff's board of directors, Plaintiff would have not have pursued the many person-years of design, development, and engineering time with Defendant.

11.    Mosaic and Cisco entered into a written Mutual Non-Disclosure Agreement ("NDA") on May 2, 2001. A true and correct copy of the NDA is attached hereto as Exhibit 1. Plaintiff trusted that Cisco would honor its agreements, and not use any confidential information disclosed by Plaintiff without an express agreement allowing such use.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.            3

## MOSAIC'S MULTIPLE DISCLOSURES TO CISCO

12.     In June 2002, Defendant notified Plaintiff that Cisco's architecture had significant technical problems that caused it to fail with standard SRAM specifications.

13.     Between June and July 2002, Defendant and Plaintiff worked together to create the CSRAM specification, ("CSRAM Spec") to solve these technical problems. During this time, Defendant's and Plaintiff's engineers communicated by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems. Many of these e-mails contained Plaintiff's trade secrets and proprietary information. At this point, Plaintiff reasonably relied on Cisco's representations that Plaintiff was developing the CSRAM chip hand-in-hand with Defendant Cisco, that it would abide by the NDA, and that Plaintiff was the only company that Defendant was working with on developing this type of SRAM technology. Defendant never disclosed to Plaintiff that it was evaluating Plaintiff's competitors, that it was using information disclosed under the NDA to develop competitive bids, or that the proprietary information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

14.     While working to develop the CSRAM chip, Plaintiff disclosed a wealth of trade secrets and proprietary information to Defendant, upon Defendant Cisco's request. These trade secrets and proprietary information include, but are not limited to, information about resolving packaging problems, projected costs, power numbers, yield data, and die sizes. Cisco's internal processor design and purchasing teams relied on this information to further develop their specification and to obtain bids from Plaintiff's competitors.

15.     Plaintiff first became aware of and concerned with competitors for Defendant Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Defendant a quote of one hundred dollars ($100) per chip. This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never given Defendant a one hundred dollar ($100) quote for the CSRAM chip.

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.        4

## THE ACQUISITION OFFER AND DISCLOSURES

16.    In September 2002, Defendant informed Plaintiff that Defendant was interested in acquiring the Plaintiff.   Defendant began to conduct due diligence, and as part of the due diligence, Defendant asked Plaintiff to provide even further updated and highly detailed proprietary information about the CSRAM design, including, but not limited to, extremely sensitive information such as die size, power numbers, and design techniques.  In reliance on Defendant's promises, Plaintiff provided this further information.

17.    On October 1 and October 2, 2002, as part of Defendant's continued due diligence for its planned acquisition of Plaintiff, Defendant requested the resumés from five of Plaintiff's engineers.  On October 2, 2002, Defendant arranged a meeting with the five engineers whose resumés Defendant had requested.  During this meeting, Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in addition to the current CSRAM project, and their willingness to work for Cisco as opposed to Mosaic.

18.    After the completion of the October 2, 2002 meeting between Plaintiff and Defendant Cisco, Plaintiff reasonably relied on the representation that it was being acquired by Cisco, and Plaintiff disclosed the requested confidential information to Cisco's processor design team.  In fact, on October 16, 2002, Plaintiff provided Cisco with proprietary information that set out what it would take to produce the technology for the CSRAM chip and how the chip could be assembled.

## THE EXCLUSIVITY AGREEMENT

19.    Plaintiff later discovered that Defendant was actively soliciting quotes on the CSRAM chip from Plaintiff's competitors.  Plaintiff is informed and believes and on that basis alleges that Defendant distributed Plaintiff's proprietary and secret information to Plaintiff's competitors at a December 5, 2002 meeting with Cisco.  Mr. Luca Cafiero, Vice President of Storage

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                5

Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all of Defendant's business

in the CSRAM industry, and he provided Plaintiff with a per-unit quote. By the end of the December 5, 2002 meeting, Plaintiff and Defendant agreed that Plaintiff would receive exclusivity and $5-6 million in funding from Defendant to continue development of the CSRAM technology. The $5-6 million offer was based on an estimate that Plaintiff had previously quoted as the level of funding that would be necessary to bring the chip to production if Plaintiff was acquired by Defendant.

20.    Plaintiff reasonably relied on Defendant's promise, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Based on Cisco's verbal agreement (communicated by Mr. Cafiero), Plaintiff also continued to provide additional trade secrets and proprietary information to Defendant pursuant to Defendant's requests.

## CISCO BREACHES ITS PROMISES

21.    Following the December 5, 2002 meeting, John McCool, Vice President of Engineering for Cisco's Gigabit Systems, told Plaintiff that it would not receive exclusivity despite Cisco's promises, and that Defendant Cisco did not want to make any non-recurring engineering commitment to Plaintiff even though Cisco had promised the same through Mr. Cafiero.

22.    Despite Cisco's failure to live up to its multiple promises, Plaintiff cooperated with Mr. McCool in a failed attempt to salvage some business relationship. However, despite Mr. Cafiero's assurance that Cisco would pay the costs of designing a chip even if they exceeded $5 million, Mr. McCool insisted that Plaintiff's proposals had to be within the $5-6 million budget. After hours of detailed analysis and planning, Plaintiff entered a proposal that took even these new Cisco "concerns" (communicated by Mr. McCool) into consideration and even these new funding limits.

**Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.**    6

23.    Defendant told Plaintiff that the pending project would be transferred to Richard Ellis from Defendant Cisco's Purchasing department. Plaintiff was also told by Cisco that a commercial agreement between Cisco and Mosaic would be completed by January 15, 2003.

24.    Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to Christmas of 2002. At this point, Plaintiff continued to reasonably believe that Cisco would live up to its promises. At the meeting, Mr. Ellis stated that the deal between Plaintiff and Defendant would be completed within two to three days, if it were not for the Christmas holidays. Plaintiff's staff went on vacation expecting to return in early January and conclude its agreement with Cisco; however, Plaintiff later discovered that within a few days of its initial meeting with Mr. Ellis, Cisco had reached an independent agreement with Sony as Cisco's supplier for CSRAM chips. Plaintiff contacted Mr. Ellis early in the first week of January 2003 to inquire about the status. Mr. Ellis told Plaintiff that Cisco was busy working out the details of the deal and that Plaintiff should not be concerned. Mr. Ellis did not disclose to Plaintiff that Cisco had already reached an agreement with Sony over the holiday season.

25.    Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Defendant and Plaintiff would be closed soon, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Based on both Mr. Cafiero's and Mr. Ellis' verbal assurances, Plaintiff also continued to disclose trade secrets and proprietary information to Defendant upon Defendant's requests.

26.    In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior promises, Cisco would not enter into an agreement with Mosaic, and that Cisco would expect that some mergers and acquisitions division from a semiconductor company would be the best way for Plaintiff to receive any money. Mr. Ellis referred Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc. ("Micron"). Mr. Ellis expressed interest in doing business

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          7

1   with an American company, and he advocated for Micron and Cypress to work with Plaintiff to

2   submit a business proposal to Defendant.

3       27.     Plaintiff traveled to Boise, Idaho to try to negotiate an acquisition deal with Micron.

4   The initial meeting with Micron went well enough for the Micron team to fly out to San Jose,

5   California to continue the negotiations.  Mr. Ellis attended the meeting in San Jose between Micron

6

7   and Plaintiff, and tried to convince Micron that acquiring Plaintiff would be a promising business

8   move.

9       28.     In parallel with Micron discussions, Plaintiff also started discussions with Cypress.

10  Plaintiff attended a three-way meeting with Cypress and Cisco where Mr. Ellis told Cypress that

11  acquiring Plaintiff would be beneficial.  Based on these representations, Plaintiff and Cypress

12

13  submitted a proposal to Cisco soon thereafter, but Mr. Ellis told Cypress that it was too late, Cisco

14  had already chosen all its suppliers.

15      29.     Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis

16  told Plaintiff that Defendant had reached a second-source supplier deal with Samsung.  Plaintiff

17  contacted Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer.  Mr.

18

19  Ellis agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial details

20  from the Samsung proposal.  Plaintiff worked with Cypress, and at the end of three days of

21  negotiations, Plaintiff was able to match Samsung's pricing.  When Plaintiff contacted Defendant to

22  deliver its proposal, Plaintiff was informed that the decision had been made to deal with Samsung,

23  and Defendant would not entertain Plaintiff's proposal.

24

25  **FURTHER USE OF CONFIDENTIAL AND TRADE SECRET INFORMATION**

26      30.     Since the discontinuation of negotiations between Plaintiff and Defendant, Plaintiff

27  has reason to believe that the confidential CSRAM specification that Plaintiff designed has been

28  used in at least one other Cisco project.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.        8

31.     Throughout the entire relationship, Plaintiff had never received any indication that Defendant was dissatisfied or otherwise had any concerns regarding Plaintiff's work.  Plaintiff's proprietary information and trade secrets were not returned upon failure to reach an agreement.

32.     Defendant has failed to acknowledge and has denied that it has a fiduciary duty or other obligations to Plaintiff, despite having been notified of such by Plaintiff, nor has it in any way attempted to rectify the substantial and irreparable harm that said failure has caused.

33.     Defendant has failed to acknowledge and has denied its express violation of the terms of its written and verbal agreements with Plaintiff, despite having been notified of such by Plaintiff, nor has it in any way attempted to rectify that breach.

34.     Plaintiff is entitled to a declaratory judgment of its rights and Defendant's responsibilities, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

35.     Under Section 1062.3 of the California Code of Civil Procedure, Plaintiff is entitled to have this Action set for trial "at the earliest possible date" in accordance with applicable law and Plaintiff requests that such trial date be set by the Court at the earliest possible time.

**FIRST CAUSE OF ACTION**
(Breach of Written Agreement)

36.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 35 above, as if set forth at length here.

37.     On or about May 2, 2001, the parties entered into an NDA, attached hereto as Exhibit 1.

38.     Plaintiff performed all of the legally required terms and conditions of the NDA.

39.     Defendants breached said contract in multiple ways, namely:

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          9

a.     By using the trade secrets, confidential information, and know-how of Plaintiff in development of technology with third-parties;

b.     By failing to disclose, or even discuss, with Plaintiff the use of said confidential information, and know-how of Plaintiff in connection with third-parties;

c.     By using the trade secrets, confidential information, and know-how of Plaintiff for purposes outside the scope of the evaluation of a potential business relationship between the parties; and,

d.     By failing to perform other terms and conditions of the NDA.

40.     Defendants' breaches are the proximate cause of damages to Plaintiff, and Plaintiff is entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
(Declaratory Relief Regarding Ownership of Trade Secrets)

41.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 40 above, as if set forth at length here.

42.     A dispute has arisen between the parties as to the rights and responsibilities of each party. Plaintiff is entitled to a declaratory judgment of Defendant's ownership of trade secrets and other proprietary information, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

//

//

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.      10

## THIRD CAUSE OF ACTION
(Trade Secret Misappropriation)

43.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 42 above, as if set forth at length here.

44.     Defendant requested that Plaintiff share its trade secrets and proprietary information with Defendant. Defendant then used this information to create chip specifications that it distributed to other departments within Cisco and to Plaintiff's competitors.

45.     Defendant continued to falsely promise acquisition, non-recurring engineering agreements, and commercial agreements to Plaintiff in order to lure Plaintiff to continue to provide trade secrets, confidential information, and general know-how to Defendant.

46.     On information and belief, Defendant chose to work with Plaintiff based on Plaintiff's industry expertise. Defendant frequently praised Plaintiff for its expertise and acknowledged the substantial skill, experience, and head-start Plaintiff had compared to the rest of the industry.

47.     Defendant continues to work in the field of SRAM chips with Sony and Samsung and continues to use the trade secrets, confidential information, and know-how of Plaintiff.

48.     Plaintiff disclosed valuable trade secrets, confidential information, know-how, and other head-starts and negative information to Defendant. This information and advantage provided Defendant with a substantial edge in the development of SRAM technology and greatly expedited Defendant's progress in the industry. This head-start was gained through the wrongful conduct and misleading statements of Defendant to provide Plaintiff with additional investments, a non-recurring engineering agreement, a commercial agreement, and a possible acquisition. These misleading indications were maintained until Defendant reached a second-source supplier agreement with Plaintiff's direct competitor.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          11

49.     Plaintiff provided trade secrets and proprietary information including detailed information and instructions to complete the development of the CSRAM chip and to change its system architecture, given that Defendant purposefully and with intent promised Plaintiff that Defendant would acquire and/or make investments in Plaintiff. These trade secrets and proprietary information, to which Defendant has no rights, were used by Defendant in the development of its CSRAM and system architecture specification. This and any other use by Defendant of illicitly acquired proprietary information has been without the expressed consent of Plaintiff.

50.     Defendant's actions were the direct and proximate cause of damages to Plaintiff.

51.     Plaintiff is entitled to damages for trade secret misappropriation, in an amount to be determined at trial.

52.     Plaintiff is entitled to preliminary and permanent injunctive relief from the continued use and disclosure of its trade secrets.

### FOURTH CAUSE OF ACTION
(Declaratory Relief Regarding Fiduciary Duty)

53.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 52 above, as if set forth at length here.

54.     A dispute has arisen between the parties as to the rights and responsibilities of each party. Plaintiff is entitled to a declaratory judgment of Defendant's former and continued fiduciary duty to Plaintiff, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

//

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          12

## FIFTH CAUSE OF ACTION
(Breach of Fiduciary Duty)

55.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 54 above, as if set forth at length here.

56.    By virtue of its special relationship of trust with Plaintiff, including an officer on Plaintiff's board, Defendant had a fiduciary duty to preserve, improve, and protect the long-term viability of Plaintiff, a duty upon which Plaintiff justifiably relied.

57.    Defendant knew or should have known that Plaintiff reasonably relied upon the assurances that a non-recurring engineering agreement, commercial agreement, investment, or acquisition would be forthcoming; Defendant knew or should have known this reliance by Plaintiff would cause great damage to Plaintiff's business if Defendant failed to reach an agreement with Plaintiff.

58.    The substantial expenditures made by Plaintiff based on Defendant's misrepresentations and breach of duty have cost Plaintiff irreparable harm and that expenditure is the proximate cause of damages to Plaintiff.

59.    Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

60.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
(Breach of Covenant of Good Faith and Fair Dealing)

61.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 60 above, as if set forth at length here.

62.    Given the relationship between Defendant and Plaintiff, Defendant had an implied obligation and duty, under California law, to act in good faith and deal fairly with Plaintiff.

**Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.**        13

63.     By its dishonesty and negligent behavior alleged herein, Defendant has breached this implied covenant of good faith and fair dealing.

64.     In committing the above actions, including but not limited to failing to disclose competitive bidding with third-parties; distribution of Plaintiff's trade secrets, confidential information, and know-how to third-parties; making multiple promises and false promises; and otherwise failing to act fairly, Defendant has acted in bad faith and in a manner designed to cause Plaintiff to rely to its detriment. These actions breached the covenant of good faith and fair dealing.

65.     As a direct and proximate result of Defendant's misconduct, Plaintiff has been damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Breach of Oral Contract)

66.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

67.     In or about June 2002 and thereafter, the parties entered into a series of oral agreements. The material terms were as follows:

    a.     Plaintiff was to assist Cisco in designing a specification for the CSRAM chip. Plaintiff was then to assist with designing and engineering the actual chip according to Cisco's customized needs and requests.

    b.     Defendant Cisco was to provide financial remuneration to Plaintiff. This would be achieved in one of several ways, such as acquisition by Cisco, a non-recurring engineering fee paid by Cisco, and/or a commercial agreement reached between Plaintiff and Cisco.

68.     On or about December 5, 2002, the parties entered into an additional oral agreement. The material terms were as follows:

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.            14

a.      Plaintiff was to engineer a CSRAM chip that met all of the requirements set forth in the CSRAM specification.

b.      In return for designing and engineering this chip, Cisco would pay Plaintiff a negotiable sum of money originally set at $5-6 million to complete the development of the CSRAM chip, a royalty for every chip created, and exclusivity for all of Cisco's business in the CSRAM field.

