RUSSO & HALE LLP
ATTORNEYS AT LAW
401 FLORENCE STREET
PALO ALTO, CALIFORNIA 94301
COMPUTERLAW.COM<sup>SM</sup>

September 4, 2003

TELEPHONE
(650) 327-9800

FAX
(650) 327-3737

**By Fax & Federal Express**

| | |
|---|---|
| Mark Chandler, Esq. | Luca Cafiero |
| Senior Vice President | Senior Vice President |
| Legal Services, General Counsel and Secretary | Storage Networking Group |
| Cisco Systems, Inc. | Cisco Systems, Inc. |
| 170 West Tasman Drive | 170 West Tasman Drive |
| San Jose, CA 95134-1706 | San Jose, CA 95134-1706 |
| | |
| Dennis Powell | Charles Giancarlo |
| Senior Vice President and | Senior Vice President and General Manager |
| Chief Financial Officer | Switching, Voice, and Carrier Systems |
| Cisco Systems, Inc. | Cisco Systems, Inc. |
| 170 West Tasman Drive | 170 West Tasman Drive |
| San Jose, CA 95134-1706 | San Jose, CA 95134-1706 |

Re: **Mosaic Systems, Inc. and Cisco Systems, Inc.**

Gentlemen:

We represent Mosaic Systems, Inc. ("Mosaic"), a California corporation since 1996. As you know from your relationship and past interactions, Mosaic is a fabless semiconductor company that specializes in the design, development and engineering of ultra-high performance SRAMs for the networking and communications marketplaces.

Until recently, Mosaic was working quite closely with Cisco on the architecture and development of SRAM chips to enable a new very high-performance product line that was to be used by Cisco in its advanced systems. Mosaic acted diligently to help solve many technical problems for Cisco, and worked with Cisco to develop a new specification for a new high-speed SRAM chip (the "CSRAM"). During more than two years of interaction, Cisco repeatedly told Mosaic that Mosaic was of strategic importance to Cisco. However, about six months ago, Cisco stopped all work with Mosaic — despite Cisco's own acknowledgment that it was depending on Mosaic to create a high-speed solution for Cisco's new product, and despite achieving business cooperation through continued representations of future acquisition, and verbal promises of sales agreements, NRE agreements, and purchase orders.

Mosaic delivered very sensitive trade secret and proprietary information to Cisco – both technical and commercial – which enabled Cisco to negotiate and do business with Mosaic competitors without regard to Mosaic's trade secrets, proprietary information and intellectual property rights, and in a manner that raises many issues. Below is a brief summary of the chronology of the Cisco-Mosaic interactions over the last three years:

1. **2000:** In mid-2000, Cisco and Mosaic entered into discussions regarding the feasibility of a technology development for Cisco including the development of a high-speed SRAM chip.

2. **July 2000:** The Mosaic Series A round closed on July 28, 2000, with Mosaic board members who included (and who still include) Mr. Andy Bechtolsheim, a full-time Executive of Cisco. At Cisco's request, Mosaic became involved in intense discussions regarding Mosaic designing an SRAM chip that would satisfy Cisco's need for a very high-speed advanced system product.

3. **January 2001:** Mosaic hired Mr. Rich Roy as Vice President of Engineering after Roy had an opportunity to talk with Cisco and assess the reality of Cisco as a Mosaic customer and business partner. Other team members were hired over the next few months after they had made similar assessments of the Mosaic-Cisco relationship. Meanwhile, Cisco provided Mosaic with IBM's DDR3 specification as the chip to be designed by Mosaic for Cisco. At Cisco's request, and with the expectation of future revenue, Mosaic started working very seriously on developing the DDR3 prototype chip. IBM was also attempting to design and develop this chip for Cisco. When Mosaic started designing the chip to meet IBM's specification, Cisco expressed to Mosaic its intention to have Mosaic serve as one of the primary sources to Cisco along with IBM in this project. IBM encountered significant problems in its efforts to develop this chip according to the specification as it was written, but Mosaic proved that it could achieve the needed performance, lower power, and pricing targets using commercially available TSMC process technology.

