1  Jack Russo (State Bar No. 96068)
   Michael Risch (State Bar No. 197600)
2  RUSSO & HALE LLP
   401 Florence Street
3  Palo Alto, CA 94301
   jrusso@computerlaw.com
4  mrisch@computerlaw.com
   650-327-9800
5
   Attorneys for Plaintiff
6  MOSAIC SYSTEMS, INC.

7

8

9        IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF SANTA CLARA

11
                                          NO. 1 0 6 C V 0 7 2 9 2 0
12  MOSAIC SYSTEMS, INC., a
    California corporation,
13                                        **COMPLAINT FOR DAMAGES BASED**
           Plaintiff,                     **UPON BREACH OF FIDUCIARY DUTY,**
14                                        **NEGLIGENT MISREPRESENTATION,**
           v.                             **CONSTRUCTIVE FRAUD,**
15                                        **CONCEALMENT, AND UNFAIR**
                                          **COMPETITION**
16  ANDREAS BECHTOLSHEIM, an
    individual, and DOES 1-20,            **[JURY TRIAL DEMANDED]**
17
           Defendants.
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Andreas Bechtolsheim ("Defendant" or "Bechtolsheim" or "Defendant Bechtolsheim") as follows:

## INTRODUCTION

1.      This is an action for breach of fiduciary duty, negligent misrepresentation, constructive fraud, and unfair competition (the "Action") stemming from Defendant's multiple and continued misrepresentations, negligent misrepresentations, empty promises, false assurances, and negligent and bad faith directives made to Plaintiff, the reliance on which caused Plaintiff to divulge, and to continue to divulge, its valuable trade secrets, proprietary materials, chip design documentation, and other confidential information (collectively the "Trade Secrets and Other Information") to Defendant's employer, Cisco Systems, Inc ("Cisco").  Defendant's statements and actions also caused Plaintiff to waste thousands of person-hours working hand-in-hand with Cisco to design and test a Static Random Access Memory ("SRAM") semiconductor chip for which Plaintiff ultimately received no remuneration.  Defendant, as both a member of Plaintiff Mosaic's Board of Directors and as the Vice President and General Manager of the very Cisco business unit with which Mosaic sought to do business, exerted a unique influence and control over Plaintiff with respect to its interaction with Cisco.  Defendant Bechtolsheim's negligent and bad faith directives, misrepresentations, negligent misrepresentations, empty promises, false assurances, and other misleading statements caused Plaintiff to disclose its Trade Secrets and Other Information  to Cisco, and caused Plaintiff to invest its time and engineering expertise in Cisco to the exclusion of other business partners and opportunities.  Plaintiff seeks damages in amount to be determined at trial.

## PARTIES

2.      Plaintiff Mosaic is a corporation duly organized and existing under California law with its principal office based in Los Altos, California, and was formerly based in Sunnyvale, California.

3.      Defendant Bechtolsheim is an individual residing in Portola Valley, California.

4.      Defendants Does 1 through 20, inclusive, whether individuals, corporations, associations or otherwise are fictitious names of defendants whose true names and capacities are at this time unknown to Plaintiff.  Each of said fictitiously named defendants, whether individuals,

corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately thereby as hereinafter alleged.  At such time as defendants' true names become known to Plaintiff, Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and capacities.

5.  Plaintiff is informed and believes and on that basis alleges that Cisco along with Defendant Does 1-20 did agree together and conspire together, with knowledge of their unlawful purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full course and scope of their illegal conspiracy, with the full knowledge and consent, either express or implied, of each of the other Defendants.

## JURISDICTION AND VENUE

6.  This Court has general jurisdiction of all claims herein arising under California law.

7.  Venue is proper in this Court because the fiduciary and other obligations of Defendant arose and were to be performed in Santa Clara County, California.

## BACKGROUND FACTS

8.  Defendant Bechtolsheim is the former Vice President and General Manager of the Gigabit Systems Business Unit at Cisco.  Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim's responsibilities in Cisco's Gigabit Systems Business Unit included but were not limited to developing network switching technologies such as the Catalyst 4000 Gigabit Switch family.

9.  Mosaic is a fabless semiconductor company specializing in the design, development and engineering of high performance SRAM for the networking and communications marketplace.

10.  Beginning in mid-2000, Defendant Bechtolsheim communicated to Mosaic that Cisco was interested in developing a high-speed SRAM chip, and that Cisco was interested in working with Mosaic to do so.  At the time, Mosaic knew how to make faster high performance SRAM chips

than had previously been developed.  Where most SRAM suppliers were only able to project the ability to supply parts in the 300 - 400 MHz range for high performance SRAM, Mosaic was forecasting the ability to achieve 750 - 1000 MHz.

