1  Jack Russo (State Bar No. 96068)
   Michael Risch (State Bar No. 197600)
2  RUSSO & HALE LLP
   401 Florence Street
3  Palo Alto, CA 94301
   650-327-9800
4
   Attorneys for Plaintiff
5  MOSAIC SYSTEMS, INC.

6

7

8              IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA
9                    IN AND FOR THE COUNTY OF SANTA CLARA
10

11                                    )  Case No. 1-04 CV016867
                                      )
12  MOSAIC SYSTEMS, INC., a           )  **PLAINTIFF'S THIRD AMENDED**
    California corporation,           )  **COMPLAINT FOR DAMAGES AND**
13                                    )  **DECLARATORY RELIEF FOR BREACH**
                                      )  **OF WRITTEN AGREEMENT, TRADE**
14          Plaintiff,                )  **SECRET MISAPPROPRIATION, BREACH**
                                      )  **OF FIDUCIARY DUTY, AIDING AND**
15          v.                        )  **ABETTING A BREACH OF FIDUCIARY**
                                      )  **DUTY, BREACH OF DUTY IN JOINT**
16  CISCO SYSTEMS, INC., a Delaware   )  **VENTURE, BREACH OF COVENANT OF**
    corporation, and DOES 1 through 20, )  **GOOD FAITH AND FAIR DEALING,**
17  inclusive,                        )  **BREACH OF ORAL AGREEMENT,**
                                      )  **PROMISSORY ESTOPPEL, QUANTUM**
18          Defendants.               )  **MERUIT, NEGLIGENT**
                                      )  **MISREPRESENTATION, CONSTRUCTIVE**
19                                    )  **FRAUD, AND UNFAIR COMPETITION**
                                      )
20                                    )  **[JURY TRIAL DEMANDED]**
                                      )
21                                    )  **(CCP § 1060 et seq.)**

22

23

24

25

26

27

28

REQUEST FOR
JUDICIAL NOTICE:
EXHIBIT 3

Plaintiff Mosaic Systems, Inc. ("Plaintiff" or "Mosaic") alleges against Defendant Cisco Systems, Inc. (the "Defendant" or "Cisco") as follows:

## INTRODUCTION

1.     This is an action for breach of written agreement, trade secret misappropriation, aiding and abetting a breach of fiduciary duty, breach of the covenant of good faith and fair dealing, promissory estoppel, constructive fraud, fraud and unfair competition (the "Action") arising from the continued receipt and use of Plaintiff's trade secrets, proprietary materials, and Plaintiff's chip design documentation (collectively the "Trade Secrets"), acquired by Defendants from Plaintiff under a written Non-Disclosure Agreement.  Defendants made multiple false promises in order to obtain the Trade Secrets as well as to otherwise take advantage of the Plaintiff, and then disclosed and used the Trade Secrets and other confidential and proprietary information (the "Trade Secrets and Other Information") notwithstanding a written agreement barring such use.

2.     Plaintiff also seeks declaratory relief in this Action because a controversy exists and Plaintiff is entitled to a declaration of its rights and of Defendant's duties under applicable California law.

## PARTIES

3.     Plaintiff Mosaic is a corporation duly organized and existing under California law and with its principal office based in Los Altos, California, and was formerly based in Sunnyvale, California.

4.     Defendant Cisco Systems, Inc. ("Cisco") is a Delaware corporation based in San Jose, California.

5.     Defendants Does 1 through 20, inclusive, whether individuals, corporations, associations or otherwise are fictitious names of defendants whose true names and capacities are at this time unknown to Plaintiff.  Each of said fictitiously named defendants, whether individuals, corporations, associations or otherwise is in some way liable or responsible to Plaintiff proximately thereby as hereinafter alleged.  At such time as defendants' true names become known to Plaintiff, Plaintiff will ask leave of this Court to amend this Complaint to insert said true names and capacities.

1       6. Plaintiff is informed and believes and on that basis alleges that Cisco along with

2  Defendant Does 1-20 did agree together and conspire together, with knowledge of their unlawful

3  purpose, to take the unlawful actions alleged in this Complaint, and were acting within the full

4  course and scope of their illegal conspiracy, with the full knowledge and consent, either express or

5  implied, of each of the other Defendants.

6                   **JURISDICTION AND VENUE**

7       7.     This Court has general jurisdiction of all claims herein arising under California law.

8  This Court also has jurisdiction of the declaratory relief claims pursuant to Section 1060 of the

9  California Code of Civil Procedure as an actual case and controversy exists between the parties.

10       8.     Venue is proper in this Court because the contractual, statutory and other obligations

11  of Defendant arose and were to be performed in Santa Clara County, California.

12            **THE WRITTEN NON-DISCLOSURE AGREEMENT**

13       9.     Defendant Cisco is known throughout the industry as a Fortune 500 publicly-traded

14  corporation that has repeatedly acquired smaller, complementary private businesses in fields where

15  Defendant expects to extend its business interests. In fact, during the period from 1990 through

16  2000, Cisco acquired over one hundred (100) other companies.

17      10.    Beginning in 2000, Defendant communicated to Plaintiff its interest in developing a

18  high-speed SRAM chip. Plaintiff knew how to make faster SRAM chips than had previously been

19  developed, and Defendant knew this given a previous joint project on a DDR3 chip in 2001 and

20  2002. With encouragement from Cisco's proclaimed interest, and a high-level Cisco executive (Mr.

21  Andreas Bechtolsheim) serving as one of Mosaic's board members, Plaintiff pursued the

22  development of SRAM that Defendant promised to purchase.

23      11.    Mr. Andreas Bechtolsheim, Vice President and General Manager of the Gigabit

24  Systems Business Unit at Cisco, was an active member of Mosaic's Board of Directors. Mr.

25  Bechtolsheim thus had a fiduciary duty to Mosaic by virtue of his position at Mosaic. Cisco was

26  aware of Mr. Bechtolsheim's investment and involvement in Mosaic as a board member, and

27  therefore knew that Mr. Bechtolsheim owed Mosaic a fiduciary duty. Mr. Bechtolsheim also made

28  substantial investments in Mosaic with Cisco's knowledge; these investments totaled over two (2)

1  million dollars.  His position on Mosaic's Board of Directors gave Cisco valuable Trade Secrets and

2  Other Information regarding Mosaic's business and technological developments.  Cisco not only had

3  knowledge that Mr. Bechtolsheim was on Mosaic's Board of Directors, but Cisco also reaped the

4  benefits of such confidential knowledge of Mosaic through Mr. Bechtolsheim's relationship to

5  Mosaic.

6      12.    Plaintiff is informed and believes and on that basis alleges that Mr. Bechtolsheim's

7  responsibilities in Cisco's Gigabit Systems Business Unit included but were not limited to

8  developing network switching technologies such as the Catalyst 4000 Gigabit Switch family.

9      13.    Mr. Bechtolsheim initiated the business dealings between Mosaic and Cisco, and he

10 encouraged Mosaic to work with Cisco on development of a custom SRAM chip.  In fact, Mr.

11 Bechtolsheim's position in the department with which Mosaic worked created a distinct advantage

12 for Cisco in its ability to influence Mosaic's business direction and technical decisions.  Mr.

13 Bechtolsheim directed Mosaic to only pursue the development of SRAM with Cisco.  Plaintiff is

14 informed and believes, and on that basis alleges, that Cisco was aware of and participated in this

15 directive.

16     14.    With direction from Mr. Bechtolsheim and Cisco through Mr. Bechtolsheim, Mosaic

17 pursued design, development and engineering of SRAM that Cisco promised to purchase, including

18 proving the feasibility of high speeds, low power, and low cost.

19     15.    If Cisco had not promised Plaintiff proprietary protection and remuneration for a

20 high-speed SRAM chip and had Cisco not had a high-ranking executive on Plaintiff's Board of

21 Directors, Plaintiff would have not have pursued the many person-years of design, development, and

22 engineering time with Defendant.

23     16.    On or about May 2, 2001, Mosaic and Cisco entered into a written Mutual Non-

24 Disclosure Agreement ("NDA").  A true and correct copy of the NDA is attached hereto as Exhibit

25 1.  Plaintiff trusted that Cisco would honor its agreements, and not use any Trade Secrets and Other

26 Information disclosed by Plaintiff without an express agreement allowing such use.

27

28

**Third Amended Complaint**                              4                              **Case No. 1-04 CV016867**

## MOSAIC'S MULTIPLE CONFIDENTIAL DISCLOSURES TO CISCO

17.    In June 2002, Defendant notified Plaintiff that Cisco's architecture had significant technical problems that caused it to fail with standard SRAM specifications.