69.     Plaintiff performed on all of its obligations under both oral agreements.

70.     Cisco breached its agreements by not providing any financial remuneration, non-recurring engineering agreements, and/or commercial agreements to Mosaic as promised.

71.     Defendant's breach of contract is the proximate cause of damage to Plaintiff. Plaintiff is entitled to damages for breach of contract in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Promissory Estoppel)

72.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

73.     Between June 2002 and January 2003, Defendant made numerous assurances, indications, and pledges to Plaintiff, namely that: Defendant Cisco was to provide financial remuneration to Plaintiff for continued development of the CSRAM chip. This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements with Cisco, investment by Cisco, or acquisition by Cisco.

74.     Plaintiff reasonably relied on these promises, and as a result expended a great deal of time and monetary funds on Defendant's behalf. Such time and money included advising Cisco in the design of the CSRAM specification, advising Cisco in the architecture and engineering of the

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                    15

CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's inquiries regarding the specific proprietary design details needed to bring the chip to production.

75.    Plaintiff's reasonable reliance on said promises was to its detriment, and it would be unjust to allow Defendant to avoid the obligations of its promises after Plaintiff so relied.

76.    Plaintiff has been damaged by its reliance, and is entitled to compensatory damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (*Quantum Meruit*)

77.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

78.    From July 2002 through January 2003, Mosaic provided services at the express request of Cisco.  These services included advising Cisco in the design of the CSRAM specification, advising Cisco in the architecture and engineering of the CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's inquiries regarding the specific proprietary design details needed to bring the chip to production.

79.    Cisco did not pay for those services, and it would be inequitable and unjust for such services to be provided without any payment.

80.    The reasonable value of such services is a sum to be proven at trial.

## TENTH CAUSE OF ACTION
### (Negligent Misrepresentation)

81.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

82.    Defendant made several representations to Plaintiff that Defendant Cisco was to provide financial remuneration to Plaintiff.  This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          16

between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco. For example, Luca Cafiero told officers of Mosaic on December 5, 2002 that Cisco would provide Mosaic with upwards of $5-6 million to complete the development of the CSRAM chip, and that Mosaic would receive exclusivity for the chip business at Cisco. Prior to Christmas 2002, Richard Ellis expressly told officers of Mosaic that "if it wasn't for Christmas break, Mosaic and Cisco would reach an agreement within a few days" or words to that effect.

83. Said representations were in fact false. Cisco did not provide financial remuneration to Plaintiff.

84. At the time said statements were made, Defendant knew or had reason to know that they were false. These statements were negligently false, for at the time said promises were made, Defendant did not intend to perform on such promises.

85. Defendant negligently intended that Plaintiff rely on its statements and promises, and Plaintiff did reasonably rely on such statements and promises to its detriment.

86. Defendant's negligent misrepresentations have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover damages in an amount to be determined at trial.

87. Defendant's negligent actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

88. Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also constitute constructive fraud.

//

//

//

//

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          17

### ELEVENTH CAUSE OF ACTION
(Constructive Fraud)

89.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 65 above, as if set forth at length here.

90.    By virtue of its special relationship of trust with Plaintiff, Defendant had a fiduciary duty to preserve, improve, and protect the long-term viability of Plaintiff, a duty upon which Plaintiff justifiably relied.

91.    Defendant made several representations to Plaintiff that Defendant Cisco was to provide financial remuneration to Plaintiff.  This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco.  For example, Luca Cafiero told officers of Mosaic in December 5, 2002 that Cisco would provide Plaintiff Mosaic with upwards of $5-6 million to complete the development of the CSRAM chip, and that Mosaic would receive exclusivity for the chip.  Also, before Christmas 2002, Richard Ellis expressly told officers of Mosaic that "if it wasn't for Christmas break, Mosaic and Cisco would reach an agreement within a few days" or words to that effect.

92.    Said representations were in fact false.  Cisco did not provide financial remuneration to Plaintiff.

93.    Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals from companies that would compete with Cisco.  Defendant further failed to disclose that it had not made any plans to provide financial remuneration to Plaintiff.

94.    Plaintiff reasonably relied on the false representations by Defendant by advising Cisco in the design of the CSRAM specification, advising Cisco in the architecture and engineering

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          18

1    of the CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's

2    inquiries regarding the specific proprietary design details needed to bring the chip to production.

3       95.    By virtue of the fiduciary relationship between the parties, said misrepresentations

4    and failures to disclose constitute constructive fraud on Plaintiff by Defendant.

5       96.    Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is

6

7    entitled to recover such damages in an amount to be determined at trial.

8       97.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

9    punitive damages in an amount to be determined at trial.

10   ## TWELFTH CAUSE OF ACTION
11   (Statutory Unfair Competition)

12      98.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

13   through 65 above, as if set forth at length here.

14

15      99.    Defendant's acts described above, including but not limited to its continued receipt

16   and use of trade secrets, its breach of fiduciary duties, its continued use and distribution of Plaintiff's

17   work product as if it were its own, and its unfulfilled false promises, were designed to and constitute

18   unfair competition by Defendant in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

19

20      100.    Defendant's unfair and unlawful actions have caused extensive damage to Plaintiff.

21   By its actions, Defendant has effectively kept Plaintiff from competing in the marketplace.

22      101.    As a direct and proximate cause of Defendant's unfair practices, Defendant has been

23   unjustly enriched and Plaintiff has provided value to Defendant, which must be repaid in restitution

24   in an amount to be proven at trial.

25      102.    Plaintiff has also suffered irreparable harm as a result of Defendant's activities and will

26

27   continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendant, and

28

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                    19

any of its officers, agents and employees, and all persons acting in concert with them, are enjoined from engaging in any further such acts of unfair competition.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendant, jointly and severally, as follows:

A.      On the First Cause of Action, for damages in an amount to be determined at trial;

B.      On the Second Cause of Action, for a declaration that Defendant owns Plaintiff's trade secrets and other proprietary information;

C.      On the Third Cause of Action, for damages in an amount to be determined at trial;

D.      On the Second and Third Causes of action, for an injunction against the further use or disclosure of Plaintiff Mosaic's trade secrets, and an Order that Defendant return all of Plaintiff's trade secrets;

E.      On the Fourth Cause of Action, for a declaration that Defendant has owed and owes a fiduciary duty to Plaintiff;

F.      On the Fifth Cause of Action, for damages in an amount to be determined at trial;

G.      On the Sixth Cause of Action, for damages in an amount to be determined at trial;

H.      On the Seventh Cause of Action, for damages in an amount to be determined at trial;

I.      On the Eighth Cause of Action, for damages in an amount to be determined at trial;

J.      On the Ninth Cause of Action, for damages in an amount to be determined at trial;

K.      On the Tenth Cause of Action, for damages in an amount to be determined at trial;

L.      On the Tenth Cause of Action, for punitive damages in an amount to be determined at trial;

M.      On the Eleventh Cause of Action, for damages in an amount to be determined at trial;

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.                    20

N.    On the Eleventh Cause of Action, for punitive damages in an amount to be determined at trial;

O.    On the Twelfth Cause of Action, for restitution in an amount to be determined at trial;

P.    On the Twelfth Cause of Action, for an injunction against further unfair trade practices;

Q.    For an injunction barring the use of Trade Secrets and other confidential information of Plaintiff;

R.    For reasonable attorney's fees, as authorized by law; and,

S.    For such other and further relief as the Court deems just and proper.

Dated: March 29, 2004

Respectfully submitted,
RUSSO & HALE LLP

By: _____
       Jack Russo
       Michael Risch

Attorneys for Plaintiff
MOSAIC SYSTEMS, INC.

Complaint for Trade Secret
Misappropriation; Breach of Contract, Breach of
Fiduciary Duty; and Breach of Contract, etc.          21

Mutual Non Disclosure Agreement

☒

# EXHIBIT 1

## CISCO SYSTEMS, INC. MUTUAL NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement ("Agreement") is entered into on the day of _____ /2001 ("Effective Date") between Cisco Systems, Inc. a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134-1706 (and its direct and indirect w holly owned subsidiaries), ("Cisco") and Mosaic Systems, Inc, a California corporation having its principal place of business at 1133 Auburn Street, Fremont, CA, USA, 94538.

In consideration of the mutual promises and covenants contained in this Agreement and the disclosure of confidential information to each other, the parties to this Agreement agree as follows:

**1. DEFINITION.** "Confidential Information" means the terms and conditions of this Agreement, the existence of the discussions between the parties, the information described in Section 2 below, and any other information concerning the Purpose defined below, including but not limited to, information regarding each party's product plans, product designs, product costs, product prices, finances, marketing plans, business opportunities, personnel, research and development activities, know-how and pre-release products; provided that information disclosed by the disclosing party ("Disclosing Party") in written or other tangible form will be considered Confidential Information by the receiving party ("Receiving Party") only if such information is conspicuously designated as "Confidential," "Proprietary" or a similar legend. Information disclosed orally shall only be considered Confidential Information if: (i) identified as confidential, proprietary or the like at the time of disclosure, and (ii) confirmed in writing within thirty (30) days of disclosure. Confidential Information disclosed to the Receiving Party by any affiliate or agent of the Disclosing Party is subject to this Agreement.

**2. DESCRIPTION.** The Confidential Information to be disclosed under this Agreement is described as follows:

Cisco:                         Requirements for high-speed SRAMs

Mosaic Systems, Inc:      Product specifications, business plans, and product roadmap for high-speed SRAMs

**3. PURPOSE.** The Receiving Party may use the Confidential Information solely for the purpose of ("Purpose"):

Cisco:                         For evaluating potential business relationship

Mosaic Systems, Inc:      For evaluating potential business relationship

**4. DISCLOSURE.** The Receiving Party shall not disclose the Confidential Information to any third party other than employees and contractors of the Receiving Party who have a need to have access to and knowledge of the Confidential Information solely for the Purpose authorized above. The Receiving Party

Mutual Non Disclosure Agreement

shall have entered into non-disclosure agreements with such employees and contractors having obligations of confidentiality as strict as those herein prior to disclosure to such employees and contractors to assure against unauthorized use or disclosure.

**5. EXCEPTIONS TO CONFIDENTIAL INFORMATION.** The Receiving Party shall have no obligation with respect to information which (i) was rightfully in possession of or known to the Receiving Party without any obligation of confidentiality prior to receiving it from the Disclosing Party; (ii) is, or subsequently becomes, legally and publicly available without breach of this Agreement; (iii) is rightfully obtained by the Receiving Party from a source other than the Disclosing Party without any obligation of confidentiality; (iv) is developed by or for the Receiving Party without use of the Confidential Information and such independent development can be shown by documentary evidence; and (v) is transmitted by a party after receiving written notification from the other party that it does not desire to receive any further Confidential Information. Further, the Receiving Party may disclose Confidential Information pursuant to a valid order issued by a court or government agency, provided that the Receiving Party provides the Disclosing Party: (a) prior written notice of such obligation; and (b) the opportunity to oppose such disclosure or obtain a protective order.

**6. RETURN OR DESTRUCTION OF CONFIDENTIAL INFORMATION.** Upon written request by the Disclosing Party, the Receiving Party shall: (i) cease using the Confidential Information, (ii) return the Confidential Information and all copies, notes or extracts thereof to the Disclosing Party within seven (7) business days of receipt of request; and (iii) upon request of the Disclosing Party, confirm in writing that the Receiving Party has complied with the obligations set forth in this paragraph.

**7. INDEPENDENT DEVELOPMENT** The Disclosing Party acknowledges that the Receiving Party may currently or in the future be developing information internally, or receiving information from other parties, that is similar to the Confidential Information. Nothing in this Agreement will prohibit the Receiving Party from developing or having developed for it products, concepts, systems or techniques that are similar to or compete with the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information provided that the Receiving Party does not violate any of its obligations under this Agreement in connection with such development. Neither party shall have any obligation to limit or restrict the assignment of its employees or consultants as a result of their having had access to Confidential Information. Further, subject to any copyrights, mask work rights or patent rights, the parties agree that as a result of exposure to Confidential Information of the Disclosing Party, employees of the Receiving Party may gain or enhance general knowledge, skills and experience (including ideas, concepts, know-how and techniques) related to Receiving Party's business ("General Knowledge"). The subsequent use by these employees of such General Knowledge as retained in their unaided memories, without reference to Confidential Information in written, electronic or other fixed form, shall not constitute a breach of this Agreement. Neither party shall have any obligation to limit or restrict the assignment of persons or to pay royalties for any work resulting from the use of such General Knowledge.

**8. NO LICENSES.** Each party shall retain all right, title and interest to such party's Confidential Information. No license under any trademark, patent or copyright, or application for same which are now or thereafter may be obtained by such party is either granted or implied by the disclosure of Confidential Information.

**9. DISCLAIMER.** CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITH ALL FAULTS. IN NO EVENT SHALL THE DISCLOSING PARTY BE LIABLE FOR THE ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION.

Mutual Non Disclosure Agreement

None of the Confidential Information disclosed by the parties constitutes any representation, warranty, assurance, guarantee or inducement by either party to the other with respect to the infringement of trademarks, patents, copyrights, any right of privacy, or any rights of third persons.

**10. EXPORT.** The parties acknowledge that the Confidential Information disclosed by each of them under this Agreement may be subject to export controls under the laws of the United States. Each party shall comply with such laws and agrees not to knowingly export, re-export or transfer Confidential Information of the other party without first obtaining all required United States authorizations or licenses.

**11. TERM.** This Agreement shall continue from the "Effective Date" written above until terminated by either party by giving thirty (30) days written notice to the other party of its intent to terminate this Agreement. Notwithstanding such termination, the obligations of the Receiving Party concerning confidentiality shall terminate five (5) years following receipt of the Confidential Information.

**12. GENERAL.** Each party acknowledges that monetary remedies may be inadequate to protect Confidential Information and that injunctive relief may be appropriate to protect such Confidential Information.

The Receiving Party shall not reverse-engineer, decompile, or disassemble any software disclosed to it under this Agreement and shall not remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from any originals or copies of Confidential Information it obtains from the Disclosing Party.

The parties hereto are independent contractors. Neither this Agreement nor any right granted hereunder shall be assignable or otherwise transferable.

If any term of this Agreement shall be held to be illegal or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect.

This Agreement may only be modified in writing and must be signed by both parties.

This Agreement shall be construed in accordance with the laws of the State of California.

This Agreement represents the entire agreement of the parties hereto pertaining to the subject matter of this Agreement, and supersedes any and all prior oral discussions and/or written correspondence or agreements between the parties with respect thereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date last written below.

CISCO SYSTEMS, INC.

By: _____

Name: Andy Bechtolsheim

Title: VP/GM

Date: 5/2/01

Mosaic Systems, Inc

By: _____

Name: Alex Alexanian

Title: President and CEO

Date: 05/02/2001

# EXHIBIT B

Jack Russo (State Bar No. 96068)
Michael Risch (State Bar No. 197600)
RUSSO & HALE LLP
401 Florence Street
Palo Alto, CA 94301
jrusso@computerlaw.com
mrisch@computerlaw.com
650-327-9800

Attorneys for Plaintiff
MOSAIC SYSTEMS, INC.

D. Kontorovsky

06 OCT 13 AM 8:00

IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

MOSAIC SYSTEMS, INC., a
California corporation,

    Plaintiff,

    v.

ANDREAS BECHTOLSHEIM, an
individual, and DOES 1-20,

    Defendants.