4. **May 2001:** Mosaic and Cisco entered into a Mutual Non-Disclosure Agreement (NDA) on May 2, 2001. This allowed Mosaic to disclose the Mosaic architecture, technology and supporting technical details illustrating the means by which Mosaic could achieve the DDR3 design and meet Cisco's power, performance, and die size needs – all of which factors are critical for competitive pricing. Mosaic taped out a test chip based on its intellectual property during May and the manufactured test chip samples validated Mosaic's technical claims. Meanwhile, Cisco continued to promise to pay Mosaic NRE funds for the design of the DDR3 chip. Cisco also promised that Mosaic would be the primary source for this chip. In fact, Cisco told Mosaic that Mosaic was its only viable source and that Mosaic was well ahead of all other companies that were attempting to develop high-speed SRAM technology.

5. **June 2002:** After committing millions of dollars of Mosaic investment money and thousands of person-hours to develop the DDR3 chip for Cisco, Mosaic was ready to "tape out" the DDR3 chip to silicon. This would have been a major expense (over another million dollars). Soon after its decision not to "tape out," Mosaic learned that Cisco was having problems with the DDR3 architecture and its new processor. Cisco asked Mosaic to develop a solution to alleviate Cisco's difficulties in integrating the DDR3 prototype. Mosaic management and engineering again worked hard and delivered a viable

solution that resolved all the issues. Mosaic's expertise in SRAM technology was instrumental in bringing a new approach to the problem; this was the birth of CSRAM. Cisco then formally asked Mosaic to drop the design of the DDR3 prototype and asked the Mosaic team to start working on CSRAM.

6. **Between June and July 2002:** Based on Cisco's system requirements, Mosaic worked with Cisco engineers to create the CSRAM specification. During this time, Mosaic communicated design techniques and implementations to Cisco on a daily basis and provided Cisco with Mosaic trade secrets and other proprietary information, many of which proved critical in the development of the CSRAM specification. At this point, Mosaic understood that it was developing the CSRAM chip hand-in-hand with Cisco, and that Mosaic was the only company with which Cisco was working directly on developing this type of SRAM technology. There was no hint from Cisco that the trade secrets and other proprietary information Mosaic had provided might be distributed to third parties without Mosaic's consent and despite the existing NDA.

7. **August 2002:** Upon Cisco's requests, Mosaic continued to provide Cisco with a wealth of trade secrets and other proprietary information including detailed reports on projected costs, power numbers, yield data, and die sizes. Cisco processor design and purchasing teams relied on this information to further develop the specification and to obtain competitive bids from other potential CSRAM manufacturers. At this time, Cisco first informed Mosaic that competitive bidding was involved, and that Micron purportedly offered a $100/chip quote to Cisco for CSRAM units <u>based on the CSRAM specifications that incorporated Mosaic's trade secrets and other proprietary information</u>.

8. **September 2002:** Cisco began to conduct due diligence for a proposed acquisition of Mosaic's business and Mosaic was asked to provide Cisco with updated and highly detailed trade secrets and other proprietary information about the CSRAM design, including, but not limited to, extremely sensitive information such as more detailed die sizes, power numbers, design techniques, and employee resumes. At this point, Mosaic was given the strongest statements by Cisco that Mosaic would be acquired. As a result, Mosaic stopped all activities related to the raising of its Series C Round of financing.

9. **October 2, 2002:** Cisco continued its due diligence on Mosaic in several meetings and discussions including a special meeting at Mosaic that consisted of a senior team of five Cisco employees individually interviewing all of the Mosaic engineers. At this meeting, Cisco inquired about Mosaic engineers' current salaries, their interest in working on Cisco projects that included the CSRAM chip along with other projects, and their interest in working for a larger public company like Cisco. The acquisition of Mosaic by Cisco was also discussed at this meeting and was promised imminently.

10. **Between October and December 2002:** Cisco continued to communicate to Mosaic and led Mosaic to believe that it was preparing for an acquisition of Mosaic. Cisco regularly requested technical information from Mosaic regarding test results and CSRAM specification design advancements. Because Mosaic understood it was about to be acquired by Cisco and because of the NDA, it did not hesitate to pass the desired information along to Cisco.