11.     Defendant Bechtolsheim encouraged Mosaic to work with Cisco on the development of a custom SRAM chip, and assured Mosaic that no other competitor could match the speed and capabilities of the SRAM design offered by Mosaic.  On this basis, Mosaic entered into serious business discussions with Cisco regarding working together to design and develop a high-speed SRAM chip which Cisco would purchase from Mosaic.

12.     On July 28, 2000, Mosaic closed Series A funding.  Mosaic was able to raise over $2.5 million, based largely on the strong indications from both Defendant Bechtolsheim and Cisco that Mosaic was going to be a chief supplier of Cisco's SRAM needs.  In fact, Defendant Bechtolsheim himself was an investor in Mosaic.  Defendant Bechtolsheim also joined Mosaic's Board of Directors at this time, assuming an active director's role over the company, and entering into a fiduciary relationship with Mosaic.

13.     After receiving Series A funding, Mosaic endeavored to hire a team of engineers who could make the discussed SRAM a reality for Cisco.  In January of 2001, engineering candidate Rich Roy met with then Mosaic CEO Suren Alexanian and Mr. Bectholsheim to discuss Cisco's need for high-speed SRAM chips and the role Mosaic could play to meet that need.  Defendant Bechtolsheim convinced Mr. Roy that Cisco was serious about working with Mosaic to design SRAM chips, and Mr. Roy joined Mosaic as Vice President of Engineering at this time.

## BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN DDR3 SRAM FOR CISCO

14.     In 2001, IBM advertised that it could achieve 750 MHz high performance SRAM at a very high price per unit, and provided Cisco with an SRAM specification called "DDR3."  In March 2001, at another meeting with Mr. Alexanian and Mr. Roy, Defendant Bechtolsheim

delivered the IBM specification to Mosaic and instructed Mosaic to try to design a chip that fit IBM's specification. Defendant Bechtolsheim told Mosaic that Cisco would be the primary customer for the designed chip, and that Cisco wanted Mosaic to serve as the second source to IBM on the project.

15.     Defendant Bechtolsheim's assurances and his status as both a director of Mosaic and as Vice President and General Manager of the very business unit at Cisco which sought SRAM, convinced Mosaic to begin work on the DDR3 test chip for Cisco with the understanding that Mosaic would be a supplier of the chip. Defendant Bechtolsheim assured Mosaic that its technology was far ahead of the competition and that Mosaic was going to be a source of SRAM for Cisco. If Defendant Bechtolsheim had not made such assurances, Mosaic would not have invested its time and resources in the DDR3 project.

16.     When Mosaic started working on DDR3, Mosaic initially tried to mold it to fit both Sun Microsystems' ("Sun") and Cisco's needs. However, Defendant Bechtolsheim convinced Mosaic that Cisco's interests in pursuing networking, and its specific priorities with respect to the chip specifications were significantly different than those of Sun. Mosaic made the decision to optimize for Cisco's needs because Defendant Bechtolsheim convinced Mosaic that Cisco's demand and potential pricing for the SRAM product was such that all Mosaic had to do to was deliver the chip, and Cisco would purchase the chips from Mosaic.

17.     To protect its Trade Secrets and Other Information, Mosaic requested that Cisco enter into a written Mutual Non-Disclosure Agreement ("NDA"). Such an agreement was entered into on or about May 2, 2001. Defendant Bechtolsheim signed the NDA on behalf of Cisco. The NDA stipulated that Mosaic's Confidential Information could be used only for the purposes of evaluating a potential business relationship. Plaintiff trusted Defendant Bechtolsheim and Cisco that Cisco would honor its agreements, and not use any Trade Secrets and Other Information disclosed by

Plaintiff without an express agreement allowing such use.

18.    Mosaic began work on the DDR3 design and, under the NDA, disclosed to Cisco the architecture and technology details describing how the DDR3 could meet Cisco's power, performance, and die size needs - all of which are important for pricing.  Even with the NDA, Mosaic would not have disclosed its Trade Secrets and Other Information to Cisco regarding the DDR3 design had it not been for Defendant Bechtolsheim's direction that Mosaic do so.  An initial test chip was taped out during May 2001, and in October, Mosaic was able to confirm for Cisco the capability of meeting an 800 MHz address rate in standard TSMC 0.18 micron process technology.  Mosaic would not have done this work for Cisco had it not been for Defendant Bechtolsheim's assurances to Mosaic that it would be a supplier of Cisco SRAM.

19.    The success of the test chip and strong indications from both Defendant Bechtolsheim and Cisco that Mosaic would be a source of SRAM for Cisco enabled Mosaic to close a Series B round of funding in the end of 2001 and early 2002.  Mosaic was able to raise over $4 million, and once again Defendant Bechtolsheim was an investor.