18.    Between June and July 2002, Defendant and Plaintiff worked together to create the CSRAM specification, ("CSRAM Spec") to solve these technical problems. During this time, Defendant's and Plaintiff's engineers communicated in person and by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems. Many of these e-mails contained Plaintiff's Trade Secrets and Other Information. Plaintiff reasonably relied on Cisco's representations that Plaintiff was developing the CSRAM chip hand-in-hand with Defendant Cisco, that it would abide by the NDA, and that Plaintiff was the only company that Defendant was working with on developing this type of SRAM technology. Defendant never disclosed to Plaintiff that it was evaluating Plaintiff's competitors, that it was using Trade Secrets and Other Information disclosed under the NDA to develop competitive bids, or that the Trade Secrets and Other Information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

19.    While working to develop the CSRAM chip, Plaintiff disclosed a wealth of Trade Secrets and Other Information to Defendant, upon Defendant Cisco's request. These Trade Secrets and Other Information include, but are not limited to, confidential and proprietary information about resolving packaging problems, projected costs, power numbers, yield data, and die sizes. Cisco's internal processor design and purchasing teams relied on Plaintiff's Trade Secrets and Other Information to further develop their specification and to obtain bids from Plaintiff's competitors.

20.    Plaintiff first became aware of and concerned with competitors for Defendant Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Defendant a quote of one hundred dollars ($100) per chip. This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never, in fact, provided Defendant a one hundred dollar ($100) quote for the CSRAM chip. Plaintiff is informed and believes and on that basis alleges that Mr. Bechtolsheim misrepresented the Micron "quote" in order to drive the cost of the CSRAM chip lower.

## MOSAIC'S MULTIPLE CONFIDENTIAL DISCLOSURES TO CISCO

17.     In June 2002, Defendant notified Plaintiff that Cisco's architecture had significant technical problems that caused it to fail with standard SRAM specifications.

18.     Between June and July 2002, Defendant and Plaintiff worked together to create the CSRAM specification, ("CSRAM Spec") to solve these technical problems.  During this time, Defendant's and Plaintiff's engineers communicated in person and by e-mail nearly every day regarding possible design techniques and implementations to solve Cisco's problems.  Many of these e-mails contained Plaintiff's Trade Secrets and Other Information.  Plaintiff reasonably relied on Cisco's representations that Plaintiff was developing the CSRAM chip hand-in-hand with Defendant Cisco, that it would abide by the NDA, and that Plaintiff was the only company that Defendant was working with on developing this type of SRAM technology.  Defendant never disclosed to Plaintiff that it was evaluating Plaintiff's competitors, that it was using Trade Secrets and Other Information disclosed under the NDA to develop competitive bids, or that the Trade Secrets and Other Information that Plaintiff had provided to Cisco would be distributed to third-parties without Plaintiff's consent.

19.     While working to develop the CSRAM chip, Plaintiff disclosed a wealth of Trade Secrets and Other Information to Defendant, upon Defendant Cisco's request.  These Trade Secrets and Other Information include, but are not limited to, confidential and proprietary information about resolving packaging problems, projected costs, power numbers, yield data, and die sizes.  Cisco's internal processor design and purchasing teams relied on Plaintiff's Trade Secrets and Other Information to further develop their specification and to obtain bids from Plaintiff's competitors.

20.     Plaintiff first became aware of and concerned with competitors for Defendant Cisco's business with respect to CSRAM chips in August 2002, when Defendant told Plaintiff that Micron Technology, Inc. ("Micron") gave Defendant a quote of one hundred dollars ($100) per chip.  This initial quote was unrealistically low, and Plaintiff later learned from Micron employees that Micron had never, in fact, provided Defendant a one hundred dollar ($100) quote for the CSRAM chip.  Plaintiff is informed and believes and on that basis alleges that Mr. Bechtolsheim misrepresented the Micron "quote" in order to drive the cost of the CSRAM chip lower.

**Third Amended Complaint**                    5                    **Case No. 1-04 CV016867**

**THE ACQUISITION OFFER AND DISCLOSURES**

21.    In September 2002, Defendant informed Plaintiff that Defendant was interested in acquiring Plaintiff.  Defendant began to conduct due diligence, and as part of the due diligence, Defendant asked Plaintiff to provide even further updated and highly detailed Trade Secrets and Other Information about the CSRAM design, including, but not limited to, extremely sensitive Trade Secrets and Other Information such as die size, power numbers, and design techniques.  In reliance on Defendant's promises, Plaintiff provided this further Trade Secrets and Other Information.

22.    On October 1 and October 2, 2002, as part of Defendant's continued due diligence for its planned acquisition of Plaintiff, Defendant requested the resumés from five of Plaintiff's engineers.  On October 2, 2002, Defendant arranged a meeting with the five of Plaintiff's engineers whose resumés Defendant had requested.  During this meeting, Cisco inquired about the engineers' current salaries, their interest in working on Cisco projects in addition to the current CSRAM project, and their willingness to transition their work from Mosaic to Cisco.

23.    After the completion of the October 2, 2002 meeting between Plaintiff and Defendant Cisco, Plaintiff reasonably relied on the representation that it was being acquired by Cisco, and Plaintiff disclosed the requested additional Trade Secrets and Other Information to Cisco's processor design team.  In fact, on October 16, 2002, Plaintiff provided Cisco with Trade Secrets and Other Information that set out what it would take to produce the CSRAM chip and how the chip would be assembled.

**THE EXCLUSIVITY AGREEMENT**

24.    At a December 5, 2002 meeting with Cisco, Mr. Luca Cafiero, Vice President of Storage Networking Group for Cisco, confirmed that Cisco would give Plaintiff exclusivity for all of Defendant's CSRAM sales.  Plaintiff later discovered that Defendant was actively soliciting quotes on the CSRAM chip from Plaintiff's competitors.  Plaintiff is informed and believes and on that basis alleges that Defendant distributed Plaintiff's Trade Secrets and Other Information to Plaintiff's

competitors.  By the end of the December 5, 2002 meeting, Plaintiff and Defendant agreed that Plaintiff would receive exclusivity, royalty payment, and actual costs for engineering and development from Defendant for the CSRAM technology.

25.    Mr. Cafiero was the former Vice President of Cisco's Workgroup Business Unit, the very unit in which Mr. Bechtolsheim began his employment at Cisco.

26.    During this December 5, 2002 meeting, Mosaic and Cisco discussed Cisco's decision not to acquire Mosaic but instead decided: (1) to grant exclusivity to Mosaic for all supply of CSRAM to Cisco; (2) to pay fifty percent (50%) royalty of the material cost of the final packaged product and tested CSRAM; and (3) to pay actual non-recurring engineering costs of at least five to six (5-6) million dollars (but not to exceed fifty (50) million dollars) to Mosaic, representing the costs of the chip engineering and development.

27.    The $5-6 million non-recurring engineering fee was based on an estimate that Plaintiff had previously quoted as the level of funding that  would be necessary to bring the chip to production if Plaintiff was acquired by Defendant.  Mr. Cafiero agreed to this budget as long as the costs did not exceed fifty (50) million dollars.

28.    Plaintiff reasonably relied on Defendant's promise, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip.  Based on Cisco's verbal agreement (communicated by Mr. Cafiero), Plaintiff also continued to provide additional Trade Secrets and Other Information to Defendant pursuant to Defendant's requests.

## CISCO BREACHES THE EXCLUSIVITY AGREEMENT

29.    Following the December 5, 2002 meeting, John McCool, Vice President of Engineering for Cisco's Gigabit Systems Business Unit, told Plaintiff that it would not receive exclusivity despite Cisco's representations, and that Defendant Cisco would not make any non-

recurring engineering commitment to Plaintiff even though Cisco had promised and agreed to the same through Mr. Cafiero.

30.     Mr. McCool worked directly with Mr. Bechtolsheim in the Gigabit Systems Business Unit.  Mr. McCool was responsible for implementing Mr. Bechtolsheim's directives.