NO. **106CV072920**

**COMPLAINT FOR DAMAGES BASED
UPON BREACH OF FIDUCIARY DUTY,
NEGLIGENT MISREPRESENTATION,
CONSTRUCTIVE FRAUD,
CONCEALMENT, AND UNFAIR
COMPETITION**

**[JURY TRIAL DEMANDED]**

1

1    Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Andreas
2    Bechtolsheim ("Defendant" or "Bechtolsheim" or "Defendant Bechtolsheim") as follows:

### INTRODUCTION

4    1.    This is an action for breach of fiduciary duty, negligent misrepresentation,
5    constructive fraud, and unfair competition (the "Action") stemming from Defendant's multiple and
6    continued misrepresentations, negligent misrepresentations, empty promises, false assurances, and
7    negligent and bad faith directives made to Plaintiff, the reliance on which caused Plaintiff to divulge,
8    and to continue to divulge, its valuable trade secrets, proprietary materials, chip design
9    documentation, and other confidential information (collectively the "Trade Secrets and Other
10    Information") to Defendant's employer, Cisco Systems, Inc ("Cisco"). Defendant's statements and
11    actions also caused Plaintiff to waste thousands of person-hours working hand-in-hand with Cisco to
12    design and test a Static Random Access Memory ("SRAM") semiconductor chip for which Plaintiff
13    ultimately received no remuneration. Defendant, as both a member of Plaintiff Mosaic's Board of
14    Directors and as the Vice President and General Manager of the very Cisco business unit with which
15    Mosaic sought to do business, exerted a unique influence and control over Plaintiff with respect to
16    its interaction with Cisco. Defendant Bechtolsheim's negligent and bad faith directives,
17    misrepresentations, negligent misrepresentations, empty promises, false assurances, and other
18    misleading statements caused Plaintiff to disclose its Trade Secrets and Other Information to Cisco,
19    and caused Plaintiff to invest its time and engineering expertise in Cisco to the exclusion of other
20    business partners and opportunities. Plaintiff seeks damages in amount to be determined at trial.

### PARTIES

22    2.    Plaintiff Mosaic is a corporation duly organized and existing under California law
23    with its principal office based in Los Altos, California, and was formerly based in Sunnyvale,
24    California.

25    3.    Defendant Bechtolsheim is an individual residing in Portola Valley, California.
26    4.    Defendants Does 1 through 20, inclusive, whether individuals, corporations,
27    associations or otherwise are fictitious names of defendants whose true names and capacities are at
28    this time unknown to Plaintiff. Each of said fictitiously named defendants, whether individuals,

1  corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately

2  thereby as hereinafter alleged.  At such time as defendants' true names become known to Plaintiff,

3  Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and

4  capacities.

5      5.  Plaintiff is informed and believes and on that basis alleges that Cisco along with

6  Defendant Does 1-20 did agree together and conspire together, with knowledge of their unlawful

7  purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full

8  course and scope of their illegal conspiracy, with the full knowledge and consent, either express or

9

10  implied, of each of the other Defendants.

11                     **JURISDICTION AND VENUE**

12      6.     This Court has general jurisdiction of all claims herein arising under California law.

13      7.     Venue is proper in this Court because the fiduciary and other obligations of Defendant

14

15  arose and were to be performed in Santa Clara County, California.

16                        **BACKGROUND FACTS**

17      8.     Defendant Bechtolsheim is the former Vice President and General Manager of the

18  Gigabit Systems Business Unit at Cisco.  Plaintiff is informed and believes and on that basis alleges

19

20  that Defendant Bechtolsheim's responsibilities in Cisco's Gigabit Systems Business Unit included

21  but were not limited to developing network switching technologies such as the Catalyst 4000 Gigabit

22  Switch family.

23      9.     Mosaic is a fabless semiconductor company specializing in the design, development

24  and engineering of high performance SRAM for the networking and communications marketplace.

25      10.     Beginning in mid-2000, Defendant Bechtolsheim communicated to Mosaic that Cisco

26  was interested in developing a high-speed SRAM chip, and that Cisco was interested in working

27  with Mosaic to do so.  At the time, Mosaic knew how to make faster high performance SRAM chips

28

than had previously been developed. Where most SRAM suppliers were only able to project the ability to supply parts in the 300 - 400 MHz range for high performance SRAM, Mosaic was forecasting the ability to achieve 750 - 1000 MHz.

11. Defendant Bechtolsheim encouraged Mosaic to work with Cisco on the development of a custom SRAM chip, and assured Mosaic that no other competitor could match the speed and capabilities of the SRAM design offered by Mosaic. On this basis, Mosaic entered into serious business discussions with Cisco regarding working together to design and develop a high-speed SRAM chip which Cisco would purchase from Mosaic.

12. On July 28, 2000, Mosaic closed Series A funding. Mosaic was able to raise over $2.5 million, based largely on the strong indications from both Defendant Bechtolsheim and Cisco that Mosaic was going to be a chief supplier of Cisco's SRAM needs. In fact, Defendant Bechtolsheim himself was an investor in Mosaic. Defendant Bechtolsheim also joined Mosaic's Board of Directors at this time, assuming an active director's role over the company, and entering into a fiduciary relationship with Mosaic.

13. After receiving Series A funding, Mosaic endeavored to hire a team of engineers who could make the discussed SRAM a reality for Cisco. In January of 2001, engineering candidate Rich Roy met with then Mosaic CEO Suren Alexanian and Mr. Bectholsheim to discuss Cisco's need for high-speed SRAM chips and the role Mosaic could play to meet that need. Defendant Bechtolsheim convinced Mr. Roy that Cisco was serious about working with Mosaic to design SRAM chips, and Mr. Roy joined Mosaic as Vice President of Engineering at this time.

## BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN DDR3 SRAM FOR CISCO

14. In 2001, IBM advertised that it could achieve 750 MHz high performance SRAM at a very high price per unit, and provided Cisco with an SRAM specification called "DDR3." In March 2001, at another meeting with Mr. Alexanian and Mr. Roy, Defendant Bechtolsheim

delivered the IBM specification to Mosaic and instructed Mosaic to try to design a chip that fit IBM's specification. Defendant Bechtolsheim told Mosaic that Cisco would be the primary customer for the designed chip, and that Cisco wanted Mosaic to serve as the second source to IBM on the project.

15.    Defendant Bechtolsheim's assurances and his status as both a director of Mosaic and as Vice President and General Manager of the very business unit at Cisco which sought SRAM, convinced Mosaic to begin work on the DDR3 test chip for Cisco with the understanding that Mosaic would be a supplier of the chip. Defendant Bechtolsheim assured Mosaic that its technology was far ahead of the competition and that Mosaic was going to be a source of SRAM for Cisco. If Defendant Bechtolsheim had not made such assurances, Mosaic would not have invested its time and resources in the DDR3 project.

16.    When Mosaic started working on DDR3, Mosaic initially tried to mold it to fit both Sun Microsystems' ("Sun") and Cisco's needs. However, Defendant Bechtolsheim convinced Mosaic that Cisco's interests in pursuing networking, and its specific priorities with respect to the chip specifications were significantly different than those of Sun. Mosaic made the decision to optimize for Cisco's needs because Defendant Bechtolsheim convinced Mosaic that Cisco's demand and potential pricing for the SRAM product was such that all Mosaic had to do was deliver the chip, and Cisco would purchase the chips from Mosaic.

17.    To protect its Trade Secrets and Other Information, Mosaic requested that Cisco enter into a written Mutual Non-Disclosure Agreement ("NDA"). Such an agreement was entered into on or about May 2, 2001. Defendant Bechtolsheim signed the NDA on behalf of Cisco. The NDA stipulated that Mosaic's Confidential Information could be used only for the purposes of evaluating a potential business relationship. Plaintiff trusted Defendant Bechtolsheim and Cisco that Cisco would honor its agreements, and not use any Trade Secrets and Other Information disclosed by

1   Plaintiff without an express agreement allowing such use.

2      18.    Mosaic began work on the DDR3 design and, under the NDA, disclosed to Cisco the

3   architecture and technology details describing how the DDR3 could meet Cisco's power,

4   performance, and die size needs - all of which are important for pricing. Even with the NDA,

5   Mosaic would not have disclosed its Trade Secrets and Other Information to Cisco regarding the

6   DDR3 design had it not been for Defendant Bechtolsheim's direction that Mosaic do so. An initial

7

8   test chip was taped out during May 2001, and in October, Mosaic was able to confirm for Cisco the

9   capability of meeting an 800 MHz address rate in standard TSMC 0.18 micron process technology.

10   Mosaic would not have done this work for Cisco had it not been for Defendant Bechtolsheim's

11   assurances to Mosaic that it would be a supplier of Cisco SRAM.

12      19.    The success of the test chip and strong indications from both Defendant Bechtolsheim

13

14   and Cisco that Mosaic would be a source of SRAM for Cisco enabled Mosaic to close a Series B

15   round of funding in the end of 2001 and early 2002. Mosaic was able to raise over $4 million, and

16   once again Defendant Bechtolsheim was an investor.

17      20.    Mosaic continued to work on the DDR3 with the understanding that it would be a

18   supplier of SRAM for Cisco. After committing millions of dollars of Mosaic investment money and

19

20   person hours to develop the DDR3 chip for Cisco, Mosaic was ready to do a "tape out" of the DDR3

21   chip to silicon in the summer of 2002. This would have cost the company a very major expense

22   (over one million dollars) and would have put the company in a very unstable financial situation in

23   the absence of any formal commercial agreement. Despite Cisco's failure to formally commit to the

24   supplier agreement promised by Defendant, Defendant Bechtolsheim encouraged Mosaic to tape out.

25      21.    However, in May 2002, Mosaic learned that Cisco was having problems with the

26   DDR3 architecture and its new processor, which problems Defendant Bechtolsheim had not

27

28   disclosed when he directed Mosaic to "tape out." IBM claimed that its design could not achieve the

required 750 Mhz operation. With the performance of IBM less certain, Cisco had growing concerns

over the DDR3 SRAM design.

22.     On June 6, 2002, Defendant Bechtolsheim, Rich Roy, Tony Moroyan (the new CEO of Mosaic), Dipankar Bhattacharya (Cisco manager), and Jim Weaver (Cisco engineer) met to discuss the technical problems that had arisen with DDR3. At this meeting, Mosaic presented results from simulations showing the 750 Mhz SRAM was viable and within budget. Impressed with these results, Cisco proposed the idea of scrapping IBM's DDR3 specification and working directly with Mosaic to create a new, custom SRAM.

## BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN CSRAM FOR CISCO

23.     Between June and July 2002, Mosaic and Cisco worked together to create the CSRAM specification ("CSRAM Spec") in order to solve the technical problems of DDR3. During this time, Mosaic and Cisco engineers (including Defendant) communicated in person and by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems. Many of these e-mails contained Plaintiff's Trade Secrets and Other Information.

24. Because of Defendant's representations, Plaintiff reasonably relied that Cisco would abide by the NDA, and that Plaintiff was the only company that Cisco was working with on developing this type of SRAM technology. Defendant never disclosed to Plaintiff that Cisco was evaluating Plaintiff's competitors, that Cisco was using Trade Secrets and Other Information disclosed under the NDA to develop competitive bids, or that the Trade Secrets and Other Information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

25.     Defendant had knowledge that Cisco was using and disclosing Plaintiff's Trade Secrets and Other Information in breach of the NDA. Defendant Bechtolsheim did not inform Plaintiff of this fact, and moreover, continued to direct Mosaic to work with Cisco in the development of the CSRAM chip, and continued to direct Mosaic to disclose its Trade Secrets and Other Information to Cisco.

26.    Plaintiff first became aware of and concerned with competitors for Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Cisco a quote of one hundred dollars ($100) per chip. This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never, in fact, provided Cisco a one hundred dollar ($100) quote for the CSRAM chip. Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim misrepresented the Micron "quote" in order to drive the cost of the CSRAM chip lower.

## THE ACQUISITION OFFER AND DISCLOSURES

27.    In September 2002, Defendant Bechtolsheim represented that he had instructed his unit at Cisco to either acquire Plaintiff or otherwise provide economic remuneration. Defendant did not disclose that Cisco was disregarding instructions from Defendant. In fact, Defendant Bechtolsheim purposely created the false impression that he could direct Cisco to acquire Plaintiff, or to otherwise ensure that Mosaic would be provided adequate compensation for Mosaic's work on SRAM to date. Cisco informed Plaintiff that Cisco was interested in acquiring Plaintiff, which directly followed Defendant Bechtolsheim's representation. Cisco began to conduct due diligence, and as part of the due diligence, Cisco asked Plaintiff to provide even further updated and highly detailed Trade Secrets and Other Information about the CSRAM design, including, but not limited to, extremely sensitive Trade Secrets and Other Information such as die size, power numbers, costs, and design techniques. In reliance on Defendant's promises and assurances, Plaintiff provided these further Trade Secrets and Other Information.

28.    On October 1 and October 2, 2002, as part of Cisco's continued due diligence for its planned acquisition of Plaintiff, Cisco requested the resumés from five of Plaintiff's engineers. On October 2, 2002, Cisco arranged a meeting with the five of Plaintiff's engineers whose resumés Cisco had requested. During this meeting, Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in addition to the current CSRAM

**Complaint for Breach of Fiduciary Duty,**
**Negligent Misrepresentation, etc.**                    8

project, and their willingness to transition their work from Mosaic to Cisco.

29.     After the completion of the October 2, 2002 meeting between Plaintiff and Cisco, Plaintiff reasonably relied on Cisco and Defendant's representation that it was being acquired by Cisco, and Plaintiff disclosed the requested additional Trade Secrets and Other Information to Cisco's processor design team. In fact, in October 2002, Plaintiff provided Cisco with Trade Secrets and Other Information that set out what it would take to produce the CSRAM chip and how the chip would be assembled.

## THE EXCLUSIVITY AGREEMENT

30.     At a December 5, 2002 meeting with Cisco, Mr. Luca Cafiero, Vice President of Storage Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all of Cisco's CSRAM sales. By the end of the December 5, 2002 meeting, Plaintiff and Cisco agreed that Plaintiff would receive exclusivity, royalty payment, and actual costs for engineering and development from Cisco for the CSRAM technology. Plaintiff later discovered that Cisco was actively soliciting quotes on the CSRAM chip from Plaintiff's competitors, and that Defendant knew the details of this but never disclosed it to Plaintiff. Plaintiff is informed and believes and on that basis alleges that Cisco distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's competitors, and that Defendant knew this fact but did not disclose it to Plaintiff. Plaintiff is informed and believes and on that basis alleges that Defendant himself distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's competitors.

31.     During this December 5, 2002 meeting, Mosaic and Cisco discussed Cisco's decision not to acquire Mosaic but instead decided: (1) to grant exclusivity to Mosaic for all supply of CSRAM to Cisco; (2) to pay fifty percent (50%) royalty of the material cost of the final packaged product and tested CSRAM; and (3) to pay actual non-recurring engineering costs of at least five to six (5-6) million dollars (but not to exceed fifty (50) million dollars) to Mosaic, representing the

costs of the chip engineering and development.

32.    The $5-6 million non-recurring engineering fee was based on an estimate that Plaintiff had previously quoted as the level of funding that would be necessary to bring the chip to production if Plaintiff was acquired by Cisco.  Mr. Cafiero agreed to this budget as long as the costs did not exceed fifty (50) million dollars.

33.    Plaintiff reasonably relied on Cisco's promise, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip.  Defendant never disclosed to Plaintiff that Cisco would not perform on its promise.   Based on Cisco's verbal agreement (communicated by Mr. Cafiero), Plaintiff also continued to provide additional Trade Secrets and Other Information to Cisco pursuant to Cisco's requests.

## CISCO BREACHES THE EXCLUSIVITY AGREEMENT

34.    Following the December 5, 2002 meeting, John McCool, Vice President of Engineering for Cisco's Gigabit Systems Business Unit, told Plaintiff that it would not receive exclusivity despite Cisco's representations, and that Cisco would not make any non-recurring engineering commitment to Plaintiff even though Cisco had promised and agreed to the same through Mr. Cafiero.  Mr. McCool worked directly for Defendant Bechtolsheim in the Gigabit Systems Business Unit.  Mr. McCool was responsible for implementing Defendant Bechtolsheim's directives.

35.    Defendant never disclosed to Plaintiff that Cisco would not perform, nor did he instruct Mr. McCool to perform on behalf of Cisco.  In fact, Defendant agreed with his Cisco co-workers that Cisco would not perform on its promises.