11. **December 5, 2002:** Mosaic was told that a formal meeting was to take place in order to finalize the acquisition discussions, so Mosaic met with Cisco executives. At this meeting Mr. Luca Cafiero stated that Cisco would not acquire Mosaic, but to Mosaic's surprise, instead committed to the following: (a) Cisco would give exclusivity to Mosaic as the source for all CSRAM; (b) Cisco would purchase directly from TSMC and pay Mosaic a royalty equal to 50% of material cost; and (c) Mosaic would complete the design and development of the production chip; and (d) Cisco would grant Mosaic $5-6 million in NRE funding. Mr. Cafiero implied that this proposed level of funding was not a set amount, and that Cisco could afford to pay Mosaic above the $5-6 million of NRE funds if need be "as long as it was not $30-40 million." Mr. Cafiero also guaranteed that the deal would be concluded very quickly (2-3 weeks) and asked Messrs. Charles Giancarlo and John McCool of Cisco to wrap up the details of the agreement.

12. **Between December 5, 2002 and the first week of January 2003:** Mosaic worked with Mr. McCool and Mr. Dick Ellis to implement the agreement detailed in the December 5 meeting with Mr. Cafiero. During this time, Mosaic learned that Cisco had reached a CSRAM supplier deal with Sony.

13. **January 2003:** Mr. Ellis contacted Mr. Tony Moroyan of Mosaic and told him that he (Mr. Ellis) had told Micron and Cypress that in order for them to participate in the Cisco CSRAM business they would have to acquire Mosaic. Mr. Ellis encouraged Mosaic to immediately contact Micron and Cypress to schedule negotiations and to push them to quote prices in cooperation with Mosaic. Mr. Ellis was complementary in all communications and stated very clearly that Mosaic was an extremely strategic company for Cisco. Both companies tendered bona-fide proposals to Cisco for the business, with Cypress being extremely competitive for both NRE development cost as well as long term pricing. Cisco rejected both bids.

14. **February 5, 2003:** Mosaic was informed by Mr. Ellis that Cisco had reached a CSRAM chip second source supplier deal with Samsung and Mosaic would not receive an order. When pressed, Mr. Ellis said that Cypress could still make a proposal if it could meet the pricing offered by Samsung (the Samsung deal was not yet signed). Mosaic teamed with Cypress senior management to work toward even lower prices, but soon learned that Cisco would not even consider a proposal. Mosaic believes that Cisco solicited the Mosaic-Cypress and Mosaic-Micron proposals in an effort to drive down Samsung's pricing and improve its negotiating position. At that point, Cisco was not going to take any

        Mosaic proposal seriously.

15. **2000 to Present:** At no time over the last three years has Mosaic granted any license to Cisco, Sony, Samsung, Micron, Cypress or others for the further development or manufacturing of the CSRAM or other technology developed by Mosaic.

## KEY QUESTIONS

The key questions raised by the above include the following:

I. Is Cisco using, disclosing or threatening to use or disclose Mosaic's trade secrets and other Mosaic intellectual property?

II. Is Cisco violating duties of confidentiality to Mosaic?

III. Is Cisco in breach of an oral contract that Cisco entered into with Mosaic?

IV. Was Cisco negligent in the representations made to Mosaic?

V. Is Cisco in breach of fiduciary duties to Mosaic?

VI. Did a "de facto" merger occur in this case, and even if not, has Cisco acted in a manner as to be subject to the doctrine of promissory estoppel?

VII. Has Cisco committed fraud against Mosaic?

VIII. Has Cisco entered into unfair competition against Mosaic?

IX. Has Cisco acted in a manner as to be subject to the doctrine of unjust enrichment?

X. Has Cisco damaged Mosaic and by how much?

XI. Is Cisco subject to punitive damages?

XII. Is Cisco responsible for all legal fees associated with this matter?

Needless to say, the above sequence and the above questions generate many problems and have left Mosaic with many questions. We have been retained to investigate this matter further and to protect the legal rights of our client. At the same time, we have also been asked by the Board of Directors and the major share holders of Mosaic to open communications and to obtain Cisco's views on the above facts and to set a meeting with Cisco management to determine if this matter can be resolved in a constructive manner. Therefore, we ask that you review the above with your legal counsel and let us know if there is a positive manner in which to proceed in a confidential and "off the record" non-binding settlement meeting.

September 4, 2003
Page 6

      Please let me know whether and when the appropriate Senior Cisco representatives are available for a meeting this month to discuss these and other questions which have been raised and which need to be resolved. We ask for a response by September 12, 2003 on a date, time and place for that meeting.

                                                            Very truly yours,

                                                            Jack Russo

cc: Mosaic Board of Directors:
    Mr. Patrick Barry
    Mr. Andy Bechtolsheim
    Mr. Tony Moroyan