20.    Mosaic continued to work on the DDR3 with the understanding that it would be a supplier of SRAM for Cisco.  After committing millions of dollars of Mosaic investment money and person hours to develop the DDR3 chip for Cisco, Mosaic was ready to do a "tape out" of the DDR3 chip to silicon in the summer of 2002.  This would have cost the company a very major expense (over one million dollars) and would have put the company in a very unstable financial situation in the absence of any formal commercial agreement.  Despite Cisco's failure to formally commit to the supplier agreement promised by Defendant, Defendant Bechtolsheim encouraged Mosaic to tape out.

21.    However, in May 2002, Mosaic learned that Cisco was having problems with the DDR3 architecture and its new processor, which problems Defendant Bechtolsheim had not disclosed when he directed Mosaic to "tape out."  IBM claimed that its design could not achieve the required 750 Mhz operation.  With the performance of IBM less certain, Cisco had growing concerns

over the DDR3 SRAM design.

22.    On June 6, 2002, Defendant Bechtolsheim, Rich Roy, Tony Moroyan (the new CEO of Mosaic), Dipankar Bhattacharya (Cisco manager), and Jim Weaver (Cisco engineer) met to discuss the technical problems that had arisen with DDR3. At this meeting, Mosaic presented results from simulations showing the 750 Mhz SRAM was viable and within budget. Impressed with these results, Cisco proposed the idea of scrapping IBM's DDR3 specification and working directly with Mosaic to create a new, custom SRAM.

**BECHTOLSHEIM DIRECTS MOSAIC TO DESIGN CSRAM FOR CISCO**

23.    Between June and July 2002, Mosaic and Cisco worked together to create the CSRAM specification ("CSRAM Spec") in order to solve the technical problems of DDR3. During this time, Mosaic and Cisco engineers (including Defendant) communicated in person and by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems. Many of these e-mails contained Plaintiff's Trade Secrets and Other Information.

24. Because of Defendant's representations, Plaintiff reasonably relied that Cisco would abide by the NDA, and that Plaintiff was the only company that Cisco was working with on developing this type of SRAM technology. Defendant never disclosed to Plaintiff that Cisco was evaluating Plaintiff's competitors, that Cisco was using Trade Secrets and Other Information disclosed under the NDA to develop competitive bids, or that the Trade Secrets and Other Information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

25.    Defendant had knowledge that Cisco was using and disclosing Plaintiff's Trade Secrets and Other Information in breach of the NDA. Defendant Bechtolsheim did not inform Plaintiff of this fact, and moreover, continued to direct Mosaic to work with Cisco in the development of the CSRAM chip, and continued to direct Mosaic to disclose its Trade Secrets and Other Information to Cisco.

26.     Plaintiff first became aware of and concerned with competitors for Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Cisco a quote of one hundred dollars ($100) per chip. This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never, in fact, provided Cisco a one hundred dollar ($100) quote for the CSRAM chip. Plaintiff is informed and believes and on that basis alleges that Defendant Bechtolsheim misrepresented the Micron "quote" in order to drive the cost of the CSRAM chip lower.

## THE ACQUISITION OFFER AND DISCLOSURES

27.     In September 2002, Defendant Bechtolsheim represented that he had instructed his unit at Cisco to either acquire Plaintiff or otherwise provide economic remuneration. Defendant did not disclose that Cisco was disregarding instructions from Defendant. In fact, Defendant Bechtolsheim purposely created the false impression that he could direct Cisco to acquire Plaintiff, or to otherwise ensure that Mosaic would be provided adequate compensation for Mosaic's work on SRAM to date. Cisco informed Plaintiff that Cisco was interested in acquiring Plaintiff, which directly followed Defendant Bechtolsheim's representation. Cisco began to conduct due diligence, and as part of the due diligence, Cisco asked Plaintiff to provide even further updated and highly detailed Trade Secrets and Other Information about the CSRAM design, including, but not limited to, extremely sensitive Trade Secrets and Other Information such as die size, power numbers, costs, and design techniques. In reliance on Defendant's promises and assurances, Plaintiff provided these further Trade Secrets and Other Information.

28.     On October 1 and October 2, 2002, as part of Cisco's continued due diligence for its planned acquisition of Plaintiff, Cisco requested the resumés from five of Plaintiff's engineers. On October 2, 2002, Cisco arranged a meeting with the five of Plaintiff's engineers whose resumés Cisco had requested. During this meeting, Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in addition to the current CSRAM

project, and their willingness to transition their work from Mosaic to Cisco.