31.     Despite Cisco's failure to live up to its multiple promises, Plaintiff cooperated with Mr. McCool in a failed attempt to salvage some business relationship.  However, despite Mr. Cafiero's assurance that Cisco would pay the costs of designing a chip even if they exceeded $5 million (as long as those costs did not exceed $50 million), Mr. McCool insisted that Plaintiff's proposals had to be within a $5-6 million budget.  After hours of detailed analysis and planning, Plaintiff entered a proposal that took even these new Cisco "concerns" (communicated by Mr. McCool) into consideration and setting these new funding limits.

32.     Defendant told Plaintiff that the pending project would be transferred to Richard Ellis from Defendant Cisco's Purchasing department.  Plaintiff was also told by Cisco that another final agreement between Cisco and Mosaic would be completed by January 15, 2003.

33.     Plaintiff met with Mr. Ellis during the third week of December 2002, just prior to Christmas of 2002.  At this point, Plaintiff continued to reasonably believe that Cisco would live up to its promises.  At the meeting, Mr. Ellis stated that the deal between Plaintiff and Defendant would be completed within two to three days, if it were not for the Christmas holidays.  Plaintiff's staff went on vacation expecting to return in early January and conclude its agreement with Cisco; however, Plaintiff later discovered that within a few days of its initial meeting with Mr. Ellis, Cisco had reached an independent agreement with Sony as Cisco's supplier for CSRAM chips.  Plaintiff contacted Mr. Ellis early in the first week of January 2003 to inquire about the status.  Mr. Ellis told Plaintiff that Cisco was busy working out the details of the deal and that Plaintiff should not be

concerned.  Mr. Ellis did not disclose to Plaintiff that Cisco had already reached an agreement with Sony over the holiday season.

34.    Plaintiff relied on Mr. Ellis' verbal assurance that a "deal" between Defendant and Plaintiff would be closed soon, and Plaintiff continued to dedicate its time and energy toward the development of the CSRAM chip.  Based on both Mr. Cafiero's and Mr. Ellis' verbal assurances, Plaintiff also continued to disclose Trade Secrets and Other Information to Defendant upon Defendant's requests.

35.    In January 2003, Mr. Ellis finally communicated to Plaintiff that despite prior promises, Cisco would not perform on its agreement with Mosaic or enter into any new agreement, and that Cisco would expect that some alternative transaction sponsored by Cisco would be the best way for Plaintiff to receive compensation for all of its work for Cisco.  Mr. Ellis referred Plaintiff to Cypress Semiconductor Corporation ("Cypress") and Micron Technology, Inc. ("Micron").  Mr. Ellis expressed interest in doing business with an American company, and he advocated for Micron and Cypress to work with Plaintiff to submit a business proposal to Defendant.

36.    At the direction of Defendant, Plaintiff traveled to Boise, Idaho to try to negotiate an acquisition deal with Micron.  The initial meeting with Micron went well enough for the Micron team to fly out to San Jose, California to continue the negotiations.  Mr. Ellis attended the meeting in San Jose between Micron and Plaintiff, and tried to convince Micron that by acquiring Plaintiff, Micron would be obtaining a new business relationship with Cisco as well for the CSRAM technology.

37.    In parallel with Micron discussions and at the direction of Defendant, Plaintiff also started discussions with Cypress.  Plaintiff attended a three-way meeting with Cypress and Cisco where Mr. Ellis told Cypress that acquiring Plaintiff would be beneficial.  Based on these

representations, Plaintiff and Cypress submitted a proposal to Cisco soon thereafter, but Mr. Ellis told Cypress that it was too late, Cisco had already chosen all its suppliers for the CSRAM technology.

38.    Despite Mr. Ellis's meeting with Cypress and the proposal from Cypress, Mr. Ellis told Plaintiff that Defendant had reached a second-source supplier deal with Samsung. Plaintiff contacted Mr. Ellis to request a chance to work with Cypress to meet Samsung's business offer. Mr. Ellis agreed to let Plaintiff attempt to meet the offer and provided Plaintiff with the financial details from the Samsung proposal. Plaintiff worked with Cypress, and at the end of three days of negotiations, Plaintiff was able to match Samsung's pricing. When Plaintiff contacted Defendant to deliver its proposal, Plaintiff was informed that the decision had been made to deal with Samsung, and Defendant would not entertain Plaintiff's proposal.

### FURTHER USE OF PLAINTIFF'S TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION

39.    Since the discontinuation of negotiations between Plaintiff and Defendant, Plaintiff has reason to believe that the confidential CSRAM specification that Plaintiff designed as well as Plaintiff's Trade Secrets and Other Information  have been used by Defendant Cisco.

40.    Throughout the entire relationship, Plaintiff had never received any indication that Defendant was dissatisfied or otherwise had any concerns regarding Plaintiff's work. Plaintiff's Trade Secrets and Other Information were not returned upon failure to reach an agreement.

41.    Defendant has failed to acknowledge and has denied that it has a fiduciary duty or other obligations to Plaintiff, despite having been notified of such by Plaintiff, nor has it in any way attempted to rectify the substantial and irreparable harm that said failure has caused.

42.    Defendant has failed to acknowledge and has denied its express violation of the

1   terms of its written and verbal agreements with Plaintiff, despite having been notified of such by

2   Plaintiff, nor has it in any way attempted to rectify that breach.

3   43.    Plaintiff is entitled to a declaratory judgment of its rights and Defendant's

4   responsibilities, without prejudice to any other remedy, provisional or otherwise, provided by law for

5   the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

6

7   44.    Under Section 1062.3 of the California Code of Civil Procedure, Plaintiff is entitled

8   to have this Action set for trial "at the earliest possible date" in accordance with applicable law and

9   Plaintiff requests that such trial date be set by the Court at the earliest possible time.

10

11  **FIRST CAUSE OF ACTION**
(Breach of Written Agreement)

12

13  45.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

14  through 44 above, as if set forth at length here.

15  46.    On or about May 2, 2001, the parties entered into the NDA, attached hereto as

16  Exhibit 1.

17  47.    Plaintiff performed all of the legally required terms and conditions of the NDA.

18

19  48.    Defendants breached the NDA in multiple ways, namely:

20      a.    By using Plaintiff's Trade Secrets and Other Information without Plaintiff's

21            consent in development of technology with third-parties;

22      b.    By failing to disclose, or even discuss, with Plaintiff the use of said Trade

23            Secrets and Other Information, and know-how of Plaintiff in connection with

24            third- parties;

25

26      c.    By using the Trade Secrets and Other Information of Plaintiff for purposes

27            outside the scope of the evaluation of a potential business relationship

28            between the parties; and,

d.    By failing to perform other terms and conditions of the NDA.

49.    Defendant's material breaches of contract are the proximate cause of damages to Plaintiff, and Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
(Declaratory Relief Regarding Ownership of Trade Secrets)

50.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 49 above, as if set forth at length here.

51.    A dispute has arisen between the parties as to the rights and responsibilities of each party.  Plaintiff is entitled to a declaratory judgment of Plaintiff's ownership of Trade Secrets, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

### THIRD CAUSE OF ACTION
(Trade Secret Misappropriation)

52.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 51 above, as if set forth at length here.

53.    At Defendant's request, Plaintiff disclosed its Trade Secrets to Defendant.  Defendant then used these Trade Secrets to create chip specifications that it distributed to other departments within Cisco and to Plaintiff's competitors without Plaintiff's consent.

54.    Defendant continued to falsely promise acquisition, non-recurring engineering agreements, and commercial agreements to Plaintiff in order to induce Plaintiff and it did induce Plaintiff to continue to provide Trade Secrets to Defendant.

55.    Plaintiff is informed and believes and on that basis alleges that Defendant chose to work with Plaintiff based on Plaintiff's industry expertise.  Defendant frequently praised Plaintiff for

its expertise and acknowledged the substantial skill, experience, and head-start Plaintiff had compared to the rest of the industry.

56.    Without any license from Plaintiff, Defendant continues to work in the field of SRAM chips with Sony and Samsung and continues to use Plaintiff's trade secrets, confidential and proprietary information, and know-how.

57.    Plaintiff disclosed valuable Trade Secrets to Defendant.  The foregoing information and advantages provided Defendant with a substantial edge in the development of SRAM technology and greatly expedited Defendant's progress in the industry.  This head-start was gained through the wrongful conduct and misleading statements of Defendant to provide Plaintiff with additional investment, non-recurring engineering fees, commercial agreements, and an overall acquisition. These misleading statements were maintained until Defendant had used Plaintiff's Trade Secrets to reach a second-source supplier agreement with Plaintiff's direct competitor.