36.    Despite Cisco's failure to live up to its multiple promises, Plaintiff cooperated with Mr. McCool in a failed attempt to salvage some business relationship.  However, despite Mr. Cafiero's assurance that Cisco would pay the costs of designing a chip even if they exceeded $5

1  million (as long as those costs did not exceed $50 million), Mr. McCool insisted that Plaintiff's

2  proposals had to be within a $5-6 million budget. After hours of detailed analysis and planning,

3  Plaintiff entered a proposal that took even these new Cisco "concerns" (communicated by Mr.

4  McCool) into consideration and setting these new funding limits.

5      37.    Cisco told Plaintiff that the pending project would be transferred to Richard Ellis

6  from Cisco's Purchasing department. Plaintiff was also told by Cisco that another final agreement

7  
8  between Cisco and Mosaic would be completed by January 15, 2003. Defendant did not disclose to

9  Plaintiff that Cisco did not intend to complete any agreement by January 15, 2003. In fact,

10  Defendant continued to reassure Plaintiff in the face of Plaintiff's growing concerns.

11
12      38.    Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to

13  Christmas of 2002. At this point, Plaintiff continued to reasonably believe that Cisco would live up

14  to its promises, and Defendant did not disclose to Plaintiff that Cisco would do otherwise, despite

15  knowledge that Cisco was actively seeking bids from Plaintiff's competitors. At the meeting, Mr.

16  
17  Ellis stated that the deal between Plaintiff and Cisco would be completed within two to three days, if

18  it were not for the Christmas holidays. Plaintiff's staff went on vacation expecting to return in early

19  January and conclude its agreement with Cisco; however, Plaintiff later discovered that within a few

20  days of its initial meeting with Mr. Ellis, Cisco had reached an independent agreement with Sony as

21  Cisco's supplier for CSRAM chips. Plaintiff contacted Mr. Ellis early in the first week of January

22  
23  2003 to inquire about the status. Mr. Ellis told Plaintiff that Cisco was busy working out the details

24  of the deal and that Plaintiff should not be concerned. Mr. Ellis did not disclose to Plaintiff that

25  Cisco had already reached an agreement with Sony over the holiday season. At no time did

26  Defendant disclose this information.

27      39.    Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Cisco and

28  Plaintiff would be closed soon, and based on that and Defendant's failure to disclose any contrary

facts, Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Based on both Mr. Cafiero's and Mr. Ellis' verbal assurances and Defendant's failure to disclose and contrary facts, Plaintiff also continued to disclose Trade Secrets and Other Information to Cisco upon Cisco and Defendant Bechtolsheim's requests.

40.    In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior promises, Cisco would not perform on its agreement with Mosaic or enter into any new agreement, and that Mosaic could expect that some alternative transaction sponsored by Cisco would be the best way for Plaintiff to receive compensation for all of its work for Cisco. Mr. Ellis referred Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc. ("Micron"). Mr. Ellis expressed interest in doing business with an American company, and he advocated for Micron and Cypress to work with Plaintiff to submit a business proposal to Cisco.

41.    At the direction of Cisco and Defendant, Plaintiff traveled to Boise, Idaho to try to negotiate an acquisition deal with Micron. The initial meeting with Micron went well enough for the Micron team to fly out to San Jose, California to continue the negotiations. Mr. Ellis attended the meeting in San Jose between Micron and Plaintiff, and tried to convince Micron that by acquiring Plaintiff, Micron would be obtaining a new business relationship with Cisco with respect to CSRAM technology.

42.    In parallel with Micron discussions and at the direction of Cisco and Defendant, Plaintiff also started discussions with Cypress. Plaintiff attended a three-way meeting with Cypress and Cisco where Mr. Ellis told Cypress that acquiring Plaintiff would be beneficial. Based on these representations, Plaintiff and Cypress submitted a proposal to Cisco soon thereafter, but Mr. Ellis told Cypress that it was too late- Cisco had already chosen all its suppliers for the CSRAM technology. Defendant never disclosed to Plaintiff any timelines or other deadlines that Plaintiff needed to meet, nor did Defendant apprise Plaintiff of the status of negotiations with Plaintiff's

competitors.

43.     Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis told Plaintiff that Cisco had reached a second-source supplier deal with Samsung.  Plaintiff contacted Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer.  Mr. Ellis agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial details from the Samsung proposal.  Plaintiff worked with Cypress, and at the end of three days of negotiations, Plaintiff was able to match Samsung's pricing.  Defendant never told Plaintiff that Cisco did not intend to follow through with its offer to accept a matched bid.  When Plaintiff contacted Cisco to deliver its proposal, Plaintiff was informed that the decision had been made to deal with Samsung, and Cisco would not entertain Plaintiff's proposal.

## FURTHER USE OF PLAINTIFF'S TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION

44.     Since the discontinuation of negotiations between Plaintiff and Cisco, Plaintiff has reason to believe that the confidential CSRAM specification that Plaintiff designed as well as Plaintiff's Trade Secrets and Other Information have been used by Cisco, and disclosed to third parties.  Plaintiff has reason to believe that said Trade Secrets and Other Information have since been disclosed to third parties by Defendant.

45.     Throughout the entire relationship, Plaintiff never received any indication from Defendant that Cisco was dissatisfied or otherwise had any concerns regarding Plaintiff's work.  Plaintiff never received any form of remuneration for all of its work on the DDR3 and CSRAM projects with Cisco.  Plaintiff would not have worked on the DDR3 and CSRAM projects with Cisco but for Defendant's multiple assurances that Plaintiff would be adequately remunerated for its work.

### FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty)

46.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 45 above, as if set forth at length here.

47.    Defendant Bechtolsheim, an executive of Cisco, also served on Mosaic's Board of Directors.  As a board member, Defendant Bechtolsheim as an individual owed a fiduciary duty to Mosaic.  Such duty includes, but is not limited to, obligations to be truthful to Mosaic, to exercise good faith and due diligence in his directives to Mosaic and to reasonably look after Mosaic's best interests.

48.    Defendant Bechtolsheim was also Vice President and General Manager of the Gigabit Systems Business Unit (the "Gigabit SBU"), the very department of Cisco which dealt with Mosaic regarding technical developments and business discussions during the parties' interactions.

49.    Defendant Bechtolsheim's position at Cisco involved business activities with other companies on technological developments, such as SRAM chips.  Defendant Bechtolsheim was an executive, and through his management duties, an authorized agent of Cisco.  Defendant Bechtolsheim had the apparent and/or actual authority to engage in business discussions with Mosaic, and Mosaic relied on such authority.  Defendant Bechtolsheim made numerous representations to Plaintiff that he not only had such authority, but also that he had the authority within Cisco to drive a deal with Mosaic through Cisco.  At no time prior to the time Plaintiff was harmed did Defendant disclose to Plaintiff that he did not have such authority.  Mosaic reasonably relied on the representations of its fiduciary.

50.    As a Mosaic board member, Defendant Bechtolsheim made specific representations, as follows:

A.    Cisco's obligations of confidentiality (by signing the NDA);

B.    Cisco's business need for particular types of SRAM within the Gigabit SBU;

C. Cisco's technical requirements within the Gigabit SBU;

D. Cisco's projected needs for SRAM within the Gigabit SBU;

E. The fact that no other competitor could match the speed and performance offered by Mosaic;

F. The specific steps (such as creation of a test chip) that would be required of Mosaic for Cisco to work with Mosaic;

G. Promises to facilitate an acquisition of Mosaic by Cisco; and

H. Representations to potential and actual investors in Mosaic about Cisco's interest in Mosaic and its technology.

51. Defendant Bechtolsheim also omitted to disclose material facts, fact such as:

A. His own authority within Cisco;

B. Cisco's intentions relating to the use of Mosaic Trade Secrets and Other Information;

C. Cisco's intentions relating to an acquisition;

D. Cisco's intentions relating to its discussions with Plaintiff's competitors; and

E. Cisco's unwillingness to abide by promises made by Cisco.

52. Specifically, Defendant Bechtolsheim breached his duty to Mosaic in at least each of the following ways:

A. Defendant Bechtolsheim breached his fiduciary duty to Mosaic by making repeated misrepresentations to Mosaic in the form of assurances (i) that Mosaic was vital to Cisco's interests, (ii) that Mosaic's technology was far ahead of any potential competitors, (iii) that Mosaic did not have to worry about the lack of a formal, written commitment from Cisco, (iv) that such a commitment would be completed, (v) that Mosaic would be a supplier of SRAM for Cisco, or would otherwise receive remuneration for all of its work with Cisco, and (vi) that Mosaic could rely on

1  Defendant Bechtolsheim's representations with respect to Cisco.  As Mosaic later discovered, such

2  representations and assurances were untrue, and furthermore, Defendant Bechtolsheim did not have

3  the authority within Cisco to make them.  These misrepresentations strengthened Mosaic's reliance

4  on Cisco's similar claims, causing Plaintiff to entrust its most vital Trade Secrets and Other

5  Information with Cisco, as well as causing Plaintiff to waste thousands of person-hours working

6

7  hand-in-hand with Cisco to design and test a Static Random Access Memory ("SRAM")

8  semiconductor chip for which Plaintiff ultimately received no remuneration.  All of these

9  misrepresentations were negligent and/or made in bad faith.

10          B.  Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directly

11  disclosing Mosaic Trade Secrets and Other Information to Mosaic competitors and to other third

12

13  parties.  These disclosures not only breached Defendant Bechtolsheim's duty to Mosaic, but also

14  were in breach of Cisco's NDA, which Defendant Bechtolsheim signed on behalf of Cisco.

15          C.  Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by

16  directing Mosaic to pursue the development of SRAM only with Cisco, to the exclusion of other

17

18  potential business partners.  During the initial stages of Mosaic's interaction with Cisco in 2000,

19  Mosaic had to make crucial business decisions concerning who it would partner with, and where to

20  apply its technical expertise in chip design.  Defendant Bechtolsheim utilized his power over Mosaic

21  as a director of Mosaic, as a principal investor in Mosaic, and as the Vice President and General

22  Manager of the very Cisco business unit that sought SRAM suppliers, to convince Mosaic to focus

23

24  only on Cisco to exclusion of other potential business partners.  Such representations and directives

25  were negligent and/or made in bad faith.

26          D.  Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directly

27  providing Cisco with confidential Mosaic Trade Secrets and Other Information with full knowledge

28  that Cisco was utilizing this information to aid in reaching supplier agreements with Mosaic's

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.

competitors, and in breach of the NDA.

E. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by providing Cisco with Mosaic Trade Secrets and Other Information for purposes other than those stipulated by the Non-Disclosure Agreement ("NDA"). Furthermore, Defendant Bechtolsheim signed the NDA on behalf of Cisco, and Cisco failed to follow it.

F. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by falsely promising an acquisition offer by Cisco to Mosaic.

G. Defendant Bechtolsheim further breached his fiduciary duty by misrepresenting to Mosaic that he had the requisite authority and influence within Cisco to drive a final deal through Cisco, and that Mosaic could rely on this fact and on Cisco's verbal promises and commitments even though Mosaic did not have a formal, written commercial agreement with Cisco. Such misrepresentations were negligent and/or made in bad faith.

H. Defendant Bechtolsheim further breached his duty by repeatedly failing to disclose information pertinent to Mosaic and its shareholders' best interests. Defendant Bechtolsheim neglected his obligations as a fiduciary by deliberately allowing Mosaic to operate under false assumptions for his own and for Cisco's gain.

I. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by failing to recognize his fundamental conflict of interest and disengage from any activities with respect to the two parties' interaction. Such failures were negligent and/or made in bad faith.

J. Defendant Bechtolsheim further breached his fiduciary duty generally, by putting his own and Cisco's interests ahead of Mosaic's.

53. Mosaic's time, money, and energy were devoted to the DDR3 and CSRAM projects, custom projects that could not be used with any other companies (Cisco's competitors) by nature of the custom design. Mosaic employees worked directly with Defendant Bechtolsheim to aid Cisco's

design. Several Cisco employees worked with Mosaic at the direction of Defendant Bechtolsheim. Mosaic employees worked with Cisco at the direction of Defendant Bechtolsheim.

54.    Cisco's business negotiations granted Cisco access to Mosaic and its Trade Secrets and Other Information, insight which other companies did not have. Cisco had access to Mosaic's financial and funding information and thus was aware of Mosaic's negotiating leverage with other parties. Plaintiff would not have provided access to said information but for Defendant Bechtolsheim's multiple verbal and other assurances to Plaintiff.

55.    The actions by Defendant Bechtolsheim and the benefits conferred on Cisco put Mosaic in an unequal and disadvantaged bargaining position with Cisco. Furthermore, Defendant Bechtolsheim's role as head of the Gigabit SBU caused Mosaic to trust Cisco in its dealings at a level that is higher than would be expected in an arm's length transaction. Because Defendant Bechtolsheim was in a position to direct Mosaic, Cisco obtained undue leverage in the negotiation process.

56.    Defendant knew that Plaintiff reasonably relied upon the relationship of trust that existed between Defendant and Mosaic given Defendant's status as an active member of Plaintiff's Board of Directors. Defendant knew that this reliance by Plaintiff would cause great damage to Plaintiff's business if Cisco failed to remunerate Mosaic.

57.    Defendant breached his fiduciary duty and trust by negligently and/or in bad faith failing to act in Plaintiff's best interests. Defendant breached his fiduciary duty by depriving Mosaic of the compensation it rightly deserved.

58.    Plaintiff did not begin learning of Defendant's breaches of duty until 2003 and commenced its investigation thereof in a reasonable fashion.

59.    The substantial expenditures made by Plaintiff based on Defendant's misrepresentations and breach of duty have cost Plaintiff irreparable harm and that expenditure is the

proximate cause of damages to Plaintiff.

60.    Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

61.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

62.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 61 above, as if set forth at length here.

63.    Defendant made several representations to Plaintiff that Cisco would to provide financial remuneration to Plaintiff. This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco.

64.    Defendant made further representations during multiple board and other meetings about Cisco's interest in Plaintiff, and about how no competitor could match Plaintiff's products in Cisco's eyes.

65.    Defendant made further representations to Plaintiff with respect to the direction that Plaintiff should take, while omitting material facts that he had a duty to disclose, namely that Cisco was in fact pursuing other competitors and was not willing to provide remuneration to Plaintiff.

66.    Said representations were in fact false and/or misleading in light of the omitted facts. At the time said statements were made, Defendant knew or had reason to know that they were false or misleading in light of the omitted facts. Said statements were negligent, for at the time Defendant Bechtolsheim's multiple promises and assurances were made, Defendant Bechtolsheim did not exercise any of the diligence required of him in his role as a fiduciary of Plaintiff to, in good faith, confirm the veracity of said promises and assurances. Given Defendant's knowledge of the weight

his words carried with respect to Plaintiff's interaction with Cisco, said promises and assurances were grossly negligent.

67.    Defendant negligently intended that Plaintiff rely on his statements and promises, and Plaintiff did reasonably rely on such statements and promises to its detriment.

68.    Defendants's negligent misrepresentations have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(Constructive Fraud)

69.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 68 above, as if set forth at length here.

70.    Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also constitute constructive fraud.

71.    As discussed above, Defendant Bechtolsheim had a fiduciary duty to Mosaic to preserve, improve, and protect Mosaic's viability and interests, a duty upon which Mosaic justifiably relied. Defendant Bechtolsheim breached his fiduciary duty to Mosaic in numerous ways.

72.    Defendant Bechtolsheim made several representations to Plaintiff that Cisco was to provide financial remuneration to Plaintiff. Such representations and inducements were made all in effort to induce Mosaic to continue to trust Cisco, and to continue providing Cisco with Mosaic Trade Secrets and Other Information as well as its engineering expertise. Defendant Bechtolsheim made assurances that Mosaic would receive purchases by Cisco in the form of a commercial agreement, a non-recurring engineering fee, investment by Cisco in Mosaic, or acquisition of Mosaic by Cisco.