29.    After the completion of the October 2, 2002 meeting between Plaintiff and Cisco, Plaintiff reasonably relied on Cisco and Defendant's representation that it was being acquired by Cisco, and Plaintiff disclosed the requested additional Trade Secrets and Other Information to Cisco's processor design team.  In fact, in October 2002, Plaintiff provided Cisco with Trade Secrets and Other Information that set out what it would take to produce the CSRAM chip and how the chip would be assembled.

## THE EXCLUSIVITY AGREEMENT

30.    At a December 5, 2002 meeting with Cisco, Mr. Luca Cafiero, Vice President of Storage Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all of Cisco's CSRAM sales.  By the end of the December 5, 2002 meeting, Plaintiff and Cisco agreed that Plaintiff would receive exclusivity, royalty payment, and actual costs for engineering and development from Cisco for the CSRAM technology.  Plaintiff later discovered that Cisco was actively soliciting quotes on the CSRAM chip from Plaintiff's competitors, and that Defendant knew the details of this but never disclosed it to Plaintiff.  Plaintiff is informed and believes and on that basis alleges that Cisco distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's competitors, and that Defendant knew this fact but did not disclose it to Plaintiff.  Plaintiff is informed and believes and on that basis alleges that Defendant himself distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's competitors.

31.    During this December 5, 2002 meeting, Mosaic and Cisco discussed Cisco's decision not to acquire Mosaic but instead decided: (1) to grant exclusivity to Mosaic for all supply of CSRAM to Cisco; (2) to pay fifty percent (50%) royalty of the material cost of the final packaged product and tested CSRAM; and (3) to pay actual non-recurring engineering costs of at least five to six (5-6) million dollars (but not to exceed fifty (50) million dollars) to Mosaic, representing the

costs of the chip engineering and development.

32.    The $5-6 million non-recurring engineering fee was based on an estimate that Plaintiff had previously quoted as the level of funding that would be necessary to bring the chip to production if Plaintiff was acquired by Cisco.  Mr. Cafiero agreed to this budget as long as the costs did not exceed fifty (50) million dollars.

33.    Plaintiff reasonably relied on Cisco's promise, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip.  Defendant never disclosed to Plaintiff that Cisco would not perform on its promise.   Based on Cisco's verbal agreement (communicated by Mr. Cafiero), Plaintiff also continued to provide additional Trade Secrets and Other Information to Cisco pursuant to Cisco's requests.

## CISCO BREACHES THE EXCLUSIVITY AGREEMENT

34.    Following the December 5, 2002 meeting, John McCool, Vice President of Engineering for Cisco's Gigabit Systems Business Unit, told Plaintiff that it would not receive exclusivity despite Cisco's representations, and that Cisco would not make any non-recurring engineering commitment to Plaintiff even though Cisco had promised and agreed to the same through Mr. Cafiero.  Mr. McCool worked directly for Defendant Bechtolsheim in the Gigabit Systems Business Unit.  Mr. McCool was responsible for implementing Defendant Bechtolsheim's directives.

35.    Defendant never disclosed to Plaintiff that Cisco would not perform, nor did he instruct Mr. McCool to perform on behalf of Cisco.  In fact, Defendant agreed with his Cisco co-workers that Cisco would not perform on its promises.

36.    Despite Cisco's failure to live up to its multiple promises, Plaintiff cooperated with Mr. McCool in a failed attempt to salvage some business relationship.  However, despite Mr. Cafiero's assurance that Cisco would pay the costs of designing a chip even if they exceeded $5

million (as long as those costs did not exceed $50 million), Mr. McCool insisted that Plaintiff's proposals had to be within a $5-6 million budget. After hours of detailed analysis and planning, Plaintiff entered a proposal that took even these new Cisco "concerns" (communicated by Mr. McCool) into consideration and setting these new funding limits.

37.    Cisco told Plaintiff that the pending project would be transferred to Richard Ellis from Cisco's Purchasing department. Plaintiff was also told by Cisco that another final agreement between Cisco and Mosaic would be completed by January 15, 2003. Defendant did not disclose to Plaintiff that Cisco did not intend to complete any agreement by January 15, 2003. In fact, Defendant continued to reassure Plaintiff in the face of Plaintiff's growing concerns.

38.    Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to Christmas of 2002. At this point, Plaintiff continued to reasonably believe that Cisco would live up to its promises, and Defendant did not disclose to Plaintiff that Cisco would do otherwise, despite knowledge that Cisco was actively seeking bids from Plaintiff's competitors. At the meeting, Mr. Ellis stated that the deal between Plaintiff and Cisco would be completed within two to three days, if it were not for the Christmas holidays. Plaintiff's staff went on vacation expecting to return in early January and conclude its agreement with Cisco; however, Plaintiff later discovered that within a few days of its initial meeting with Mr. Ellis, Cisco had reached an independent agreement with Sony as Cisco's supplier for CSRAM chips. Plaintiff contacted Mr. Ellis early in the first week of January 2003 to inquire about the status. Mr. Ellis told Plaintiff that Cisco was busy working out the details of the deal and that Plaintiff should not be concerned. Mr. Ellis did not disclose to Plaintiff that Cisco had already reached an agreement with Sony over the holiday season. At no time did Defendant disclose this information.