58.    Plaintiff provided Trade Secrets including detailed information and instructions to complete the development of the CSRAM chip and to change its system architecture, given that Defendant purposefully and with intent promised Plaintiff that Defendant would pay royalties to, acquire, and/or make investments in Plaintiff.  These Trade Secrets, to which Defendant has no rights, were used by Defendant in the development of its CSRAM and system architecture specification.  This and any other use by Defendant of improperly acquired Trade Secrets has been without the express consent of Plaintiff.

59.    Defendant's actions were the direct and proximate cause of damages to Plaintiff.

60.    Plaintiff is entitled to damages for trade secret misappropriation, in an amount to be determined at trial.

61.    Plaintiff is entitled to preliminary and permanent injunctive relief from the continued use and disclosure of its trade secrets.

### FOURTH CAUSE OF ACTION [1]
(Declaratory Relief Regarding Fiduciary Duty)

62.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 61 above, as if set forth at length here.

63.    A dispute has arisen between the parties as to the rights and responsibilities of each party.  Plaintiff is entitled to a declaratory judgment of Defendant's former and continued fiduciary duty to Plaintiff, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

### FIFTH CAUSE OF ACTION [1]
(Breach of Fiduciary Duty)

64.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 63 above, as if set forth at length here.

<u>Andreas Bechtolsheim</u>

65.    Mr. Bechtolsheim, an executive of Cisco, also served on Mosaic's Board of Directors.  As a board member, Mr. Bechtolsheim as an individual owed a duty to Mosaic.

---

[1]Plaintiff acknowledges that the Court has sustained a demurrer based on the pleadings that the relationship between Mosaic and Cisco was not fiduciary in nature. Plaintiff retains the Fourth and Fifth Causes of Action in this Complaint only for the purpose of preserving them for appeal as well as for the alleging of background facts.  Pursuant to the Court's Order of May 23, 2005, Plaintiff introduces a Sixth Cause of Action below for aiding and abetting a breach of fiduciary duty.

66.    Mr. Bechtolsheim was also Vice President and General Manager of the Gigabit Systems Business Unit (the "Gigabit SBU"), the very department of Cisco which dealt with Mosaic regarding technical developments and business discussions during the parties' interactions.

Cisco's Role

67.    Mr. Bechtolsheim's position at Cisco involved business activities working with other companies on technological developments, such as SRAM chips. Mr. Bectholsheim was an executive, and through his management duties, an authorized agent of Cisco. Mr. Bechtolsheim had the apparent and/or actual authority to engage in business discussions with Mosaic.

68.    As an agent of Cisco, Mr. Bechtolsheim's involvement in Mosaic and the duties imposed thereunder were foreseeable and known to Cisco. Further, Plaintiff is informed and believes, and on that basis alleges, that Cisco had knowledge of and participated in Mr. Bechtolsheim's interaction with Mosaic. Defendant also directed or assisted in Mr. Bechtolsheim's activities. As a result, Cisco reaped benefits from Mr. Bechtolsheim's actions.

Mr. Bechtolsheim's Actions

69.    As a Mosaic board member, Mr. Bechtolsheim made specific representations, as follows:

  A.  Cisco's obligations of confidentiality (by signing the NDA);

  B.  Cisco's business need for particular types of SRAM within the Gigabit SBU;

  C.  Cisco's technical requirements within the Gigabit SBU;

  D.  Cisco's projected needs for SRAM within the Gigabit SBU;

  E.  The fact that no other competitor could match the speed offered by Mosaic;

F.  The specific steps (such as creation of a test chip) that would be required of Mosaic for Cisco to work with Mosaic;

G.  Promises to facilitate an acquisition of Mosaic by Cisco; and

H.  Representations to potential and actual investors in Mosaic about Cisco's interest in Mosaic and its technology.

70.    Mr. Bechtolsheim directed Mosaic to engage in discussions with third-party manufacturers, including Taiwan Semiconductor Manufacturing Company ("TSMC") from which Cisco would purchase the manufactured CSRAM product.

71.    Mr. Bechtolsheim mandated that Mosaic demonstrate to Cisco the feasibility of the CSRAM product.

72.    By making the above representations and exercising his power as a director of Mosaic, Mr. Bechtolsheim directed Mosaic to do business only with Cisco, and he signed the NDA on behalf of Cisco, which initiated the confidential disclosure of information between Plaintiff and Defendant.

Benefits to Cisco

73.    Mosaic's time, money, and energy was devoted to the CSRAM project, a custom project that could not be used with any other companies (Cisco's competitors) by nature of the custom design.  Mosaic employees worked directly with Mr. Bechtolsheim to aid Cisco's design. Several Cisco employees worked with Mosaic at the direction of Mr. Bechtolsheim.  Mosaic employees worked with Cisco at the direction of Mr. Bechtolsheim.

74.    Mosaic was successful in demonstrating feasibility of a high-speed, low power SRAM chip.  Mosaic was the only company that could demonstrate feasibility in silicon prior to Cisco's decision to obtain bids from third parties.  By virtue of this feasability test, Cisco knew that

it could obtain a production version of SRAM chips rather than risking experimentation on its own in an area in which it did not have expertise.

75.    Further, Cisco was in a position to understand and have knowledge of Mosaic's financial position and technical advancements, and to direct the operations of Mosaic to its benefit.

76.    Finally, Cisco was able to learn about the costs, die size, production yields and other details that allowed it to effectively negotiate with other companies who might make contrary claims about such design details.

<u>Effect on Mosaic</u>

77.    Cisco's business negotiations granted Cisco access to Mosaic and its Trade Secrets and Other Information, insight which other companies did not have.  Cisco had access to Mosaic's financial and funding information and thus was aware of Mosaic's negotiating leverage with other parties.

78.    Mosaic was also beholden to Cisco through the direction of Mr. Bechtolsheim, Mosaic's director.  Mr. Bechtolsheim made representations about Cisco purchasing, volumes, and needs, affecting Mosaic's business decision-making.  Mr. Bechtolsheim even reviewed and offered Cisco's perspective on Mosaic's non-recurring engineering and cost budgets provided to Cisco per agreement.  Mosaic would have pursued projects with other companies if not for Cisco's and Mr. Bechtolsheim's assurances.  This put it at a significant disadvantage in negotiations.

79.    The actions by Mr. Bechtolsheim and the benefits conferred on Cisco put Mosaic in an unequal and disadvantaged bargaining position with Cisco.  Furthermore, Mr. Bechtolsheim's role as head of the Gigabit SBU caused Mosaic to trust Cisco in its dealings at a level that is higher than would be expected in an arm's length transaction.  Because Mr. Bechtolsheim was in a position to direct Mosaic and because Cisco obtained undue leverage in the negotiation process, Cisco did not

engage in business dealings with Mosaic at an arm's length, but instead formed a special relationship of trust with Mosaic.

80.    By virtue of its special relationship of trust with Plaintiff, Defendant had a fiduciary duty to preserve, improve, and protect the long-term viability and interests of Plaintiff, a duty upon which Plaintiff justifiably relied.

<u>Cisco's Breach of Duty</u>

81.    By virtue of the above facts, the relationship between Cisco and Mosaic was not a simple "arm's length" transaction, but instead was a relationship of trust for multiple independent reasons.

82.    Defendant knew that Plaintiff reasonably relied upon the relationship of trust that had developed between Cisco and Mosaic; Defendant knew that this reliance by Plaintiff would cause great damage to Plaintiff's business if Defendant failed to remunerate Mosaic.

83.    Defendant breached the fiduciary duty and trust by failing to compensate Mosaic for its work on the joint development of SRAM technology and by failing to keep the Trade Secrets and Other Information of Mosaic confidential.  Cisco breached its fiduciary duty, failed to protect the interests of Mosaic, and deprived Mosaic of the compensation it rightly deserved.  Cisco knew and inequitably profited from its breaches of fiduciary duty under the doctrines of:

1.    Breach of duty directly with respect to a special relationship (as opposed to an arms length negotiation);

2.    Breach of duty by participating in and/or profiting from the breach of duty of its agent; and/or,

3.    Breach of duty/Unfair Competition by interfering in the duties owed by Mr. Bechtolsheim to Mosaic.

84.     The substantial expenditures made by Plaintiff based on Defendant's misrepresentations and breach of duty have cost Plaintiff irreparable harm and that expenditure is the proximate cause of damages to Plaintiff.