73.    Said representations were in fact false. Cisco did not provide financial remuneration to Plaintiff.

74.    Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.

from companies that would compete with Cisco.  Defendant further failed to disclose that Cisco had not made any plans to provide financial remuneration to Plaintiff.

75.    Reasonably relying on the false representations made by Defendant Bechtolsheim, Mosaic advised Cisco in the design of DDR3 chip, advised Cisco in the design of the CSRAM specification, advised Cisco in the architecture and engineering of the CSRAM chip, aided in the development and engineering in the CSRAM chip, and responded to Cisco's repeated inquiries regarding the specific proprietary design details needed to bring the chip to production.

76.    Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover such damages in an amount to be determined at trial.

77.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Concealment)

78.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 77 above, as if set forth at length here.

79.    As a director of Plaintiff, Defendant Bechtolsheim owed a fiduciary duty to Plaintiff, including the duty to disclose important facts pertinent to Mosaic's interests.

80.    As discussed in detail above, over the course of the interaction between Mosaic and Cisco from 2000 through 2003, Defendant Bechtolsheim intentionally failed to disclose many important facts to Plaintiff.  Specifically, Defendant Bechtolsheim concealed the following important facts from Plaintiff: (i) that Cisco was using Mosaic Trade Secrets and Other Information for purposes other than those allowed by the NDA, including to develop competitive bids, (ii) that Cisco was disclosing Mosaic Trade Secrets and Other Information to third parties, (iii) that Defendant Bechtolsheim himself was using Mosaic Trade Secrets and Other Information for purposes other

than those allowed by the NDA as well as disclosing Mosaic Trade Secrets and Other Information to third parties, (iv) that Cisco did not in fact intend to acquire Plaintiff or otherwise provide any remuneration for Plaintiff's work for Cisco, and (v) other important facts discussed in Paragraphs 1 through 79 above.  Plaintiff is informed and believes, and on that basis alleges that Defendant Bechtolsheim intended to deceive Plaintiff by concealing the important facts.

81.    Plaintiff did not know of the important facts concealed by Defendant, and Plaintiff reasonably relied on Defendant Bechtolsheim's deception.

82.    Plaintiff was harmed and Defendant Bechtolsheim's concealment of important facts from Plaintiff was a substantial factor in causing Plaintiff's harm and in causing substantial damages to Plaintiff.

83.    Defendant's wrongful actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Statutory Unfair Competition)

84.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 83 above, as if set forth at length here.

85.    Defendant's acts as described above were designed to and constitute unfair competition by Cisco in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

86.    Defendant's unfair and unlawful actions have caused extensive damage to Plaintiff. By its actions, Defendant has effectively kept Plaintiff from competing in the marketplace.

87.    As a direct and proximate cause of Defendant's unfair practices, Cisco has been unjustly enriched and Plaintiff has provided value to Cisco, which must be repaid in restitution in an amount to be proven at trial.

88.    Plaintiff has also suffered irreparable harm as a result of Defendant's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendant is enjoined from engaging in any further such acts of unfair competition.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Cisco, jointly and severally, as follows:

A.    On the First Cause of Action, for damages and punitive damages in an amount to be determined at trial;

B.    On the First Cause of Action, for exemplary damages in an amount to be determined at trial;

C.    On the Second and Third Causes of Action for damages in an amount to be determined at trial;

D.    On the Third Causes of Action, for punitive damages in an amount to be determined at trial;

E.    On the Fourth Cause of Action for damages and punitive damages in an amount to be determined at trial

F.    On the Fifth Cause of Action, for restitution in an amount to be determined at trial;

G.    On the Fifth Cause of Action, for an injunction against further unfair trade practices;

H.    For reasonable attorney's fees, as authorized by law; and,

1.      For such other and further relief as the Court deems just and proper.

Dated: October 13, 2006

RUSSO & HALE LLP

By: _Jack Russo_
      Jack Russo
      Michael Risch

Attorneys for Plaintiff
MOSAIC SYSTEMS, INC.

EXHIBIT C



1  JACK RUSSO State Bar No. 96068
   CHRISTOPHER SARGENT State Bar No. 246285
2  RUSSO & HALE LLP
   401 Florence St.
3  Palo Alto, CA 94301
   Tel.: 650-327-9800
4  Fax: 650-327-3737
   Email: jrusso@computerlaw.com
5  Email: csargent@computerlaw.com

6  Attorneys for Plaintiff
   MOSAIC SYSTEMS, INC.

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF SANTA CLARA

10

11  MOSAIC SYSTEMS, INC., a California          )  Case No. 1-04 CV016867 (Consolidated for
    corporation,                                )  limited purposes with Case No. 1-06 CV
12                                              )  072920)
                                                )
13                         Plaintiff,           )  [PROPOSED] ORDER
                                                )
14            v.                                )
                                                )
15  CISCO SYSTEMS, INC., a Delaware             )
    corporation, and DOES 1 through 20,         )
16  inclusive,                                  )
                                                )
17                         Defendants.          )
                                                )
18  _____         )
                                                )
19  MOSAIC SYSTEMS, INC.,                       )
                                                )
20                         Plaintiff,           )
                                                )
21            v.                                )
                                                )
22  ANDREAS BECHTOLSHEIM, and DOES              )
    1-20,                                       )
23                                              )
                           Defendants.          )
24  _____         )

25

26

27

28  [Proposed] Order                    1                        1-04 CV016867

1      WHEREAS, on or about October 13, 2006, Plaintiff Mosaic Systems, Inc. (Plaintiff" or

2   "Mosaic") filed the Case No. 1-06 CV 072920 against Andreas Bechtolsheim (the "*Mosaic v.*

3   *Bechtolsheim* Action");

4      WHEREAS, on or about May 21, 2007, Defendant Cisco Systems, Inc. ("Defendant" or

5   "Cisco") filed a motion to consolidate the *Mosaic v. Bechtolsheim* Action for all purposes

6   including for discovery, motion practice and for trial;

7      WHEREAS, Mosaic opposed Cisco's consolidation motion and has requested that the

8   *Mosaic v. Bechtolsheim* Action be set for a separate trial after trial in the *Mosaic v. Cisco* Action;

9      NOW, THEREFORE, for good cause shown, after hearing argument by counsel for the

10  parties, the Court hereby orders as follows:

11      1.      The *Mosaic v. Bechtolsheim* Action shall be consolidated with the *Mosaic v.*

12              *Cisco* Action for purposes of discovery and motions but the Court defers and

13              reserves its decision on whether the two cases will be consolidated for trial;

14      2.      The hearing on the pending demurrer by Defendant in the *Mosaic v. Bechtolsheim*

15              Action shall remain on calender for July 3, 2007 before this Court;

16      3.      The Trial Setting Conference currently set for July 17, 2007 shall be reset as a

17              Case Management Conference to occur on July 17, 2007, at 10:00 a.m.

18      4.      The parties shall meet and confer on and after July 3, 2007 with respect to putting

19              the *Mosaic v. Bechtolsheim* Action at issue and with a view for setting a new Trial

20              Setting Conference in this action; and,

21

22

23

24

25

26

27

28  [Proposed] Order                                2                                    1-04 CV016867

5.      The parties also shall meet and confer on and before July 3, 2007 with respect to
scheduling of deposition and other discovery to be completed before the end of
this calender year.

Entered on this _18th_ day of June, 2007.

IT IS SO ORDERED:

Honorable Kevin McKenney

APPROVED AS TO FORM:

Dated: _June 13, 2007_                    MORGAN, LEWIS & BOCKIUS LLP

By: _____

Howard Holderness, Esq.
Lorelei A. Craig, Esq.

Attorneys for Defendants
ANDREAS BECHTOLSHEIM
and CISCO SYSTEMS, INC.

[Proposed] Order                              3                              1-04 CV016867

EXHIBIT D

COPY

1  JACK RUSSO (State Bar No. 96068)
   CHRISTOPHER SARGENT (State Bar No. 246285)
2  RUSSO & HALE LLP
   401 Florence Street
3  Palo Alto, CA 94301
   Phone: 650-327-9800
4  Email: jrusso@computerlaw.com
   Email: csargent@computerlaw.com
5
   Attorneys for Plaintiff
6  MOSAIC SYSTEMS, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SANTA CLARA

10 ───────────────────────────────

11 MOSAIC SYSTEMS, INC., a          )  Case No. 1-06-CV072920
   California corporation,          )
12                                  )  **FIRST AMENDED COMPLAINT FOR**
              Plaintiff,            )  **BREACH OF FIDUCIARY DUTY**
13                                  )  **(LOYALTY), BREACH OF FIDUCIARY**
          v.                       )  **DUTY(CARE), BREACH OF FIDUCIARY**
14                                  )  **DUTY (HONESTY), BREACH OF**
   ANDREAS BECHTOLSHEIM, an         )  **FIDUCIARY DUTY(GOOD FAITH),**
15 individual, and DOES 1-20,       )  **BREACH OF FIDUCIARY**
                                    )  **DUTY(LOYALTY-PATENT), BREACH**
16            Defendants.           )  **OF FIDUCIARY DUTY (CARE-TRADE**
                                    )  **SECRET), CONSTRUCTIVE FRAUD,**
17                                  )  **AND CONCEALMENT**
                                    )
18                                  )  **[JURY TRIAL DEMANDED]**
                                    )
19 ───────────────────────────────  )

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────
First Amended Complaint                                    Case No. 1-06-CV072920

1         Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Andreas

2   Bechtolsheim ("Defendant" or "Bechtolsheim") as follows:

3                            **INTRODUCTION**

4       1.      This is an action for breach of fiduciary duty (duty of loyalty), breach of fiduciary

5   duty (duty of care), breach of fiduciary duty (duty of honesty), breach of fiduciary duty (duty of

6   good faith), breach of fiduciary duty (duty of loyalty - theft of patent), breach of fiduciary duty

7   (duty of care - theft of trade secret), constructive fraud, and concealment (collectively, the

8   "Action") following Defendant's failure to uphold a director's fiduciary duties of loyalty, good

9   faith and due diligence. As a member of Plaintiff Mosaic's Board of Directors **and** as Vice

10   President and General Manager of the Cisco unit with which Mosaic sought to do business,

11   eventually Mosaic's only customer, Defendant dominated Mosaic completely. Defendant exerted a

12   unique influence and undue control over Mosaic with respect to its interaction with Cisco.

13   Defendant made empty promises and bad faith directives to Plaintiff, the reliance on which caused

14   Mosaic to repeatedly divulge valuable trade secrets, proprietary materials, chip design

15   documentation, and other confidential information (collectively the "Trade Secrets and

16   Confidential Information") to Defendant's employer, Cisco Systems, Inc ("Cisco"). Defendant's

17   statements and actions caused Plaintiff to waste thousands of person-hours working hand-in-hand

18   with Cisco to design and test a Static Random Access Memory ("SRAM") semiconductor chip for

19   which Plaintiff ultimately received no remuneration. In breach of his fiduciary duties, defendant

20   allowed individuals under his supervision at Cisco to wrongfully apply for a patent stolen from,

21   derived from, and based upon Plaintiff's Trade Secrets and Confidential Information and other

22   Mosaic knowledge. Defendant also improperly directly disclosed said information to Mosaic

23   competitors and other third parties. Defendant Bechtolsheim's violation of and failure to uphold

24   his fiduciary duties caused Plaintiff to disclose its Trade Secrets and Confidential Information to

25   Cisco, and caused Plaintiff to invest its time and engineering expertise in Cisco to the exclusion of

26   other business partners and opportunities. Plaintiff seeks damages in amount to be determined at

27   trial.

28   //

---

**First Amended Complaint**                  2                  **Case No. 1-06-CV072920**

**PARTIES**

2.    Plaintiff Mosaic is a corporation duly organized and existing under California law with its principal office based in Los Altos, California, and was formerly based in Sunnyvale, California.

3.    Defendant Bechtolsheim is an individual residing, on information and belief, in Portola Valley, California.

4.    Defendants Does 1 through 20, inclusive, whether individuals, corporations, associations or otherwise are fictitious names of defendants whose true names and capacities are at this time unknown to Plaintiff.  Each of said fictitiously named defendants, whether individuals, corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately thereby as hereinafter alleged.  At such time as defendants' true names become known to Plaintiff, Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and capacities.

5.    Plaintiff is informed and believes and on that basis alleges that Cisco along with Defendants Does 1 through 20 did agree together and conspire together, with knowledge of their unlawful purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full course and scope of their illegal conspiracy, with the full knowledge and consent, either express or implied, of each of the other Defendants.

**JURISDICTION AND VENUE**

6.    This Court has general jurisdiction of all claims herein arising under California law.

7.    Venue is proper in this Court because the fiduciary and other obligations of Defendant arose and were to be performed in Santa Clara County, California.

**BACKGROUND FACTS**

8.    Defendant Bechtolsheim is the former Vice President and General Manager of the Gigabit Systems Business Unit at Cisco.  Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim's responsibilities in Cisco's Gigabit Systems Business Unit included, but were not limited to, developing network switching technologies such as the Catalyst 4000 Gigabit Switch family.

1      9.      Mosaic is a fabless semiconductor company specializing in the design, development

2    and engineering of high performance SRAM for the networking and communications marketplace.

3      10.      Beginning in mid-2000, Defendant Bechtolsheim communicated to Mosaic that

4    Cisco was interested in developing a high-speed SRAM chip, and that Cisco was interested in

5    working with Mosaic to do so.  At the time, Mosaic knew how to make high performance SRAM

6    chips that were significantly faster than previously developed chips. Where most SRAM suppliers

7    at the time were only able to project the ability to supply parts in the 300 - 400 MHz range for high

8    performance SRAM, Mosaic was already forecasting the ability to achieve 750 - 1000 MHz.

9      11.      Defendant Bechtolsheim encouraged Mosaic to work with Cisco on the

10   development of a custom SRAM chip, and assured Mosaic that no other competitor could match

11   the speed and capabilities of the SRAM design offered by Mosaic.  On this basis, Mosaic entered

12   into serious business discussions with Cisco regarding collaborating to design and develop a

13   high-speed SRAM chip which Cisco would ultimately purchase from Mosaic.

14     12.      On July 28, 2000, Mosaic closed Series A funding.  Mosaic was able to raise over

15   $2.5 million, based largely on the strong indications from both Defendant Bechtolsheim and Cisco

16   that Mosaic was going to be a chief supplier of Cisco's SRAM needs.  In fact, Defendant

17   Bechtolsheim himself was an investor in Mosaic.  Defendant Bechtolsheim joined Mosaic's Board

18   of Directors at this time, assuming an active director's role over the company, and entering into a

19   clear fiduciary relationship with Mosaic.

20     13.      After becoming a member of Mosaic's Board of Directors, Defendant Bechtolsheim

21   became increasingly dominant over Mosaic as a result of his investment in Mosaic, his

22   membership on the Board, and his role as a primary representative of Mosaic's most important,

23   and later only, customer – Cisco.

24     14.      After receiving Series A funding, Mosaic endeavored to hire a team of engineers

25   who could make the discussed SRAM a reality for Cisco.  In January of 2001, engineering

26   candidate Rich Roy met with then Mosaic CEO Suren Alexanian and Defendant to discuss Cisco's

27   need for high-speed SRAM chips and the role Mosaic could play to meet that need.  Defendant

28

1  Bechtolsheim convinced Mr. Roy that Cisco was serious about working with Mosaic to design

2  SRAM chips, and Mr. Roy joined Mosaic as Vice President of Engineering at this time.

3  **BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN DDR3 SRAM FOR CISCO**

4      15.    In 2001, IBM advertised that it could achieve 750 MHz high performance SRAM at

5  a very high price per unit, and provided Cisco with an SRAM specification called "DDR3." In

6  March 2001, at another meeting with Mr. Alexanian and Mr. Roy, Defendant Bechtolsheim

7  delivered the IBM specification to Mosaic and instructed Mosaic to try to design a chip that fit

8  IBM's specification. Defendant Bechtolsheim told Mosaic that Cisco would be the primary

9  customer for the designed chip, and that Cisco wanted Mosaic to serve as the second source to

10  IBM on the project.

11      16.    Defendant Bechtolsheim's personal assurances, coupled with his status as both a

12  director of Mosaic and as Vice President and General Manager of the business unit at Cisco

13  seeking SRAM, convinced Mosaic to begin work on the DDR3 test chip for Cisco with the

14  understanding that Mosaic would be a supplier of the chip. Defendant firmly insisted upon this

15  path for Mosaic, and assured Mosaic that its technology was far ahead of the competition and that

16  Mosaic was definitively going to be a source of SRAM for Cisco. Had Defendant Bechtolsheim

17  not made such assurances, Mosaic would not have invested its time and resources in the DDR3

18  project.