39.    Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Cisco and Plaintiff would be closed soon, and based on that and Defendant's failure to disclose any contrary

facts, Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip. Based on both Mr. Cafiero's and Mr. Ellis' verbal assurances and Defendant's failure to disclose and contrary facts, Plaintiff also continued to disclose Trade Secrets and Other Information to Cisco upon Cisco and Defendant Bechtolsheim's requests.

40.    In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior promises, Cisco would not perform on its agreement with Mosaic or enter into any new agreement, and that Mosaic could expect that some alternative transaction sponsored by Cisco would be the best way for Plaintiff to receive compensation for all of its work for Cisco. Mr. Ellis referred Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc. ("Micron"). Mr. Ellis expressed interest in doing business with an American company, and he advocated for Micron and Cypress to work with Plaintiff to submit a business proposal to Cisco.

41.    At the direction of Cisco and Defendant, Plaintiff traveled to Boise, Idaho to try to negotiate an acquisition deal with Micron. The initial meeting with Micron went well enough for the Micron team to fly out to San Jose, California to continue the negotiations. Mr. Ellis attended the meeting in San Jose between Micron and Plaintiff, and tried to convince Micron that by acquiring Plaintiff, Micron would be obtaining a new business relationship with Cisco with respect to CSRAM technology.

42.    In parallel with Micron discussions and at the direction of Cisco and Defendant, Plaintiff also started discussions with Cypress. Plaintiff attended a three-way meeting with Cypress and Cisco where Mr. Ellis told Cypress that acquiring Plaintiff would be beneficial. Based on these representations, Plaintiff and Cypress submitted a proposal to Cisco soon thereafter, but Mr. Ellis told Cypress that it was too late. Cisco had already chosen all its suppliers for the CSRAM technology. Defendant never disclosed to Plaintiff any timelines or other deadlines that Plaintiff needed to meet, nor did Defendant apprise Plaintiff of the status of negotiations with Plaintiff's

competitors.

43.    Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis

told Plaintiff that Cisco had reached a second-source supplier deal with Samsung.  Plaintiff contacted

Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer.  Mr. Ellis

agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial details from

the Samsung proposal.  Plaintiff worked with Cypress, and at the end of three days of negotiations,

Plaintiff was able to match Samsung's pricing.  Defendant never told Plaintiff that Cisco did not

intend to follow through with its offer to accept a matched bid.  When Plaintiff contacted Cisco to

deliver its proposal, Plaintiff was informed that the decision had been made to deal with Samsung,

and Cisco would not entertain Plaintiff's proposal.

## FURTHER USE OF PLAINTIFF'S TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION

44.    Since the discontinuation of negotiations between Plaintiff and Cisco, Plaintiff

has reason to believe that the confidential CSRAM specification that Plaintiff designed as well as

Plaintiff's Trade Secrets and Other Information have been used by Cisco, and disclosed to third

parties.  Plaintiff has reason to believe that said Trade Secrets and Other Information have since been

disclosed to third parties by Defendant.

45.    Throughout the entire relationship, Plaintiff never received any indication from

Defendant that Cisco was dissatisfied or otherwise had any concerns regarding Plaintiff's work.

Plaintiff never received any form of remuneration for all of its work on the DDR3 and CSRAM

projects with Cisco.  Plaintiff would not have worked on the DDR3 and CSRAM projects with Cisco

but for Defendant's multiple assurances that Plaintiff would be adequately remunerated for its work.

## FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty)

46.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 45 above, as if set forth at length here.

47.    Defendant Bechtolsheim, an executive of Cisco, also served on Mosaic's Board of Directors.  As a board member, Defendant Bechtolsheim as an individual owed a fiduciary duty to Mosaic.  Such duty includes, but is not limited to, obligations to be truthful to Mosaic, to exercise good faith and due diligence in his directives to Mosaic and to reasonably look after Mosaic's best interests.

48.    Defendant Bechtolsheim was also Vice President and General Manager of the Gigabit Systems Business Unit (the "Gigabit SBU"), the very department of Cisco which dealt with Mosaic regarding technical developments and business discussions during the parties' interactions.