85.     Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

86.     Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
(Aiding and Abetting a Breach of Fiduciary Duty)

87.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 86 above, as if set forth at length here.

88.     By virtue of his position on Mosaic's Board of Directors, Mr. Bechtolsheim had a fiduciary duty to Mosaic to preserve, improve, and protect Mosaic's viability and interests, a duty upon which Plaintiff justifiably relied.  Cisco was aware of Mr. Bechtolsheim's position on Mosaic's Board of Directors and therefore knew that Mr. Bechtolsheim owed Mosaic a fiduciary duty.

89.     Plaintiff is informed and believes and on that basis alleges that Mr. Bechtolsheim breached his fiduciary duty to Mosaic in each of the ways described herein.  Plaintiff is further informed and believes and on that basis alleges that Cisco had full knowledge of each of Mr. Bechtolsheim's breaches of his fiduciary duty to Mosaic and that, furthermore, Cisco chose to aid and abet Mr. Bechtolsheim in each of his breaches of fiduciary duty.

90.     Cisco received substantial benefit from its decision to aid and abet Mr. Bechtolsheim in his breaches of his fiduciary duty to Mosaic.  For example, in reliance on Mr. Bechtolsheim and Cisco's misrepresentations that a deal and remuneration strategy was or soon would be reached, Mosaic successfully demonstrated to Cisco the feasibility of a high-speed, low power SRAM chip.

By virtue of this feasability test, Cisco knew it could obtain a production version of SRAM chips rather than risk experimentation on its own in an area in which it did not have expertise. Cisco was further able to learn about the costs, die size, production yields and other details of SRAM chips which allowed it to effectively negotiate with other companies who might make contrary claims about such design details.

91.    Specifically, Mr. Bechtolsheim breached his duty to Mosaic, and Cisco substantially assisted, aided, abetted, and/or encouraged said breach, in each of the following ways:

A. Mr. Bechtolsheim breached his fiduciary duty to Mosaic by making repeated misrepresentations to Mosaic in the form of assurances that Mosaic was vital to Cisco's interests and that Mosaic could rely on that fact. As Mosaic later discovered, such representations and assurances were untrue, and furthermore, Mr. Bechtolsheim did not have the authority within Cisco to make them. Cisco substantially assisted these misrepresentations to Mosaic by purposefully making corroborating and supporting misrepresentations and assurances as to Mosaic's importance to Cisco and that a deal and remuneration strategy was or soon would be worked out. These misrepresentations strengthened Mosaic's reliance on Mr. Bechtolsheim's similar claims, causing Plaintiff to entrust its most vital Trade Secrets and Other Information as well as engineering expertise with Defendant. Cisco further assisted Mr. Bechtolsheim's breach by purposefully letting Mosaic operate under the impression that Mr. Bechtolsheim had authority within Cisco to personally carry out the claims he was making. Only after Cisco had received the full benefit of Mosaic's Trade Secrets and Other Information, and utilized them to obtain bids from Mosaic competitors, did Cisco inform Mosaic that Mr. Bechtolsheim did not have the authority within Cisco to make good on the assurances he was making to Mosaic. Cisco further assisted Mr. Bechtolsheim's breach by failing to correct Mr. Bechtolsheim's misrepresentations and purposefully allowing Mosaic to operate under false impressions.

B.  Mr. Bechtolsheim further breached his fiduciary duty to Mosaic by directing Mosaic to pursue the development of SRAM only with Cisco, to the exclusion of other potential business partners.  Cisco encouraged and/or directed Mr. Bechtolsheim to make this directive.

C.  Mr. Bechtolsheim further breached his fiduciary duty to Mosaic by directly providing Cisco with confidential Mosaic Trade Secrets and Other Information with full knowledge that Cisco was utilizing this information to aid in reaching supplier agreements with Mosaic's competitors.  Cisco encouraged this breach by actively requesting that Mr. Bechtolsheim provide it with said Trade Secrets and Other Information.

D.  Mr. Bechtolsheim further breached his fiduciary duty to Mosaic by providing Cisco with Mosaic Trade Secrets and Other Information for purposes other than those stipulated by the Non-Disclosure Agreement ("NDA").  Cisco encouraged this breach by actively requesting that Mr. Bechtolsheim do so.  Furthermore, Mr. Bechtolsheim signed the NDA on behalf of Cisco, and Cisco failed to follow it.

E.  Mr. Bechtolsheim further breached his fiduciary duty to Mosaic by falsely promising an acquisition offer by Cisco to Mosaic.  Cisco substantially assisted this false promise by making similar and corroborating misrepresentations, and by purposefully allowing Mosaic to operate under the belief that Mr. Bechtolsheim had the authority within Cisco to implement such a promise.

F.  Mr. Bechtolsheim further breached his fiduciary duty by misrepresenting to Mosaic that he had the requisite authority and influence within Cisco to drive a final deal through Cisco.  Cisco substantially assisted this misrepresentation by purposefully allowing Mosaic to operate under the belief that it was true.

G.  Mr. Bechtolsheim further breached his fiduciary duty to Mosaic by failing to recognize his fundamental conflict of interest and to disengage from any activities with respect to the

**Third Amended Complaint**                    21                    Case No. 1-04 CV016867

two parties' interaction.  Cisco substantially assisted and encouraged  this by allowing Mr.

Bechtolsheim to continue to serve on Mosaic's Board of Directors throughout the parties' CSRAM

venture as well as by allowing Mr. Bechtolsheim to sign the NDA on Cisco's behalf.

H.  Mr. Bechtolsheim further breached his fiduciary duty generally, by putting his

own and Cisco's interests ahead of Mosaic's.  Cisco encouraged and/or directed Mr. Bechtolsheim to

do so.

I.  Mr. Bechtolsheim further breached his fiduciary duty to Mosaic by misrepresenting

the one hundred dollar ($100) per chip Micron quote in August of 2002.  Cisco encouraged and/or

directed Mr. Bechtolsheim to do so for the purpose of driving down the cost of the CSRAM chip.

92.    The substantial expenditures made by Plaintiff based on Defendant's aiding and

abetting of Mr. Bechtolsheim's multiple breaches of duty have caused Plaintiff irreparable harm and

that expenditure is the proximate cause of damages to Plaintiff.

93.    Defendant has willfully acted in a manner that has permanently and irreparably

harmed Plaintiff.

94.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be

determined at trial.

### SEVENTH CAUSE OF ACTION [2]
(Declaratory Relief Regarding Joint Venture and Accounting)

95.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1

through 94 above, as if set forth at length here.

---

[2]Plaintiff acknowledges that the Court has sustained Cisco's demurrer to the joint venture causes of action.  Plaintiff retains the joint venture causes of action in this Complaint only for the purpose of preserving them for appeal.

**Third Amended Complaint**                    22                    Case No. 1-04 CV016867

96.     A dispute has arisen between the parties as to the rights and responsibilities of each party. Plaintiff is entitled to a declaratory judgment of Defendant's former and continued breach of the joint venture and its duty in that joint venture to Plaintiff, including an accounting, without prejudice to any other remedy, provisional or otherwise, provided by law for the benefit of Plaintiff, in accordance with Section 1062 of the California Code of Civil Procedure.

## EIGHTH CAUSE OF ACTION [2]
### (Breach of Duty in a Joint Venture)

97.     Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 88 above, as if set forth at length here.

98.     Beginning in or about March 2001, Plaintiff and Defendant engaged in a series of written and oral communications as well as meetings regarding the development a DDR3 chip. In May 2001, the parties entered into the NDA to govern disclosure of confidential and proprietary information. Mosaic worked with Cisco to prove feasibility and to design and develop this chip until on or about June 28, 2002, when Cisco notified Mosaic that it did not intend to use DDR3 chips.

99.     Soon after the termination of the DDR3 project, the parties engaged in additional written and oral communications, and additional meetings to begin joint development of a high speed SRAM chip. The NDA continued to govern disclosure of confidential and proprietary information. It was understood by both Plaintiff and Defendant that the CSRAM project was a joint development.