19      17.    When Mosaic started working on DDR3, Mosaic initially tried to mold it to fit both

20  Sun Microsystems' ("Sun") and Cisco's needs. However, Defendant Bechtolsheim convinced

21  Mosaic that Cisco's interests in pursuing networking, and its specific priorities with respect to the

22  chip specifications, were significantly different than those of Sun. With repeated assurance from

23  Defendant that Cisco's demand and potential pricing for the SRAM product was such that all

24  Mosaic had to do was deliver the chip and Cisco would purchase the chips from Mosaic, Mosaic

25  made the decision to optimize for Cisco's need.

26      18.    To protect its Trade Secrets and Confidential Information, Mosaic requested that

27  Cisco enter into a written Mutual Non-Disclosure Agreement ("NDA"). Such an agreement was

28  entered into on or about May 2, 2001. Defendant Bechtolsheim signed the NDA on behalf of

---

**First Amended Complaint**                    5                    **Case No. 1-06-CV072920**

1 | Cisco. The NDA stipulated that Mosaic's Trade Secrets and Confidential Information could be

2 | used only for the purposes of evaluating a potential business relationship. Plaintiff trusted

3 | Defendant, as a Director on Mosaic's Board, and Cisco that Cisco would honor its agreements, and

4 | not use any Trade Secrets and Confidential Information disclosed by Plaintiff without an express

5 | agreement allowing such use.

6 | 19.    Mosaic began work on the DDR3 design and, under the NDA, disclosed to Cisco

7 | the architecture and technology details describing how the DDR3 could meet Cisco's power,

8 | performance, and die size needs - all of which are important for pricing. Even with the NDA,

9 | Mosaic would not have disclosed its Trade Secrets and Confidential Information to Cisco

10 | regarding the DDR3 design had it not been for Defendant Bechtolsheim's specific direction that

11 | Mosaic do so. An initial test chip was "taped out" during May 2001, and in October, Mosaic was

12 | able to confirm for Cisco the capability of meeting an 800 MHz address rate in standard TSMC

13 | 0.18 micron process technology. Mosaic would not have done this work for Cisco had it not been

14 | for Defendant Bechtolsheim's assurances to Mosaic that it would be a supplier of SRAM to Cisco.

15 | 20.    The success of the test chip and strong indications from both Defendant and Cisco

16 | that Mosaic would be a source of SRAM for Cisco enabled Mosaic to close a Series B round of

17 | funding in the end of 2001 and early 2002. Mosaic was able to raise over $4 million, and once

18 | again Defendant Bechtolsheim was an investor.

19 | 21.    Mosaic continued to work on the DDR3 with the understanding that it would be a

20 | supplier of SRAM for Cisco. After committing millions of dollars of Mosaic investment money

21 | and thousands of person hours to develop the DDR3 chip for Cisco, Mosaic was ready to do a

22 | "tape out" of the DDR3 chip to silicon in the Summer of 2002. This would have cost the company

23 | a major expense (over one million dollars) and would have put the company in a very unstable

24 | financial situation in the absence of any formal commercial agreement. Despite Cisco's failure to

25 | formally commit to the supplier agreement promised by Defendant, Defendant Bechtolsheim

26 | strongly encouraged Mosaic to tape out.

27 | 22.    However, in May 2002, Mosaic learned that Cisco was having problems with the

28 | DDR3 architecture and its new processor, problems which Defendant had not disclosed when he

1    directed Mosaic to "tape out." IBM claimed that its design could not achieve the required 750

2    Mhz operation. With the performance of IBM less certain, Cisco had growing concerns over the

3    DDR3 SRAM design.

4        23.    On June 6, 2002, Defendant Bechtolsheim, Rich Roy, Tony Moroyan (the new

5    CEO of Mosaic), Dipankar Bhattacharya (a Cisco manager), and Jim Weaver (a Cisco engineer)

6    met to discuss the technical problems that had arisen with DDR3. At this meeting, Mosaic

7    presented results from simulations showing the that 750 Mhz SRAM was both viable and within

8    budget. Impressed with these results, Cisco proposed the idea of scrapping IBM's DDR3

9    specification and working directly with Mosaic to create a new, custom SRAM.

10    **BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN CSRAM FOR CISCO**

11        24.    Between June and July 2002, Mosaic and Cisco worked together to create the

12    CSRAM specification ("CSRAM Spec") in order to solve the technical problems of DDR3.

13    During this time, Mosaic and Cisco engineers (including Defendant) communicated in person and

14    by e-mail nearly every day regarding possible design techniques and implementations to solve

15    Cisco's problems. Many of these e-mails contained Plaintiff's Trade Secrets and Confidential

16    Information.

17        25.    Through Defendant's representations, Plaintiff reasonably believed that Cisco

18    would abide by the NDA, and that Plaintiff was the only company Cisco was working with to

19    develop this type of technology. Defendant never disclosed to Plaintiff that Cisco was in fact

20    evaluating Plaintiff's competitors, using Trade Secrets and Confidential Information disclosed

21    under the NDA to develop competitive bids, or that the Trade Secrets and Confidential Information

22    were being distributed to third-parties without Plaintiff's knowledge or consent.

23        26.    Defendant Bechtolsheim had personal knowledge that Cisco was using and

24    disclosing Plaintiff's Trade Secrets and Confidential Information in breach of the NDA.

25    Defendant Bechtolsheim did not inform Plaintiff of this fact, and moreover, continued to direct

26    Mosaic to work with Cisco in the development of the CSRAM chip, and continued to direct

27    Mosaic to disclose its Trade Secrets and Confidential Information to Cisco.

28    //

---

First Amended Complaint        7        Case No. 1-06-CV072920

1    27.    Plaintiff first became aware of and concerned with competitors for Cisco's

2  business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron

3  Technology, Inc. ("Micron") gave Cisco a quote of one hundred dollars ($100) per chip.  This

4  initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron

5  had never, in fact, provided Cisco a one hundred dollar ($100) quote for the CSRAM chip.

6  Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim

7  intentionally misrepresented the Micron "quote" in order to drive the cost of the CSRAM chip

8  lower against Mosaic's interests.

9                              **THE ACQUISITION OFFER**

10    28.    In September 2002, Defendant Bechtolsheim represented that he had instructed his

11  unit at Cisco to either acquire Plaintiff or otherwise provide economic remuneration.  Defendant

12  intentionally or negligently did not disclose that Cisco was disregarding instructions from

13  Defendant.  In fact, Defendant purposely or negligently created the false impression at Mosaic that

14  he could direct Cisco to acquire Plaintiff, or to otherwise ensure that Mosaic would be provided

15  adequate compensation for Mosaic's work on CSRAM to date.  Cisco then informed Plaintiff that

16  Cisco was interested in acquiring Plaintiff, which directly followed Defendant's similar

17  representation.  Cisco began to conduct due diligence, and as part of the due diligence, asked

18  Plaintiff to provide even further updated and highly detailed Trade Secrets and Confidential

19  Information about the CSRAM design, including, but not limited to, extremely sensitive Trade

20  Secrets and Confidential Information such as die size, power numbers, costs, and design

21  techniques.  In reliance on Defendant Bechtolsheim's authoritative promises and assurances,

22  Plaintiff provided these further Trade Secrets and Confidential Information.

23    29.    On October 1 and October 2, 2002, as part of Cisco's continued due diligence for its

24  planned acquisition of Plaintiff, Cisco requested the résumés from five of Plaintiff's engineers.  On

25  or about October 2, 2002, Cisco arranged a meeting with these five engineers. During this meeting,

26  Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in

27  addition to the current CSRAM project, and their willingness to transition their work from Mosaic

28  to Cisco.

1       30.    After the completion of the October 2, 2002 meeting between Plaintiff and

2 Cisco, Plaintiff reasonably relied on Cisco and Defendant's representation that it was being

3 acquired by Cisco, and Plaintiff disclosed the requested additional Trade Secrets and Confidential

4 Information to Cisco's processor design team. In fact, in October 2002, Plaintiff provided Cisco

5 with Trade Secrets and Confidential Information that set out precisely what it would take to

6 produce the CSRAM chip and how the chip would be assembled.

7                                 **THE EXCLUSIVITY AGREEMENT**

8       31.    At a December 5, 2002 meeting with Cisco, Mr. Luca Cafiero, Vice President of

9 Storage Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all

10 of Cisco's CSRAM sales. By the end of the December 5, 2002 meeting, Plaintiff and Cisco agreed

11 that Plaintiff would receive exclusivity, royalty payment, and actual costs for engineering and

12 development from Cisco for the CSRAM technology. Plaintiff later discovered that Cisco was in

13 fact actively soliciting quotes on the CSRAM chip from Plaintiff's competitors at this time, and

14 that Defendant knew the details of this but never disclosed it to Plaintiff. Plaintiff is informed and

15 believes and on that basis alleges that Cisco distributed Plaintiff's Trade Secrets and Confidential

16 Information to Plaintiff's competitors, and that Defendant knew this fact but did not disclose it to

17 Plaintiff. Plaintiff is informed and believes and on that basis alleges that Defendant himself

18 distributed Plaintiff's Trade Secrets and Confidential Information to Plaintiff's competitors.

19       32.    During this December 5, 2002 meeting, Mosaic and Cisco discussed Cisco's

20 decision not to acquire Mosaic but instead decided: (1) to grant exclusivity to Mosaic for all supply

21 of CSRAM to Cisco; (2) to pay fifty percent (50%) royalty of the material cost of the final

22 packaged product and tested CSRAM; and (3) to pay actual non-recurring engineering costs of at

23 least five to six (5-6) million dollars (but not to exceed fifty (50) million dollars) to Mosaic,

24 representing the costs of the chip engineering and development.

25       33.    The $5-6 million non-recurring engineering fee was based on an estimate that

26 Plaintiff had previously quoted as the level of funding that would be necessary to bring the chip to

27 production if Plaintiff was acquired by Cisco. Mr. Cafiero agreed to this budget as long as the

28 costs did not exceed fifty (50) million dollars.

1     34.    Plaintiff reasonably relied on Cisco's promise, and Plaintiff continued to dedicate

2     its time and energy toward the development of the CSRAM chip following Defendant

3     Bechtolsheim and Cisco's directions and assurances.  Defendant never disclosed to Plaintiff that

4     Cisco would not perform on its promise.   Based on Cisco's verbal agreement (communicated by

5     Mr. Cafiero), Plaintiff also continued to provide additional Trade Secrets and Confidential

6     Information to Cisco pursuant to Cisco's requests.

7                    **CISCO BREACHES THE EXCLUSIVITY AGREEMENT**

8     35.    Following the December 5, 2002 meeting, John McCool, Vice President of

9     Engineering for Cisco's Gigabit Systems Business Unit, told Plaintiff that it would not receive

10    exclusivity despite Cisco's representations, and that Cisco would not make any non-recurring

11    engineering commitment to Plaintiff even though Cisco had promised and agreed to the same

12    through Mr. Cafiero.  Mr. McCool worked directly for Defendant in the Gigabit

13    Systems Business Unit and was responsible for implementing Defendant Bechtolsheim's

14    directives.

15    36.    Defendant hid from Plaintiff that Cisco would not perform, nor did he request Mr.

16    McCool to perform on behalf of Cisco.  In fact, Defendant agreed with his Cisco co-workers that

17    Cisco would not perform on its promises to Mosaic.

18    37.    Despite Cisco's blatant failure to live up to its multiple promises, Plaintiff

19    continued to cooperate with Mr. McCool in a failed attempt to salvage some remnant of their

20    business relationship.  However, despite Mr. Cafiero's assurance that Cisco would pay the costs of

21    designing a chip even if they exceeded $5 million (as long as those costs did not exceed $50

22    million), Mr. McCool insisted that Plaintiff's proposals had to be within a $5-6 million budget.

23    After hours of detailed analysis and planning, Plaintiff entered a proposal that even took these new

24    Cisco "concerns" (communicated by Mr. McCool) into consideration and set new funding limits.

25    38.    Cisco told Plaintiff that the pending project would be transferred to Richard Ellis

26    from Cisco's Purchasing department.  Plaintiff was also told by Cisco that another final agreement

27    between Cisco and Mosaic would be completed by January 15, 2003.  Defendant Bechtolsheim,

28    despite his continued role on Mosaic's Board of Directors, did not disclose to Plaintiff that Cisco

1   did not intend to complete any agreement by January 15, 2003. In fact, Defendant continued to

2   falsely reassure Plaintiff in the face of Plaintiff's growing concerns.

3       39.    Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to

4   Christmas of 2002. At this point, Plaintiff continued to reasonably believe that Cisco would live

5   up to its promises, and Defendant did not disclose to Plaintiff that Cisco would do otherwise,

6   despite his personal knowledge that Cisco was actively seeking bids from Plaintiff's competitors.

7   At the meeting, Mr. Ellis stated that if not for the Christmas holiday, the deal between Plaintiff and

8   Cisco would be completed within two to three days. Plaintiff's staff went on vacation expecting to

9   return in early January to conclude its agreement with Cisco. However, Plaintiff later discovered

10  that within a few days of its initial meeting with Mr. Ellis, Cisco had reached an independent

11  agreement with Sony as Cisco's supplier for CSRAM chips. Plaintiff contacted Mr. Ellis early in

12  the first week of January 2003 to inquire about the status. Mr. Ellis told Plaintiff that Cisco was

13  busy working out the details of the deal and that Plaintiff should not be concerned. Mr. Ellis did

14  not disclose to Plaintiff that Cisco had already reached an agreement with Sony over the holiday

15  season. At no time did Defendant Bechtolsheim disclose this information either.

16      40.    Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Cisco and

17  Plaintiff would be closed soon, and based on that and Defendant's failure to disclose any contrary

18  facts, Plaintiff continued to dedicate its time and energy toward the development of the CSRAM

19  chip. Based on Mr. Cafiero's and Mr. Ellis' verbal assurances and Defendant's failure to disclose

20  the true facts, Plaintiff also continued to disclose Trade Secrets and Confidential Information to

21  Cisco upon Cisco and Defendant's requests.

22      41.    In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior

23  promises and reassurances, Cisco would not perform on its agreement with Mosaic or enter into

24  any new agreement, and that Mosaic should expect that some alternative transaction sponsored by

25  Cisco would be the best way to receive compensation for all of its work. Mr. Ellis referred

26  Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc.

27  ("Micron"). Mr. Ellis expressed interest in doing business with an American company, and he

28  advocated for Micron and Cypress to work with Plaintiff to submit a business proposal to Cisco.

---

**First Amended Complaint**                                 11                          **Case No. 1-06-CV072920**

1    42.    At the direction of Cisco and Defendant Bechtolsheim, Plaintiff traveled to Boise,

2   Idaho to try to negotiate an acquisition deal with Micron.  The initial meeting with Micron went

3   well enough for the Micron team to fly out to San Jose, California to continue the negotiations.