49.    Defendant Bechtolsheim's position at Cisco involved business activities with other companies on technological developments, such as SRAM chips.  Defendant Bechtolsheim was an executive, and through his management duties, an authorized agent of Cisco.  Defendant Bechtolsheim had the apparent and/or actual authority to engage in business discussions with Mosaic, and Mosaic relied on such authority.  Defendant Bechtolsheim made numerous representations to Plaintiff that he not only had such authority, but also that he had the authority within Cisco to drive a deal with Mosaic through Cisco.  At no time prior to the time Plaintiff was harmed did Defendant disclose to Plaintiff that he did not have such authority.  Mosaic reasonably relied on the representations of its fiduciary.

50.    As a Mosaic board member, Defendant Bechtolsheim made specific representations, as follows:

A.  Cisco's obligations of confidentiality (by signing the NDA);

B.  Cisco's business need for particular types of SRAM within the Gigabit SBU;

C.  Cisco's technical requirements within the Gigabit SBU;

D.  Cisco's projected needs for SRAM within the Gigabit SBU;

E.  The fact that no other competitor could match the speed and performance offered by Mosaic;

F.  The specific steps (such as creation of a test chip) that would be required of Mosaic for Cisco to work with Mosaic;

G.  Promises to facilitate an acquisition of Mosaic by Cisco; and

H.  Representations to potential and actual investors in Mosaic about Cisco's interest in Mosaic and its technology.

51.    Defendant Bechtolsheim also omitted to disclose material facts, fact such as:

A.  His own authority within Cisco;

B.  Cisco's intentions relating to the use of Mosaic Trade Secrets and Other Information;

C.  Cisco's intentions relating to an acquisition;

D.  Cisco's intentions relating to its discussions with Plaintiff's competitors; and

E.  Cisco's unwillingness to abide by promises made by Cisco.

52.    Specifically, Defendant Bechtolsheim breached his duty to Mosaic in at least each of the following ways:

A.  Defendant Bechtolsheim breached his fiduciary duty to Mosaic by making repeated misrepresentations to Mosaic in the form of assurances (i) that Mosaic was vital to Cisco's interests, (ii) that Mosaic's technology was far ahead of any potential competitors, (iii) that Mosaic did not have to worry about the lack of a formal, written commitment from Cisco, (iv) that such a commitment would be completed, (v) that Mosaic would be a supplier of SRAM for Cisco, or would otherwise receive remuneration for all of its work with Cisco, and (vi) that Mosaic could rely on

Defendant Bechtolsheim's representations with respect to Cisco. As Mosaic later discovered, such representations and assurances were untrue, and furthermore, Defendant Bechtolsheim did not have the authority within Cisco to make them. These misrepresentations strengthened Mosaic's reliance on Cisco's similar claims, causing Plaintiff to entrust its most vital Trade Secrets and Other Information with Cisco, as well as causing Plaintiff to waste thousands of person-hours working hand-in-hand with Cisco to design and test a Static Random Access Memory ("SRAM") semiconductor chip for which Plaintiff ultimately received no remuneration. All of these misrepresentations were negligent and/or made in bad faith.

B. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directly disclosing Mosaic Trade Secrets and Other Information to Mosaic competitors and to other third parties. These disclosures not only breached Defendant Bechtolsheim's duty to Mosaic, but also were in breach of Cisco's NDA, which Defendant Bechtolsheim signed on behalf of Cisco.

C. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directing Mosaic to pursue the development of SRAM only with Cisco, to the exclusion of other potential business partners. During the initial stages of Mosaic's interaction with Cisco in 2000, Mosaic had to make crucial business decisions concerning who it would partner with, and where to apply its technical expertise in chip design. Defendant Bechtolsheim utilized his power over Mosaic as a director of Mosaic, as a principal investor in Mosaic, and as the Vice President and General Manager of the very Cisco business unit that sought SRAM suppliers, to convince Mosaic to focus only on Cisco to exclusion of other potential business partners. Such representations and directives were negligent and/or made in bad faith.

D. Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by directly providing Cisco with confidential Mosaic Trade Secrets and Other Information with full knowledge that Cisco was utilizing this information to aid in reaching supplier agreements with Mosaic's

competitors, and in breach of the NDA.

E.  Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by providing Cisco with Mosaic Trade Secrets and Other Information for purposes other than those stipulated by the Non-Disclosure Agreement ("NDA").  Furthermore, Defendant Bechtolsheim signed the NDA on behalf of Cisco, and Cisco failed to follow it.

F.  Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by falsely promising an acquisition offer by Cisco to Mosaic.

G.  Defendant Bechtolsheim further breached his fiduciary duty by misrepresenting to Mosaic that he had the requisite authority and influence within Cisco to drive a final deal through Cisco, and that Mosaic could rely on this fact and on Cisco's verbal promises and commitments even though Mosaic did not have a formal, written commercial agreement with Cisco.  Such misrepresentations were negligent and/or made in bad faith.