100.     Plaintiff and Defendant designed and developed the CSRAM specification as a joint venture by which Plaintiff expected to receive some of the benefit, either by acquisition or royalty. Under the NDA Mosaic was convinced that it could trust and rely on Cisco, as Cisco had claimed it could be relied upon.

---

101.    Indicia of the Joint Venture were:

A.  Joint development of the CSRAM specification, including frequent visits to Cisco by Mosaic personnel;

B.  Joint discussions by Cisco and Mosaic to TSMC to discuss how TSMC would manufacture Mosaic's design and deliver chips to Cisco;

C.  Feasibility demonstrations by Mosaic to Cisco;

D.  Cisco assisted Mosaic with the recruitment of new engineers;

E.  Due diligence conducted by Cisco in preparation for an acquisition;

F.  The December 5 meeting, in which Cisco agreed to exclusivity with Mosaic, agreed to pay Mosaic for each chip used by Cisco;

G.  Meetings between Cisco and Micron and Cypress with respect to acquisition of Mosaic;

H.  Representations by Cisco employees to third parties that Mosaic developed more than half of the CSRAM specification; and

I.  TSMC's investment (by an affiliate) in Mosaic which included a board observer position.

102.    Based on the trust in the joint venture, Mosaic exchanged daily emails with Cisco, emails that contained trade secrets, confidential and proprietary information on CSRAM architecture and design.  Defendant was to complete the design of the product in exchange for a portion of the revenues from the CSRAM chip.

103.    Mosaic never received benefits or compensation from this joint venture with Cisco, despite providing Cisco with confidential and proprietary CSRAM architecture and design information.

104.    The substantial expenditures made by Plaintiff based on Defendant's misrepresentations and breach of this joint venture have cost Plaintiff irreparable harm and that expenditure is the proximate cause of damages to Plaintiff.

105.    Defendant has acted in breach of that duty by willfully acting in a manner that has permanently and irreparably harmed Plaintiff.

106.    Plaintiff is entitled to damages for the wrongdoing of Defendant, in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
(Breach of Covenant of Good Faith and Fair Dealing)

107.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 106 above, as if set forth at length here.

108.    Given the relationship between Defendant and Plaintiff, Defendant had an implied obligation and duty, under California law, to act in good faith and deal fairly with Plaintiff.

109.    By its dishonesty and negligent behavior alleged herein, Defendant has breached this implied covenant of good faith and fair dealing.

110.    In committing the above actions, including but not limited to failing to disclose competitive bidding with third-parties; distribution of Plaintiff's Trade Secrets and Other Information to third-parties; making multiple promises and false promises; and otherwise failing to act fairly, Defendant has acted in bad faith and in a manner designed to cause Plaintiff to rely to its detriment. These actions breached the covenant of good faith and fair dealing.

111.    As a direct and proximate result of Defendant's misconduct, Plaintiff has been damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
(Breach of Oral Agreement)

112.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 111 above, as if set forth at length here.

113.    In or about late 2002, the parties entered into re-negotiations following Cisco's original failed promise to provide financial remuneration to Mosaic for its work on the CSRAM project and Mosaic's continued reliance on that promise while it continued its work, design, and development of the CSRAM chip.

114.    On or about December 5, 2002, the parties entered into an oral agreement following the negotiations.  Mr. Cafiero, a Cisco executive, and Tony Moroyan of Mosaic agreed to the following material terms for the oral agreement (the "Oral Agreement"):

      a.    Plaintiff was to complete engineering of a CSRAM chip that met all of the requirements set forth in the CSRAM specification.

      b.    As compensation for Mosaic's designing and engineering services for the Chip and providing the design to Cisco for manufacture, Cisco would:

          (1) Grant exclusivity to Mosaic for all sales of CSRAM by Cisco;

          (2) Pay a royalty to Mosaic equal to fifty percent (50%) of the material cost of the final packaged product and tested CSRAM; and,

          (3) Pay actual non-recurring engineering costs of at least five to six (5-6) million dollars to Mosaic, costs which were agreed not to exceed fifty (50) million dollars, representing the costs of the chip engineering and development time and materials.

Attached hereto as Exhibit 2 is a true and correct copy of the December 5, 2002 notes of Mr. Moroyan, which record the foregoing terms of the Oral Agreement.

115.    The Oral Agreement was silent as to its duration, but the chip could have been engineered and Mosaic could have received exclusivity, royalty payments, and actual non-recurring engineering costs within one year of the parties entering into the Oral Agreement on December 5, 2002. Plaintiff performed on all of its obligations possible under the Oral Agreement prior to December 5, 2003.

116.    Cisco breached the Oral Agreement by not providing actual non-recurring engineering costs, exclusivity and/or royalty payments to Mosaic as promised.

117.    Defendant's breach of contract is the proximate cause of damage to Plaintiff. Plaintiff is entitled to damages for breach of contract in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
(Promissory Estoppel)

118.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 117 above, as if set forth at length here.

119.    Between June 2002 and January 2003, Defendant made numerous assurances, indications, and pledges to Plaintiff, namely that: Defendant Cisco was to provide financial remuneration to Plaintiff for assisting Cisco in designing a specification for CSRAM and in designing and engineering the chip per Cisco's customized needs and requests. This would be achieved through purchases by Cisco in the form of commercial agreements, non-recurring engineering costs paid by Cisco to Mosaic, investment in Mosaic by Cisco, or acquisition of Mosaic by Cisco.

120.    Plaintiff reasonably relied on these promises, and as a result expended a great deal of time and monetary funds on Defendant's behalf. Such time and money included advising Cisco in the design of the CSRAM specification, advising Cisco in the architecture and engineering of the

CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's inquiries regarding the specific proprietary design details needed to bring the chip to production.

121.    Plaintiff's reasonable reliance on said promises was to its detriment, and it would be unjust to allow Defendant to avoid the obligations of its promises after Plaintiff so relied.

122.    Plaintiff has been damaged by its reliance, and is entitled to compensatory damages in an amount to be determined at trial.

### TWELFTH CAUSE OF ACTION
(Quantum Meruit)

123.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 122 above, as if set forth at length here.

124.    From July 2002 through January 2003, Mosaic provided services at the express request of Cisco.  These services included advising Cisco in the design of the CSRAM specification, advising Cisco in the architecture and engineering of the CSRAM chip, developing and engineering the CSRAM chip, and responding to Cisco's inquiries regarding the specific proprietary design details needed to bring the chip to production.

125.    Cisco did not pay for those services, and it would be inequitable and unjust for such services to be provided without any payment.

126.    The reasonable value of such services is a sum to be proven at trial.

### THIRTEENTH CAUSE OF ACTION
(Negligent Misrepresentation)

127.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 126 above, as if set forth at length here.

128.    Defendant made several representations to Plaintiff that Defendant Cisco was to provide financial remuneration to Plaintiff.  This would be achieved in one of several ways, such as purchases by Cisco in the form of commercial agreements, non-recurring engineering agreements between Plaintiff and Cisco, investment by Cisco, or acquisition by Cisco.  For example, Luca Cafiero told officers of Mosaic on December 5, 2002 that Cisco would provide Mosaic with more than $5-6 million to complete the development of the CSRAM chip, and that Mosaic would receive exclusivity for the CSRAM chip business at Cisco.  Prior to Christmas 2002, Richard Ellis expressly told officers of Mosaic that "if it wasn't for Christmas break, Mosaic and Cisco would reach an agreement within a few days" or words to that effect.

129.    Said representations were in fact false.  Cisco did not provide financial remuneration to Plaintiff.

130.    At the time said statements were made, Defendant knew or had reason to know that they were false.  These statements were negligently false, for at the time said promises were made, Defendant did not intend to perform on such promises.

131.    Defendant negligently intended that Plaintiff rely on its statements and promises, and Plaintiff did reasonably rely on such statements and promises to its detriment.

132.    Defendant's negligent misrepresentations have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover damages in an amount to be determined at trial.

133.    Defendant's negligent actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

134.    Defendant's misrepresentations, coupled with Defendant's fiduciary duty, also constitute constructive fraud.

1

## FOURTEENTH CAUSE OF ACTION
(Constructive Fraud)

135.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 134 above, as if set forth at length here.

136.    As discussed above in Paragraphs 87 through 94, Mr. Bechtolsheim had a fiduciary duty to Mosaic to preserve, improve, and protect Mosaic's viability and interests, a duty upon which Mosaic justifiably relied. Mr. Bechtolsheim breached his fiduciary duty to Mosaic in numerous ways; Cisco had full knowledge of and, moreover, aided and abetted Mr. Bechtolsheim in each of these breaches.