4   Mr. Ellis attended the meeting in San Jose between Micron and Plaintiff, and tried to convince

5   Micron that by acquiring Plaintiff, Micron would be obtaining a new business relationship with

6   Cisco with respect to CSRAM technology.

7    43.    In parallel with Micron discussions and at the direction of Cisco and Defendant,

8   Plaintiff also started discussions with Cypress.  Plaintiff attended a three-way meeting with

9   Cypress and Cisco where Mr. Ellis told Cypress that acquiring Plaintiff would be beneficial.

10  Based on these representations, Plaintiff and Cypress submitted a proposal to Cisco soon

11  thereafter, but Mr. Ellis told Cypress that it was too late–Cisco had already chosen all its suppliers

12  for the CSRAM technology.  Defendant Bechtolsheim never disclosed to Plaintiff any deadlines or

13  other timelines that Plaintiff needed to meet, nor did Defendant apprise Plaintiff of the status of

14  negotiations with Plaintiff's competitors.

15   44.    Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis

16  told Plaintiff that Cisco had reached a second-source supplier deal with Samsung.  Plaintiff

17  contacted Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer.

18  Mr. Ellis agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial

19  details from the Samsung proposal.  Plaintiff worked with Cypress, and at the end of three days of

20  negotiations, Plaintiff was able to match Samsung's pricing.  Defendant Bechtolsheim never told

21  Plaintiff that Cisco did not intend to follow through with its offer to accept a matched bid.  When

22  Plaintiff contacted Cisco to deliver its proposal, Plaintiff was informed that the decision had been

23  made to deal with Samsung, and that Cisco would not even entertain Plaintiff's proposal.

24    **FURTHER USE OF PLAINTIFF'S TRADE SECRETS AND**

25    **CONFIDENTIAL AND PROPRIETARY INFORMATION**

26   45.    Since the discontinuation of negotiations between Plaintiff and Cisco, Plaintiff has

27  significant reason to believe that the confidential CSRAM specification that Plaintiff designed as

28  well as Plaintiff's Trade Secrets and Confidential Information have been used by Cisco and

1  disclosed to third parties.  Plaintiff has reason to believe that said Trade Secrets and Confidential

2  Information have since been directly disclosed to third parties by Defendant.

3      46.    Throughout the entire relationship between Plaintiff and Defendant, Plaintiff never

4  received any indication from Defendant that Cisco was dissatisfied or otherwise had any concerns

5  regarding Plaintiff's work.  Plaintiff never received any form of remuneration for all of its work on

6  the DDR3 and CSRAM projects exclusively with Cisco.  Plaintiff would not have worked on the

7  DDR3 and CSRAM projects with Cisco but for Defendant's multiple assurances that Plaintiff

8  would be adequately remunerated for its work.

9      47.    Furthermore, throughout Plaintiff's entire relationship with Defendant, Plaintiff

10  never received any indication from Defendant Bechtolsheim that Plaintiff's Trade Secrets and

11  Confidential Information would be improperly used by Cisco or disclosed to third parties.

12                    **INVESTIGATION AND DISCOVERY OF CLAIMS**

13      48.    In or about March 2003, Plaintiff, through its Board of Directors, including

14  Defendant, began investigating potential legal claims against Cisco.

15      49.    On or about June 16, 2003, while Defendant Bechtolsheim was still on Plaintiff's

16  Board of Directors, two (2) individuals under his direct supervision in Cisco wrongfully filed an

17  application for a patent which ultimately issued as a U.S. Patent as further described below.

18      50.    On or about September 4, 2003, Defendant Bechtolsheim resigned from the Board

19  of Directors.

20      51.    On or about December 14, 2003, Defendant resigned from Cisco's employment.

21      52.    Following Cisco's November 18, 2004 Objections and Responses to Mosaic's

22  Request for Production of Documents in the Mosaic-Cisco matter and the production of responsive

23  documents, Plaintiff first discovered that Defendant Bechtolsheim had in fact sat in on meetings

24  with Cisco employees and was involved in decision making at Cisco, contrary to his statements

25  otherwise.  Plaintiff similarly discovered many other statements of defendant to be false and many

26  of the Defendants' breaches of fiduciary duties as a result of said document production.

27      53.    Plaintiff also recently learned that on May 16, 2006, patent US 7,047,385 B1 (the

28  "'385 Patent"), termed "High-Speed Memory for Use in Networking Systems," issued to Cisco.

---

1  The application for this patent was filed when Defendant Bechtolsheim was employed by Cisco
2  and on the Board of Directors for Mosaic. The two inventors named in the '385 Patent, Dipankar
3  Bhattacharya and Jeff Hirschman, were both directly supervised by Defendant Bechtolsheim when
4  he was a director of Mosaic and the head of the Gigabit Systems Business Unit at Cisco. The '385
5  Patent contains many of Plaintiff's Trade Secrets and Confidential Information, which were
6  discussed orally and in writing to the alleged "investors" by Plaintiff, during a time in which
7  Defendant was encouraging Plaintiff to release such proprietary and confidential information. At
8  no point did Defendant Bechtolsheim disclose to Plaintiff that a patent was being pursued, sought,
9  or developed by individuals under his supervision nor that Plaintiff's Trade Secrets and
10 Confidential Information were being used and disclosed for such purposes.

11     54.    In or about March 2007, Plaintiff Mosaic learned of Cisco's '385 Patent; the earliest
12 date that Plaintiff could have learned of it from public records was May 2006.

13                          **FIRST CAUSE OF ACTION**

14                      (Breach of Fiduciary Duty - Duty of Loyalty)

15     55.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs
16 1 through 54 above, as if set forth at length here.

17     56.    Defendant Bechtolsheim served simultaneously as a member of Mosaic's Board of
18 Directors and as an executive of Cisco. As a board member, Defendant Bechtolsheim owed clear
19 and statutorily established fiduciary duties to Mosaic.

20     57.    Defendant's executive position at Cisco was as Vice President and General
21 Manager of the Gigabit Systems Business Unit (the "Gigabit SBU"), the very department of Cisco
22 which dealt extensively with Mosaic regarding technical developments and business discussions
23 during the parties' interactions. Defendant even signed the NDA on behalf of Cisco.

24     58.    As a director on Plaintiff Mosaic's Board, Defendant Bechtolsheim failed to
25 recognize or acknowledge his fundamental conflict of interest by serving both as a director on
26 Mosaic's Board and as an executive in the Cisco department directly conducting business with
27 Plaintiff. Defendant failed to disengage from necessary activities with respect to the two parties'
28 //

1  interaction, particularly with regard to Plaintiff, and such failures were a breach of the Defendant's

2  duty of loyalty to Plaintiff.

3      59.    Defendant Bechtolsheim's position at Cisco involved business activities with other

4  companies on technological developments, such as SRAM chips.  Defendant Bechtolsheim was an

5  authorized agent of Cisco and had the apparent and/or actual authority to engage in business

6  discussions with Mosaic, and Mosaic relied on such authority.

7      60.    As a result of Defendant Bechtolsheim's dual positions in both Cisco and Mosaic,

8  he dominated Mosaic Board.  Defendant Bechtolsheim exerted a significant influence over Mosaic

9  project developments and directed Mosaic to pursue the development of SRAM with Cisco, to the

10  exclusion of other potential business partners and projects.  During the initial stages of Mosaic's

11  interaction with Cisco in 2000, Mosaic had to make crucial business decisions concerning who it

12  would partner with and where to apply its technical expertise in chip design.  Under Defendant

13  Bechtolsheim's direction, Plaintiff's time, money and energy were devoted to the DDR3 and

14  CSRAM projects, custom projects that could not be used with any other companies (i.e. Cisco's

15  competitors) by nature of its custom design.

16      61.    Under Defendant's domination and direction, Plaintiff Mosaic wasted thousands of

17  person-hours and millions of dollars worth of funding designing, testing, and customizing a SRAM

18  chip for which Plaintiff ultimately received no remuneration.

19      62.    The actions by Defendant Bechtolsheim and the benefits conferred on Cisco put

20  Mosaic in an unequal and disadvantaged bargaining position with Cisco.  Defendant

21  Bechtolsheim's role as head of the Gigabit SBU caused Mosaic to trust Cisco in its dealings at a

22  level that is higher than would be expected in an arm's length transaction.  Because Defendant

23  Bechtolsheim was in a position to direct Mosaic and Cisco, Cisco obtained undue leverage in the

24  negotiation process.

25      63.    Defendant Bechtolsheim utilized his power over Mosaic as a director of Mosaic, as

26  a principal investor in Mosaic, and as the Vice President and General Manager of the very Cisco

27  business unit seeking SRAM from Mosaic, to convince Mosaic to focus exclusively on Cisco.

28  Defendant Bechtolsheim utilized his position as a director and manipulated Plaintiff Mosaic's

1  business and product development to the severe detriment of Plaintiff, and to the benefit of Cisco

2  and himself. Such directives were breaches of Defendant's fiduciary duties to Mosaic.

3      64.    In acting as described above, Defendant Bechtolsheim failed to exercise the loyalty

4  required of directors by law. Defendant failed to recognize the fundamental conflict of interest in

5  serving as both a Cisco executive and Mosaic director. Defendant failed to perform his duties in a

6  manner that served the best interests of Plaintiff, and additionally failed to protect Plaintiff's

7  interests. Plaintiff reasonably acted on Defendant's reassurances and information as a member of

8  the Board of Directors, and consequently suffered irreparable harm from his intentional breach of

9  fiduciary duty. Defendant Bechtolsheim, by repeatedly putting his own and Cisco's interests ahead

10  of Mosaic's, breached his fiduciary duty of loyalty to Mosaic.

11      65.    Plaintiff discovered Defendant's breaches of his duty of loyalty starting in February

12  2003 following the collapse of Mosaic's relationship with Cisco.

13      66.    The substantial expenditures made by Plaintiff based on Defendant's breach of duty

14  have cost Plaintiff irreparable harm and that expenditure is the proximate cause of damages to

15  Plaintiff.

16      67.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

17  determined at trial.

18      68.    Defendant's actions were willful and malicious and Plaintiff is entitled to punitive

19  damages in an amount to be determined at trial.

20                    **SECOND CAUSE OF ACTION**

21                    (Breach of Fiduciary Duty-Duty of Honesty)

22      69.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs

23  1 through 68 above, as if set forth at length here.

24      70.    While on the Mosaic Board, Defendant Bechtolsheim chose to omit material facts,

25  facts such as: (i) his own authority within Cisco; (ii) Cisco's true intentions relating to the use of

26  Mosaic Trade Secrets and Confidential Information; (iii) Cisco's true intentions relating to an

27  acquisition; (iv) Cisco's true intentions relating to its discussions with Plaintiff's competitors; and

28  (v) Cisco's unwillingness to abide by promises made by its representatives.

1    71.    Plaintiff did not discover Cisco's true intentions or Defendant Bechtolsheim's role

2    in such intentions and decision-making processes until after discovery surfaced in the Cisco matter

3    in early 2005.

4    72.    Defendant Bechtolsheim repeatedly assured Plaintiff that Mosaic's technology was

5    far ahead of any potential competitors, and that Mosaic could rely on Defendant Bechtolsheim's

6    representations with respect to Cisco.  Plaintiff later discovered, that such representations and

7    assurances were untrue, and furthermore, Defendant Bechtolsheim did not have the authority

8    within Cisco to make them.

9    73.    Defendant Bechtolsheim promised an acquisition offer by Cisco to prevent Plaintiff

10    from seeking out other potential business partners.  Defendant hid several material facts from

11    Plaintiff regarding Cisco's on-going negotiations with Plaintiff's competitors.  Defendant's actions

12    effectively served to lock Plaintiff out of the SRAM market.

13    74.    The above described statements and assurances, coupled with Defendant's role as a

14    member of the Board of Directors, caused Plaintiff to entrust its most vital Trade Secrets and

15    Confidential Information to Cisco and to waste thousands of person-hours working with Cisco to

16    design and test a SRAM semiconductor chip for which Plaintiff ultimately received no

17    remuneration.  All of these misrepresentations were negligent and/or made in bad faith.

18    75.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

19    determined at trial.

20    76.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

21    punitive damages in an amount to be determined at trial.

22                              **THIRD CAUSE OF ACTION**

23                          (Breach of Fiduciary Duty- Duty of Care)

24    77.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs

25    1 through 76 above, as if set forth at length here.

26    78.    As a Mosaic board member, Defendant Bechtolsheim made specific

27    representations, as follows:

28                    A.    Cisco's obligations of confidentiality (by signing the NDA);

---

First Amended Complaint                    17                    Case No. 1-06-CV072920

|   |   |   |
|---|---|---|
| 1 | B. | Cisco's business need for particular types of SRAM within the Gigabit |
| 2 |    | SBU; |
| 3 | C. | Cisco's technical requirements within the Gigabit SBU; |
| 4 | D. | Cisco's projected needs for SRAM within the Gigabit SBU; |
| 5 | E. | The fact that no other competitor could match the speed and performance |
| 6 |    | offered by Mosaic; |
| 7 | F. | The specific steps (such as creation of a test chip) that would be required of |
| 8 |    | Mosaic for Cisco to work with Mosaic; |
| 9 | G. | Promises to facilitate an acquisition of Mosaic by Cisco; |
| 10 | H. | Later in the Mosaic-Cisco relationship, that Defendant was not part of the |
| 11 |    | specific decision making team at Cisco due to his membership on Mosaic's |
| 12 |    | Board of Directors; and, |
| 13 | I. | Representations to potential and actual investors in Mosaic about Cisco's |
| 14 |    | interest in Mosaic and its technology. |

79.     Defendant also repeatedly assured Mosaic (i) that Mosaic did not have to worry about the lack of a formal, written commitment from Cisco, (ii) that such a commitment would be completed, and (iii) that Mosaic would be a supplier of SRAM for Cisco, or would otherwise receive remuneration for all its work with Cisco.

80.     Plaintiff was not aware that other Cisco representatives did not know of the NDA that Defendant Bechtolsheim had signed on their behalf. Plaintiff learned of such fact during discovery proceedings in the Cisco matter beginning in early 2005.  Defendant Bechtolsheim also failed to investigate the veracity of the many representations and assurances he made to Mosaic, and this was a flagrant violation of his fiduciary duty of care.

81.     Defendant knew that Plaintiff reasonably relied upon the relationship of trust that existed between Defendant and Mosaic given Defendant's status as an active member of Plaintiff's Board of Directors.  Defendant knew that this reliance by Plaintiff would cause great damage to Plaintiff's business if Cisco failed to remunerate Mosaic or uphold its promises to Mosaic.

---

**First Amended Complaint**                    18                    **Case No. 1-06-CV072920**

1      82.    Defendant Bechtolsheim utilized his position as a director of Mosaic and

2 manipulated Plaintiff Mosaic's business and product development to the severe detriment of

3 Plaintiff, and to the benefit of Cisco and himself.

4      83.    Defendant Bechtolsheim repeatedly failed to disclose information pertinent to

5 Mosaic and its shareholders' best interests. Defendant Bechtolsheim neglected his obligations as a

6 fiduciary by deliberately allowing Mosaic to operate under false assumptions for his own and for

7 Cisco's gain.  This failure of full disclosure and good faith violated his fiduciary duty of due

8 diligence and his obligation to protect and act in Plaintiff Mosaic's best interests.

9      84.    Defendant Bechtolsheim, despite serving as a trusted director of the board,

10 performed his duties in a manner that not only failed to uphold his fiduciary obligation of care, but

11 also grossly and negligently harmed Plaintiff.  Defendant made repeated promises and assurances,

12 which he knew to be false or misleading in light of omitted facts.  By failing to confirm the

13 veracity of said statements in good faith, Defendant Bechtolsheim grossly and negligently failed to

14 exercise any of the due diligence required of him in his role as a fiduciary to Plaintiff.

15      85.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

16 determined at trial.

17      86.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

18 punitive damages in an amount to be determined at trial.

19                         **FOURTH CAUSE OF ACTION**

20                   (Breach of Fiduciary Duty- Duty of Good Faith)

21      87.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs

22 1 through 86, as if set forth at length here.

23      88.    Defendant Bechtolsheim utilized his power over Mosaic to convince Mosaic to

24 focus its business and development with Cisco to the detriment and exclusion of other potentially

25 viable business partners.