H.  Defendant Bechtolsheim further breached his duty by repeatedly failing to disclose information pertinent to Mosaic and its shareholders' best interests.  Defendant Bechtolsheim neglected his obligations as a fiduciary by deliberately allowing Mosaic to operate under false assumptions for his own and for Cisco's gain.

I.  Defendant Bechtolsheim further breached his fiduciary duty to Mosaic by failing to recognize his fundamental conflict of interest and disengage from any activities with respect to the two parties' interaction.  Such failures were negligent and/or made in bad faith.

J.  Defendant Bechtolsheim further breached his fiduciary duty generally, by putting his own and Cisco's interests ahead of Mosaic's.

53.    Mosaic's time, money, and energy were devoted to the DDR3 and CSRAM projects, custom projects that could not be used with any other companies (Cisco's competitors) by nature of the custom design.  Mosaic employees worked directly with Defendant Bechtolsheim to aid Cisco's

design.  Several Cisco employees worked with Mosaic at the direction of Defendant Bechtolsheim.
Mosaic employees worked with Cisco at the direction of Defendant Bechtolsheim.

54.     Cisco's business negotiations granted Cisco access to Mosaic and its Trade Secrets
and Other Information, insight which other companies did not have.  Cisco had access to Mosaic's
financial and funding information and thus was aware of Mosaic's negotiating leverage with other
parties.  Plaintiff would not have provided access to said information but for Defendant
Bechtolsheim's multiple verbal and other assurances to Plaintiff.

55.     The actions by Defendant Bechtolsheim and the benefits conferred on Cisco put
Mosaic in an unequal and disadvantaged bargaining position with Cisco.  Furthermore, Defendant
Bechtolsheim's role as head of the Gigabit SBU caused Mosaic to trust Cisco in its dealings at a
level that is higher than would be expected in an arm's length transaction.  Because Defendant
Bechtolsheim was in a position to direct Mosaic, Cisco obtained undue leverage in the negotiation
process.

56.     Defendant knew that Plaintiff reasonably relied upon the relationship of trust that
existed between Defendant and Mosaic given Defendant's status as an active member of Plaintiff's
Board of Directors.  Defendant knew that this reliance by Plaintiff would cause great damage to
Plaintiff's business if Cisco failed to remunerate Mosaic.

57.     Defendant breached his fiduciary duty and trust by negligently and/or in bad faith
failing to act in Plaintiff's best interests.  Defendant breached his fiduciary duty by depriving Mosaic
of the compensation it rightly deserved.

58.     Plaintiff did not begin learning of Defendant's breaches of duty until 2003 and
commenced its investigation thereof in a reasonable fashion.

59.     The substantial expenditures made by Plaintiff based on Defendant's
misrepresentations and breach of duty have cost Plaintiff irreparable harm and that expenditure is the

proximate cause of damages to Plaintiff.

60.    Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

61.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
(Negligent Misrepresentation)

62.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 61 above, as if set forth at length here.

63.    Defendant made several representations to Plaintiff that Cisco would to provide financial remuneration to Plaintiff. This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco.

64.    Defendant made further representations during multiple board and other meetings about Cisco's interest in Plaintiff, and about how no competitor could match Plaintiff's products in Cisco's eyes.

65.    Defendant made further representations to Plaintiff with respect to the direction that Plaintiff should take, while omitting material facts that he had a duty to disclose, namely that Cisco was in fact pursuing other competitors and was not willing to provide remuneration to Plaintiff.

66.    Said representations were in fact false and/or misleading in light of the omitted facts. At the time said statements were made, Defendant knew or had reason to know that they were false or misleading in light of the omitted facts. Said statements were negligent, for at the time Defendant Bechtolsheim's multiple promises and assurances were made, Defendant Bechtolsheim did not exercise any of the diligence required of him in his role as a fiduciary of Plaintiff to, in good faith, confirm the veracity of said promises and assurances. Given Defendant's knowledge of the weight

his words carried with respect to Plaintiff's interaction with Cisco, said promises and assurances were grossly negligent.

67.    Defendant negligently intended that Plaintiff rely on his statements and promises, and Plaintiff did reasonably rely on such statements and promises to its detriment.

68.    Defendants's negligent misrepresentations have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
(Constructive Fraud)

69.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 68 above, as if set forth at length here.

70.    Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also constitute constructive fraud.

71.    As discussed above, Defendant Bechtolsheim had a fiduciary duty to Mosaic to preserve, improve, and protect Mosaic's viability and interests, a duty upon which Mosaic justifiably relied.  Defendant Bechtolsheim breached his fiduciary duty to Mosaic in numerous ways.