137.    Defendant and Mr. Bechtolsheim made several representations to Plaintiff that Cisco was to provide financial remuneration to Plaintiff. Such representations and inducements were made all in effort to induce Mosaic to continue to trust Cisco, and to continue providing Cisco with Mosaic Trade Secrets and Other Information as well as its engineering expertise. Cisco and Mr. Bechtolsheim made assurances that Mosaic would receive purchases by Cisco in the form of a commercial agreement, a non-recurring engineering fee, investment by Cisco in Mosaic, or acquisition of Mosaic by Cisco. One such remuneration representation was made by Luca Cafiero, who informed officers of Mosaic on or about December 5, 2002 that Cisco would provide Plaintiff Mosaic with exclusivity for the CSRAM chip, payment of a fifty percent (50%) royalty of the material cost of the final packaged product and tested CSRAM, and actual non-recurring engineering costs of at least five to six (5-6) million dollars (not to exceed $50 million). Also, before Christmas 2002, Richard Ellis expressly told officers of Mosaic that "if it wasn't for Christmas break, Mosaic and Cisco would reach an agreement within a few days" or words to that effect.

138.    Said representations were in fact false.  Cisco did not provide financial remuneration to Plaintiff.

139.    Additionally, Defendant failed to disclose that Cisco was in fact soliciting proposals from companies that would compete with Cisco.  Defendant further failed to disclose that it had not made any plans to provide financial remuneration to Plaintiff.

140.    Reasonably relying on the false representations made by Defendant and Mr. Bechtolsheim, Mosaic advised Cisco in the design of the CSRAM specification, advised Cisco in the architecture and engineering of the CSRAM chip, aided in the development and engineering in the CSRAM chip, and responded to Cisco's repeated inquiries regarding the specific proprietary design details needed to bring the chip to production.

141.    Cisco's decision to aid and abet Mr. Bechtolsheim in his multiple breaches of his fiduciary duty to Mosaic constitutes constructive fraud on Plaintiff by Defendant.

142.    Defendant's actions have proximately caused damage to Plaintiff, and Plaintiff is entitled to recover such damages in an amount to be determined at trial.

143.    Defendant's actions were malicious and oppressive, and Plaintiff is entitled to punitive damages in an amount to be determined at trial.

**FIFTEENTH CAUSE OF ACTION**
(Statutory Unfair Competition)

144.    Plaintiff incorporates by reference each and every allegation set forth in Paragraphs 1 through 143 above, as if set forth at length here.

145.    Defendant's acts described above, including but not limited to its continued receipt and use of trade secrets, its aiding and abetting breaches of fiduciary duties, its continued use and distribution of Plaintiff's work product as if it were its own, and its unfulfilled false promises, were

designed to and constitute unfair competition by Defendant in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

146.    Defendant's unfair and unlawful actions have caused extensive damage to Plaintiff. By its actions, Defendant has effectively kept Plaintiff from competing in the marketplace.

147.    As a direct and proximate cause of Defendant's unfair practices, Defendant has been unjustly enriched and Plaintiff has provided value to Defendant, which must be repaid in restitution in an amount to be proven at trial.

148.    Plaintiff has also suffered irreparable harm as a result of Defendant's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendant, and any of its officers, agents and employees, and all persons acting in concert with them, are enjoined from engaging in any further such acts of unfair competition.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendant, jointly and severally, as follows:

A.    On the First Cause of Action, for damages in an amount to be determined at trial;

B.    On the Second Cause of Action, for a declaration that Plaintiff owns the Trade Secrets and Other Information provided to Defendant;

C.    On the Third Cause of Action, for damages in an amount to be determined at trial;

D.    On the Second and Third Causes of Action, for an injunction against the further use or disclosure of Plaintiff Mosaic's trade secrets, and an Order that Defendant return all of Plaintiff's Trade Secrets and Other Information;

E.    On the Third Cause of Action, for punitive damages in an amount to be determined at trial;

F.      On the Fourth Cause of Action, for a declaration that Defendant has owed and owes a fiduciary duty to Plaintiff;[3]

G.      On the Fifth Cause of Action, for damages and punitive damages in an amount to be determined at trial;[3]

H.      On the Sixth Cause of Action for damages in an amount to be determined at trial;

I.      On the Sixth Cause of Action, for punitive damages in an amount to be determined at trial;

J.      On the Seventh Cause of Action, for declaratory relief that a joint venture existed and for an accounting;[4]

K.      On the Eighth Cause of Action, for damages and punitive damages in an amount to be determined at trial;[4]

L.      On the Ninth Cause of Action, for damages in an amount to be determined at trial;

M.      On the Tenth Cause of Action, for damages in an amount to be determined at trial;

N.      On the Eleventh Cause of Action, for damages in an amount to be determined at trial;

O.      On the Twelfth Cause of Action, for damages in an amount to be determined at trial;

P.      On the Thirteenth Cause of Action, for damages in an amount to be determined

---

[3]Plaintiff acknowledges that the Court has sustained a demurrer based on the pleadings that the relationship between Mosaic and Cisco was not fiduciary in nature. Plaintiff retains the Fourth and Fifth Causes of Action in this Complaint only for the purpose of preserving them for appeal as well as for the alleging of background facts. Pursuant to the Court's Order of May 23, 2005, Plaintiff introduces a Sixth Cause of Action for aiding and abetting a breach of fiduciary duty.

[4]Plaintiff acknowledges that the Court has sustained Cisco's demurrer to the joint venture causes of action. Plaintiff retains the joint venture causes of action in this Complaint only for the purpose of preserving them for appeal.

at trial;

Q.     On the Fourteenth Cause of Action, for damages in an amount to be determined at trial;

R.     On the Thirteenth and Fourteenth Causes of Action, for punitive damages in an amount to be determined at trial;

S.     On the Fifteenth Cause of Action, for restitution in an amount to be determined at trial;

T.     On the Fifteenth Cause of Action, for an injunction against further unfair trade practices;

U.     For an injunction barring the use of Plaintiff's Trade Secrets and Other Information of Plaintiff;

V.     For reasonable attorney's fees, as authorized by law; and,

W.     For such other and further relief as the Court deems just and proper.

Dated: June 7, 2005                              Respectfully submitted,
                                                 RUSSO & HALE LLP


                                                 By: _____
                                                     Jack Russo
                                                     Michael Risch

                                                 Attorneys for Plaintiff
                                                 MOSAIC SYSTEMS, INC.

# EXHIBIT 1

Mutual Non Disclosure Agreement                                    Page 1 of 3



# CISCO SYSTEMS, INC. MUTUAL NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement ("Agreement") is entered into on the day of    /2001 ("Effective Date") between Cisco Systems, Inc. a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134-1706 (and its direct and indirect w holly owned subsidiaries), ("Cisco") and Mosaic Systems, Inc, a California corporation having its principal place of business at 1133 Auburn Street, Fremont, CA, USA, 94538.

In consideration of the mutual promises and covenants contained in this Agreement and the disclosure of confidential information to each other, the parties to this Agreement agree as follows:

1. **DEFINITION.** "Confidential Information" means the terms and conditions of this Agreement, the existence of the discussions between the parties, the information described in Section 2 below, and any other information concerning the Purpose defined below, including but not limited to, information regarding each party's product plans, product designs, product costs, product prices, finances, marketing plans, business opportunities, personnel, research and development activities, know-how and pre-release products; provided that information disclosed by the disclosing party ("Disclosing Party") in written or other tangible form will be    nsidered Confidential Information by the receiving party ("Receiving Party") only if such information is co.   icuously designated as "Confidential," "Proprietary" or a similar legend. Information disclosed orally shall only be considered Confidential Information if: (i) identified as confidential, proprietary or the like at the time of disclosure, and (ii) confirmed in writing within thirty (30) days of disclosure. Confidential Information disclosed to the Receiving Party by any affiliate or agent of the Disclosing Party is subject to this Agreement.