26      89.    Under Defendant Bechtolsheim's direction, Plaintiff invested invaluable time,

27 money and energy into custom projects that could not be used with any other companies besides

28 //

1    Cisco. Defendant, as a member on Plaintiff Mosaic's board, knew that Mosaic would experience

2    irreparable damage if Cisco failed to remunerate Mosaic or uphold the promises it made to Mosaic.

3        90.      Plaintiff Mosaic ultimately wasted thousands of irrecoverable person-hours and

4    millions of lost dollars worth of funding on a SRAM chip designed for Cisco, under Defendant

5    Bechtolsheim's influence and direction.

6        91.      Defendant promised an acquisition offer by Cisco to prevent Plaintiff Mosaic from

7    seeking out other business opportunities while also hiding several material facts from Mosaic

8    regarding Cisco's on-going negotiations with Plaintiff's competitors. Defendant's actions

9    effectively served to lock Plaintiff out of the SRAM market.

10       92.      Defendant Bechtolsheim, while both a member on Plaintiff Mosaic's board and an

11   employee of Cisco, allowed individuals under his supervision at Cisco to file a patent on what was

12   essentially Mosaic proprietary ideas. Defendant did not inform Mosaic that a patent was being

13   filed on its ideas nor did he give credit to Plaintiff Mosaic in the '385 patent.

14       93.      Defendant Bechtolsheim, in committing above described actions, and failing to

15   uphold his role as a Mosaic director in a manner believed to be in the best interests of the

16   corporations and its shareholders, grossly violated his fiduciary obligation of good faith dealings.

17   Despite being a Mosaic director, Defendant negligent and/or maliciously failed to protect and/or

18   look after Mosaic and its shareholders best interests.

19       94.      Plaintiff did not discover Cisco's true intentions or Defendant Bechtolsheim's role

20   in such intentions and decision-making processes until after discovery surfaced in the Cisco matter

21   in early 2005, and in the case of the patent, until early 2007.

22       95.      Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

23   determined at trial.

24       96.      Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

25   punitive damages in an amount to be determined at trial.

26   //

27   //

28   //

---

**First Amended Complaint**                    20                    **Case No. 1-06-CV072920**

# FIFTH CAUSE OF ACTION

(Breach of Fiduciary Duty- Duty of Loyalty-Theft of Patent)

97.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 96 above, as if set forth at length here.

98.    At no time did Defendant disclose to Plaintiff that Mosaic's Trade Secrets and Confidential Information were being used to apply for a patent by Cisco, nor did he disclose the existence of a Cisco patent application based upon and derived from said information. Defendant Bechtolsheim also did not inform Plaintiff that the patent application was developed by two (2) Cisco employees under his supervision.

99.    Defendant knew that Plaintiff reasonably relied upon the relationship of trust that existed between Defendant and Mosaic given Defendant's status as an active member of Plaintiff's Board of Directors. Plaintiff would not have agreed to released such detailed Trade Secrets and Confidential Information to Cisco but for Defendant's influence as a trusted member of Mosaic's board.

100.    Plaintiff reasonably relied on Defendant's role as a director to believe that Defendant would not misappropriate proprietary and confidential information, mislead or conceal material facts, perform bad faith directives, or violate his fiduciary duties as a director in any other form or manner.

101.    As a director, Defendant Bechtolsheim had a clear duty to protect Mosaic's intellectual property. Not only did he fail to protect Mosaic's proprietary and confidential information, Defendant instead purported ownership of it and actively helped others take the credit.

102.    In or about March 2007, Plaintiff Mosaic learned of Cisco's '385 Patent; the earliest date that Plaintiff could have learned of it from public records was May 2006.

103.    Plaintiff is entitled to compensatory relief and other damages for the misappropriation of its Trade Secrets and Confidential Information into a Cisco patent, and any subsequently developed related patents, in an amount to be determined at trial.

104.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

1      105.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

2   punitive damages in an amount to be determined.

3      106.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

4   determined at trial.

5                               **SIXTH CAUSE OF ACTION**

6                    (Breach of Fiduciary Duty- Duty of Care- Theft of Trade Secrets)

7      107.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs

8   1 through 106 above, as if set forth at length here.

9      108.    The Plaintiff's NDA, which Defendant Bechtolsheim signed on behalf of Cisco

10   stipulated that Plaintiff's Trade Secrets and Confidential Information could be used only for

11   purposes of evaluating their potential business relationship.

12      109.    Cisco's business negotiations granted Cisco access to Mosaic and its Trade Secrets

13   and Confidential Information, insight which other companies did not have.  Cisco had access to

14   Mosaic's financial and funding information and thus was aware of Mosaic's negotiating leverage

15   with other parties.  Plaintiff would not have provided access to said information but for Defendant

16   Bechtolsheim's multiple verbal and other assurances to Plaintiff.

17      110.    In breach of the NDA, Defendant Bechtolsheim provided Cisco with Mosaic Trade

18   Secrets and Confidential Information for purposes other than those stipulated by the

19   Non-Disclosure Agreement ("NDA").  Defendant provided Cisco with confidential Mosaic Trade

20   Secrets and Confidential Information with full knowledge that Cisco was utilizing this information

21   to aid in reaching supplier agreements with Mosaic's competitors.

22      111.    Defendant directly disclosed Mosaic Trade Secrets and Confidential Information to

23   Mosaic competitors and to other third parties. Plaintiff became aware of such direct disclosures by

24   Defendant following discovery in the Mosaic-Cisco matter in early 2005. .These disclosures not

25   only breached Defendant Bechtolsheim's obvious duty of loyalty to Plaintiff and to his obligation

26   to protect Plaintiff's proprietary and confidential information, but were also in breach of Cisco's

27   NDA, which Defendant signed on behalf of Cisco.

28

---

1    112.    As a director on Mosaic's board, Defendant Bechtolsheim breached his fiduciary

2    duty by disseminating and allowing third parties and Plaintiff competitors access to Plaintiff's

3    proprietary and confidential information. Defendant failed to act in Plaintiff's best interest and

4    instead acted in a negligent and/or bad faith manner.

5    113.    In a gross breach of fiduciary duty and an obvious misappropriation of trade secrets,

6    Defendant Bechtolsheim not only failed to protect Mosaic's Trade Secrets and Confidential

7    Information, but instead facilitated its misappropriation to Plaintiff Mosaic's detriment.

8    114.    Plaintiff did not discover Defendant Bechtolsheim's personal role in such trade

9    secret misappropriations until after discovery surfaced in the Cisco matter in early 2005

10    115.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

11    determined at trial.

12    116.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

13    punitive damages in an amount to be determined at trial.

14                            **SEVENTH CAUSE OF ACTION**

15                                (Constructive Fraud)

16    117.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs

17    1 through 117 above, as if set forth at length here.

18    118.    Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also

19    constitute constructive fraud.

20    119.    As discussed above, Defendant Bechtolsheim had a fiduciary duty to Mosaic to

21    preserve, improve, and protect Mosaic's viability, interests, and intellectual property, duties which

22    Mosaic justifiably relied upon.  Defendant Bechtolsheim breached his fiduciary duty to Mosaic in

23    numerous ways.

24    120.    Defendant Bechtolsheim made several representations to Plaintiff that Cisco was to

25    provide financial remuneration to Plaintiff.  Such representations and inducements were made all

26    in effort to induce Mosaic to continue to trust Cisco, and to continue providing Cisco with Mosaic

27    Trade Secrets and Confidential Information as well as its engineering expertise.  Defendant

28    Bechtolsheim made assurances that Mosaic would receive purchases by Cisco in the form of a

1    commercial agreement, a non-recurring engineering fee, investment by Cisco in Mosaic, or

2    acquisition of Mosaic by Cisco.

3         121.    Said representations were in fact false. Cisco did not provide financial

4    remuneration to Plaintiff.

5         122.    Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals

6    from companies that would compete with Cisco. Defendant further failed to disclose that Cisco

7    had not made any plans to provide financial remuneration to Plaintiff.

8         123.    Reasonably relying on the false representations made by Defendant Bechtolsheim,

9    Mosaic advised Cisco in the design of DDR3 chip, advised Cisco in the design of the CSRAM

10    specification, advised Cisco in the architecture and engineering of the CSRAM chip, aided in the

11    development and engineering in the CSRAM chip, and responded to Cisco's repeated inquiries

12    regarding the specific proprietary design details needed to bring the chip to production.

13         124.    Plaintiff did not discover Cisco's true intentions or Defendant Bechtolsheim's role

14    in such intentions until after discovery surfaced in the Cisco matter in early 2005

15         125.    Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is

16    entitled to recover such damages in an amount to be determined at trial.

17         126.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to

18    punitive damages in an amount to be determined at trial.

19                     **EIGHTH CAUSE OF ACTION**

20                         (Concealment)

21         127.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs

22    1 through 126 above, as if set forth at length here.

23         128.    As a director of Plaintiff, Defendant Bechtolsheim owed a fiduciary duty to

24    Plaintiff, including the duty to disclose important facts pertinent to Mosaic's interests.

25         129.    As discussed in detail above, over the course of the interaction between Mosaic and

26    Cisco from 2000 through 2003, Defendant Bechtolsheim intentionally failed to disclose several

27    material facts to Plaintiff. Specifically, Defendant Bechtolsheim concealed the following

28    important facts from Plaintiff:

---

1        (i)     That Cisco was using Mosaic Trade Secrets and Confidential Information

2                  for purposes other than those allowed by the NDA, including to develop

3                  competitive bids,

4        (ii)    That Cisco was disclosing Mosaic Trade Secrets and Confidential

5                  Information to third parties,

6        (iii)   That Defendant Bechtolsheim himself was using Mosaic Trade Secrets and

7                  Confidential Information for purposes other than those allowed by the NDA

8                  as well as disclosing Mosaic Trade Secrets and Confidential Information to

9                  third parties,

10       (iv)   That Cisco did not in fact intend to acquire Plaintiff or otherwise provide

11                any remuneration for Plaintiff's work for Cisco,

12       (v)    That Cisco had applied for a patent derived from and based upon Mosaic's

13                Trade Secrets and Confidential Information, and

14       (vi)   Other important facts discussed in Paragraphs 1 through 123 above.

15  Plaintiff is informed and believes, and on that basis alleges that Defendant Bechtolsheim intended

16  to deceive Plaintiff by concealing these important facts.

17      130.   Plaintiff did not know of the important facts concealed by Defendant, and Plaintiff

18  reasonably relied on Defendant Bechtolsheim's deception.

19      131.   Plaintiff did not discover Defendant Bechtolsheim's concealments until after

20  discovery surfaced in the Cisco matter in early 2005

21      132.   Plaintiff was harmed and Defendant Bechtolsheim's concealment of important

22  facts from Plaintiff was a substantial factor in causing Plaintiff's harm and in causing substantial

23  damages to Plaintiff.

24      133.   Defendant's wrongful actions were malicious and oppressive, and Plaintiff is

25  entitled to punitive damages in an amount to be determined at trial

26  //

27  //

28  //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Cisco, jointly and severally, as follows:

    A.    On the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action, for damages and punitive damages in an amount to be determined at trial;

    B.    For reasonable attorney's fees, as authorized by law; and,

    C.    For such other and further relief as the Court deems just and proper.

Dated: July 18, 2007

                             RUSSO & HALE LLP

                By:      _Jack Russo_
                             Jack Russo
                             Christopher Sargent

                             Attorneys for Plaintiff
                             MOSAIC SYSTEMS, INC.

---

1   JACK RUSSO (State Bar No. 96068)
    CHRISTOPHER SARGENT (State Bar No. 246285)
2   RUSSO & HALE LLP
    401 Florence Street
3   Palo Alto, CA 94301
    Telephone: (650) 327-9800
4   Facsimile: (650) 327-3737
    Email:  jrusso@computerlaw.com
5           csargent@computerlaw.com

6   Attorneys for Plaintiff
    MOSAIC SYSTEMS, INC
7

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                             COUNTY OF SANTA CLARA

10  MOSAIC SYSTEMS, INC.,                   Case No. 1-04 CV 016867 (Consolidated for
                                            limited purposes with Case No. 1-06 CV
11                         Plaintiff,       072920)

12          v.                              **PROOF OF SERVICE**

13  CISCO SYSTEMS, INC., and DOES 1-20,

14                         Defendants.

15  MOSAIC SYSTEMS, INC.,

16                         Plaintiff,

17          v.

18  ANDREAS BECHTOLSHEIM, and DOES 1-
    20,
19
20                         Defendants.

21          I am a resident of the State of California, over the age of eighteen years, and not a party to

22  the within action.  I work with the law firm of RUSSO & HALE, whose address is 401 Florence

23  Street, Palo Alto, California and am readily familiar with RUSSO & HALE's practice for mailing

24  and know that in the ordinary course of RUSSO & HALE's business practice, I served the within

25  documents:

26          **FIRST AMENDED COMPLAINT**

27          **PROOF OF SERVICE [UNEXECUTED]**

28

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com℠    Proof of Service                1             Case No. 1-04 CV 016867

1

2  ☒ MAIL: I am readily familiar with the firm's practice of collection and processing
3  correspondence for mailing.  Under that practice, the document(s) described herein
4  would be sealed in an envelope which would be deposited with the United States Postal Service
5  on the above-listed date with postage thereon fully prepaid in the ordinary course of business.
6

☐ FAX: I caused to be transmitted via facsimile the document(s) listed above to the fax number(s) set forth below on above-listed date.  The transmission was reported as complete and without error by the facsimile machine at telephone number (650) 327-3737.

7  ☐ HAND: I personally delivered the above-listed documents on the date set forth above to
8  an authorized courier to be served by hand by said courier on the date set forth above to the
9  person(s) at the address(es) set forth below.

☒ ELECTRONIC MAIL: I caused to be transmitted the above-referenced document(s) via electronic mail to the persons at the e-mail addresses set forth below.

10  ☐ FEDEX: I am readily familiar with the practice of Russo & Hale LLP for collection and
11  processing of correspondence for overnight delivery and know that the document(s)
12  described herein were deposited on the date set forth below in a box or other facility regularly
13  maintained by FedEx for overnight delivery in an envelope or package designated by FedEx
14  with delivery fees paid or provided for, addressed to the person(s) at the address(es) set
15  forth below.
16

☐ PERSONAL: I personally served the above-listed documents to the person(s) at the address(es) set forth below by: (a) handing to the person(s); or, (b) leaving it at the person's(s) office with a clerk or other person in charge, or if no on was in charge, leaving it in a conspicuous place in the office.

17  Howard Holderness, Esq.
18  Lorelei A. Craig, Esq.
   Morgan Lewis LLP
19  One Market Street, Spear Tower
   San Francisco, CA 94105
20  Fax: (415) 442-1001
   hholderness@morganlewis.com
21  lorelei.craig@morganlewis.com

22

23      I declare under penalty of perjury under the laws of the State of California that the above is
24  true and correct based upon my personal knowledge.
25      Executed on July 18, 2007 at Palo Alto, California.
26

27                                          _____
                                           Su-Han Wang
28

**PROOF OF SERVICE**

(*Mosaic Systems v. Cisco Systems*, Superior Court of Santa Clara, Case 1-04 CV 016867)

I, Bridget Mullins, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is One Market, Spear Street Tower, San Francisco, CA 94105-1126. On July 30, 2007, I served the within document(s):

**NOTICE OF FILING NOTICE OF REMOVAL**

☐   by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐   via email service per parties' agreement

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☐   by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express agent for delivery.

☐   (BY PERSONAL SERVICE) I caused the envelope(s) to be delivered by hand to the addressee(s) noted below.

| Attorney/Party | Party(ies) for: | Type of Service |
|---|---|---|
| Jack Russo, Esq.<br>Michael Risch, Esq.<br>RUSSO & HALE LLP<br>401 Florence Street<br>Palo Alto, CA 94301<br>Off: 650-327-9800<br>Fax: 650-327-3737 | Plaintiff Mosaic Systems, Inc. | Via US. Mail |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on June 18, 2007, at San Francisco, California.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

_Bridget Mullins_
Bridget Mullins