72.    Defendant Bechtolsheim made several representations to Plaintiff that Cisco was to provide financial remuneration to Plaintiff.  Such representations and inducements were made all in effort to induce Mosaic to continue to trust Cisco, and to continue providing Cisco with Mosaic Trade Secrets and Other Information as well as its engineering expertise.  Defendant Bechtolsheim made assurances that Mosaic would receive purchases by Cisco in the form of a commercial agreement, a non-recurring engineering fee, investment by Cisco in Mosaic, or acquisition of Mosaic by Cisco.

73.    Said representations were in fact false.  Cisco did not provide financial remuneration to Plaintiff.

74.    Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals

from companies that would compete with Cisco. Defendant further failed to disclose that Cisco had not made any plans to provide financial remuneration to Plaintiff.

75.     Reasonably relying on the false representations made by Defendant Bechtolsheim, Mosaic advised Cisco in the design of DDR3 chip, advised Cisco in the design of the CSRAM specification, advised Cisco in the architecture and engineering of the CSRAM chip, aided in the development and engineering in the CSRAM chip, and responded to Cisco's repeated inquiries regarding the specific proprietary design details needed to bring the chip to production.

76.     Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover such damages in an amount to be determined at trial.

77.     Defendant's actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Concealment)

78.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 77 above, as if set forth at length here.

79.     As a director of Plaintiff, Defendant Bechtolsheim owed a fiduciary duty to Plaintiff, including the duty to disclose important facts pertinent to Mosaic's interests.

80.     As discussed in detail above, over the course of the interaction between Mosaic and Cisco from 2000 through 2003, Defendant Bechtolsheim intentionally failed to disclose many important facts to Plaintiff. Specifically, Defendant Bechtolsheim concealed the following important facts from Plaintiff: (i) that Cisco was using Mosaic Trade Secrets and Other Information for purposes other than those allowed by the NDA, including to develop competitive bids, (ii) that Cisco was disclosing Mosaic Trade Secrets and Other Information to third parties, (iii) that Defendant Bechtolsheim himself was using Mosaic Trade Secrets and Other Information for purposes other

than those allowed by the NDA as well as disclosing Mosaic Trade Secrets and Other Information to third parties, (iv) that Cisco did not in fact intend to acquire Plaintiff or otherwise provide any remuneration for Plaintiff's work for Cisco, and (v) other important facts discussed in Paragraphs 1 through 79 above. Plaintiff is informed and believes, and on that basis alleges that Defendant Bechtolsheim intended to deceive Plaintiff by concealing the important facts.

81.     Plaintiff did not know of the important facts concealed by Defendant, and Plaintiff reasonably relied on Defendant Bechtolsheim's deception.

82.     Plaintiff was harmed and Defendant Bechtolsheim's concealment of important facts from Plaintiff was a substantial factor in causing Plaintiff's harm and in causing substantial damages to Plaintiff.

83.     Defendant's wrongful actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Statutory Unfair Competition)

84.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 83 above, as if set forth at length here.

85.     Defendant's acts as described above were designed to and constitute unfair competition by Cisco in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

86.     Defendant's unfair and unlawful actions have caused extensive damage to Plaintiff. By its actions, Defendant has effectively kept Plaintiff from competing in the marketplace.

87.     As a direct and proximate cause of Defendant's unfair practices, Cisco has been unjustly enriched and Plaintiff has provided value to Cisco. which must be repaid in restitution in an amount to be proven at trial.

Complaint for Breach of Fiduciary Duty,
Negligent Misrepresentation, etc.                    22

88.     Plaintiff has also suffered irreparable harm as a result of Defendant's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendant is enjoined from engaging in any further such acts of unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Cisco, jointly and severally, as follows:

A.     On the First Cause of Action, for damages and punitive damages in an amount to be determined at trial;

B.     On the First Cause of Action, for exemplary damages in an amount to be determined at trial;

C.     On the Second and Third Causes of Action for damages in an amount to be determined at trial;

D.     On the Third Causes of Action, for punitive damages in an amount to be determined at trial;

E.     On the Fourth Cause of Action for damages and punitive damages in an amount to be determined at trial

F.     On the Fifth Cause of Action, for restitution in an amount to be determined at trial;

G.     On the Fifth Cause of Action, for an injunction against further unfair trade practices;

H.     For reasonable attorney's fees, as authorized by law; and,

I.    For such other and further relief as the Court deems just and proper.

Dated: October 13, 2006

RUSSO & HALE LLP

By: _____
     Jack Russo
     Michael Risch

Attorneys for Plaintiff
MOSAIC SYSTEMS, INC.