2. **DESCRIPTION.** The Confidential Information to be disclosed under this Agreement is described as follows:

| | |
|---|---|
| Cisco: | Requirements for high-speed SRAMs |
| Mosaic Systems, Inc: | Product specifications, business plans, and product roadmap for high-speed SRAMs |

3. **PURPOSE.** The Receiving Party may use the Confidential Information solely for the purpose of ("Purpose"):

| | |
|---|---|
| Cisco: | For evaluating potential business relationship |
| Mosaic Systems, Inc: | For evaluating potential business relationship |

4. **DISCLOSURE.** The Receiving Party shall not disclose the Confidential Information to any third party the    an employees and contractors of the Receiving Party who have a need to have access to and nowledge of the Confidential Information solely for the Purpose authorized above. The Receiving Party

**EXHIBIT__|__**

Mutual Non Disclosure Agreement

shall have entered into non-disclosure agreements with such employees and contractors having obligations of confidentiality as strict as those herein prior to disclosure to such employees and contractors to assure against unauthorized use or disclosure.

**5. EXCEPTIONS TO CONFIDENTIAL INFORMATION.** The Receiving Party shall have no obligation with respect to information which (i) was rightfully in possession of or known to the Receiving Party without any obligation of confidentiality prior to receiving it from the Disclosing Party; (ii) is, or subsequently becomes, legally and publicly available without breach of this Agreement; (iii) is rightfully obtained by the Receiving Party from a source other than the Disclosing Party without any obligation of confidentiality; (iv) is developed by or for the Receiving Party without use of the Confidential Information and such independent development can be shown by documentary evidence; and (v) is transmitted by a party after receiving written notification from the other party that it does not desire to receive any further Confidential Information. Further, the Receiving Party may disclose Confidential Information pursuant to a valid order issued by a court or government agency, provided that the Receiving Party provides the Disclosing Party: (a) prior written notice of such obligation; and (b) the opportunity to oppose such disclosure or obtain a protective order.

**6. RETURN OR DESTRUCTION OF CONFIDENTIAL INFORMATION.** Upon written request by the Disclosing Party, the Receiving Party shall: (i) cease using the Confidential Information, (ii) return the Confidential Information and all copies, notes or extracts thereof to the Disclosing Party within seven (7) business days of receipt of request; and (iii) upon request of the Disclosing Party, confirm in writing that the Receiving Party has complied with the obligations set forth in this paragraph.

**7. INDEPENDENT DEVELOPMENT** The Disclosing Party acknowledges that the Receiving Party may currently or in the future be developing information internally, or receiving information from other parties, that is similar to the Confidential Information. Nothing in this Agreement will prohibit the Receiving Party from developing or having developed for it products, concepts, systems or techniques that are similar to or compete with the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information provided that the Receiving Party does not violate any of its obligations under this Agreement in connection with such development. Neither party shall have any obligation to limit or restrict the assignment of its employees or consultants as a result of their having had access to Confidential Information. Further, subject to any copyrights, mask work rights or patent rights, the parties agree that as a result of exposure to Confidential Information of the Disclosing Party, employees of the Receiving Party may gain or enhance general knowledge, skills and experience (including ideas, concepts, know-how and techniques) related to Receiving Party's business ("General Knowledge"). The subsequent use by these employees of such General Knowledge as retained in their unaided memories, without reference to Confidential Information in written, electronic or other fixed form, shall not constitute a breach of this Agreement. Neither party shall have any obligation to limit or restrict the assignment of persons or to pay royalties for any work resulting from the use of such General Knowledge.

**8. NO LICENSES.** Each party shall retain all right, title and interest to such party's Confidential Information. No license under any trademark, patent or copyright, or application for same which are now or hereafter may be obtained by such party is either granted or implied by the disclosure of Confidential Information.

**9. DISCLAIMER.** CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITH ALL FAULTS. IN NO EVENT SHALL THE DISCLOSING PARTY BE LIABLE FOR THE ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION.

Mutual Non Disclosure Agreement                                         Page 3 of 3

None of the Confidential Information disclosed by the parties constitutes any representation, warranty, assurance, guarantee or inducement by either party to the other with respect to the infringement of trademarks, patents, copyrights, any right of privacy, or any rights of third persons.

**10. EXPORT.** The parties acknowledge that the Confidential Information disclosed by each of them under this Agreement may be subject to export controls under the laws of the United States. Each party shall comply with such laws and agrees not to knowingly export, re-export or transfer Confidential Information of the other party without first obtaining all required United States authorizations or licenses.

**11. TERM.** This Agreement shall continue from the "Effective Date" written above until terminated by either party by giving thirty (30) days written notice to the other party of its intent to terminate this Agreement. Notwithstanding such termination, the obligations of the Receiving Party concerning confidentiality shall terminate five (5) years following receipt of the Confidential Information.

**12. GENERAL.** Each party acknowledges that monetary remedies may be inadequate to protect Confidential Information and that injunctive relief may be appropriate to protect such Confidential Information.

The Receiving Party shall not reverse-engineer, decompile, or disassemble any software disclosed to it under this Agreement and shall not remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from any originals or copies of Confidential Information it obtains from the Disclosing Party.

..._ parties hereto are independent contractors. Neither this Agreement nor any right granted hereunder shall be assignable or otherwise transferable.

If any term of this Agreement shall be held to be illegal or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect.

This Agreement may only be modified in writing and must be signed by both parties.

This Agreement shall be construed in accordance with the laws of the State of California.

This Agreement represents the entire agreement of the parties hereto pertaining to the subject matter of this Agreement, and supersedes any and all prior oral discussions and/or written correspondence or agreements between the parties with respect thereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date last written below.

CISCO SYSTEMS, INC.                         Mosaic Systems, Inc

By:                                         By:

Name: Andy Bechtolsheim                     Name: Alex Alexanian

Title: VP/GM                                Title: President and CEO

Date:  5/2/01                               Date:  05/02/2001

EXHIBIT 2

**EXHIBIT 2**

*Important*
*Archive*

PV.
Dec 5, 2002

CISCO & MOSAIC SR. MANAGEMENT MEETING.

Objective

Final meeting to bless the acquisition of MOSAIC
by CISCO so that the M&A documents can
proceed thru Draft & finalization

Meeting Attendees

CISCO: Luca Cafiero
        Charles Giancarlo
        John McCool
        Dae Lee

MOSAIC: TONY MOROYAN
        RICH ROY
        Sarkis Narkizian

Meeting Minutes:

- finally Mr. Cafiero joined us.
- Mr. Cafiero very clear & direct & in charge.
- Interruption - Got a Tel. call - Mr. Giancarlo
  informed Mr. Cafiero
- Back to the meeting
- Mr. Cafiero: Questions about MOSAIC
    • brief history & what it does & strategy
    • interaction w/ and on CISCO project & SPAN
    • Ownership of Mosaic

**EXHIBIT 2**



- Andey's involvement & ownership (a smile!) P2/
- amount of investment MOSAIC has received
- ~~Design Method - ASIC~~ 2 custom.

— Mr. Cafiero stated that:

CISCO will not acquire MOSAIC.

CISCO would not know what to do with SRAM Company or Team - (Uncertain?) bring to production!

CISCO had bad experience in the past!

— Mr. Cafiero - complimentary about MOSAIC's capability & Technology — No sign of concern that MOSAI can do CSRAM.

— Mr. Cafiero's "deal" to MOSAIC:

1 - CISCO will grant Exclusivity to MOSAIC for all the supply of CSRAM to CISCO

2 - CISCO will pay - Royalty ≈ 50% of material cost of final packaged product & tested CSRAM (TSMC calculation) CISCO will directly interact w/ TSMC

3 - CISCO will pay $5-6 M NRE.

— TW — (this was based on M&A model to complete the product by MOSAIC under CISCO), MOSAIC was going to utilize back end capabilities of CISCO.

P3/

— Mr. Cafiero — "O.K." cisco can pay more but "don't come back with $50M."

— Mr. Cafiero — "take the deal" this is "the best deal." Mr. Cafiero stated this is very valuable for MOSAIC — In the future — M & A by SC company !.

— Dae Lee — Jumped from his seat and tried to bring Mr. Cafiero's attention to a document. Mr. Cafiero said he knows.

— John McCool reefed concerning the NRE etc. ~ ~ He did not — R — budget !

— Mr. Cafiere "I will give you the money".

— TM is concerns about time it will take to conclude this accepted deal !

— Cafiero — John McCool & GianCarlo will do it next few weeks & complete by February.

— Giancarlo moved for deal — acceptance !

— Shook hands _____ it's a deal !